UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEOFFREY VARGA and MARK LONGBOTTOM, as Joint Official Liquidators of Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MCGRAW HILL FINANCIAL, INC. (f/k/a THE MCGRAW-HILL COMPANIES, INC. and d/b/a STANDARD & POOR'S RATING SERVICES), STANDARD & POOR'S FINANCIAL SERVICES LLC, MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., MOODY'S INVESTORS SERVICE LIMITED, FITCH GROUP, INC., FITCH RATINGS, INC. (f/k/a FITCH, INC.) and FITCH RATINGS LIMITED,<br><br>    Defendants.<br><br>BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES MASTER FUND, LTD. and BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES ENHANCED LEVERAGE MASTER FUND, LTD.,<br><br>    Nominal Defendants. | Case No.: 13-cv-8743 |

## DEFENDANTS' NOTICE OF REMOVAL

Defendants McGraw Hill Financial, Inc., Standard & Poor's Financial Services LLC, Moody's Corporation, Moody's Investors Service, Inc., Moody's Investors Service Limited, Fitch Group, Inc., Fitch Ratings, Inc. and Fitch Ratings Limited[1] jointly remove this case to the United States District Court for the Southern District of New York.[2] The Court has jurisdic-

---

[1] Defendant Fitch Ratings, Ltd. appears specially solely to join the Defendants' notice of removal, but does not waive and expressly preserves all defenses, including its objection to the court's exercise of personal jurisdiction over it.

[2] A case brought by Plaintiff Varga and arising from the same facts was previously filed in state court, removed to this Court on the basis of federal question jurisdiction, and deemed related to existing cases pending before Judge Hellerstein. *See Varga* v. *Deloitte & Touche, LLP, et al.*, 1:09-cv-4936 (S.D.N.Y.).

tion over this matter pursuant to 28 U.S.C. § 1331. The claims are removable pursuant to 28

U.S.C. §§ 1441 and 1446. This action is removable pursuant to 28 U.S.C. § 1441(a), which al-

lows removal of any action over which a federal district court has original jurisdiction. The

Court has original jurisdiction over this action because it arises "under the Constitution, laws, or

treaties of the United States." 28 U.S.C. § 1331. The bases for removal are set forth below.[3]

## NATURE OF THE FEDERAL QUESTIONS PRESENTED

Defendants are the foremost credit rating agencies – Nationally Recognized Sta-

tistical Rating Organizations ("NRSROs") – in the United States.

In this action, Plaintiffs purport to sue as liquidators of Bear Stearns High-Grade

Structured Credit Strategies (Overseas) Ltd. and Bear Stearns High-Grade Structured Credit

Strategies Enhanced Leverage (Overseas) Ltd. (together, the "Overseas Feeder Funds"). Plain-

tiffs assert a claim for common law fraud on behalf of the Overseas Feeder Funds based on the

Overseas Feeder Funds' investments through the Bear Stearns High-Grade Structured Credit

Strategies Master Fund, Ltd. and the Bear Stearns High-Grade Structured Credit Strategies En-

hanced Leverage Master Fund, Ltd. (together the "Master Funds"). They allege, in essence, that

Defendants yielded to pressure from issuers of securities to assign higher credit ratings than they

otherwise would have, thereby rendering "false" various statements that Defendants have made

over the years about the independence and objectivity of their credit ratings processes. Plaintiffs

alternatively assert their claim for common law fraud derivatively on behalf of the Master Funds,

which are also in liquidation, based on the same allegations against Defendants.

Plaintiffs' claims "necessarily raise a stated federal issue, actually disputed and

substantial, which a federal forum may entertain without disturbing any congressionally ap-

---

[3] Defendants specially appear for the purpose of removal only, and reserve all available defenses, whether
jurisdictional or otherwise.

proved balance of federal and state judicial responsibilities." *Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Manufacturing*, 545 U.S. 308, 314 (2005); *see also D'Alessio* v. *N.Y. Stock Exchange, Inc.*, 258 F.3d 93, 104 (2d Cir. 2001) (a case arises under federal law where state law "claims necessarily require a court to construe . . . federal law").

Defendants' ratings businesses, and in particular their management of potential conflicts of interest, are the subject of a dedicated, comprehensive, and tailored federal regulatory regime, found primarily in the Credit Rating Agency Reform Act of 2006 ("CRARA") and the regulations promulgated thereunder by the United States Securities and Exchange Commission ("SEC"). CRARA includes a variety of requirements related to the independence of the ratings process of NRSROs and delegated to the SEC "exclusive authority to enforce the provisions of this section in accordance with this chapter with respect to any [NRSRO], if such [NRSRO] issues credit ratings in material contravention of those procedures relating to such [NRSRO], including procedures relating to the prevention of misuse of nonpublic information and conflicts of interest." 15 U.S.C. § 78o-7(c)(1) (2006).[4] The issues of federal law raised by the Complaint are myriad.

Plaintiffs allege that "[t]he issuer pays model created a tremendous conflict of interest and undermined the credibility of the ratings structures and surveillance of the CDOs and/or RMBS at issue and their constituent structured finance assets." Compl. ¶ 136. But the SEC has determined that conflicts arising from the "issuer pays" compensation model fall into

---

[4] *See also* 15 U.S.C. § 78o-7(h)(1) ("Each [NRSRO] shall establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of the business of such [NRSROs] and affiliated persons and affiliated companies thereof, to address and manage any conflicts of interest that can arise from such business."); § 78o-7(h)(2) ("The Commission shall issue final rules in accordance with subsection (n) to prohibit, or require the management and disclosure of, any conflicts of interest relating to the issuance of credit ratings by a [NRSRO] … ."); § 78o-7(h)(4)(B)(ii) ("The Commission shall review the code of ethics and conflict of interest policy of each [NRSRO] — (I) not less frequently than annually; and (II) whenever such policies are materially modified or amended.").

the group of permitted conflicts "in the public interest and for the protection of investors," based on the SEC's conclusion that prohibiting them outright could "adversely impact the ability of an NRSRO to operate as a credit rating agency." *Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations*, Exchange Act Release No. 55857, 72 Fed. Reg. 33564, 33595 (June 18, 2007) (adding 17 C.F.R. § 240.17g-5).

Plaintiffs allege that misrepresentations as to independence and objectivity were made by the Defendants in their respective codes of conduct and claim that Defendants failed to meet obligations created by their own policies and procedures. But such policies and procedures are required by federal mandate and are filed with the SEC as part of the NRSRO registration process. *See* Compl. ¶ 67 ("in connection with their respective applications and re-applications for NRSRO recognition, each of the Rating Agencies was required to assure the SEC that it had 'policies and procedures to address and manage conflicts of interest'").

Plaintiffs' Complaint raises questions as to whether state common law may be used to regulate the federally mandated disclosure and examination regime surrounding rating agency conflicts of interest and the manner in which a credit rating agency conducts its analysis of structured finance securities. The Complaint takes issue with, and seeks to enforce, obligations imposed upon NRSROs by CRARA concerning the management and disclosure of potential conflicts of interest. Resolution of such claims will require the resolution of substantial questions of federal law in dispute between the parties.[5] *See D'Alessio*, 258 F.3d at 103 ("[I]t is the propriety of the NYSE's actions, as prescribed under federal law, that is at the heart of D'Alessio's allegations. . . . Thus, resolution of D'Alessio's claims requires a court to construe

---

[5] Defendants do not rely on preemption in their removal of this action. *See* 15 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 103.31(4)(d)(i) (3d ed. 2013) (describing "traditional preemption analysis" as "a matter of substantive constitutional law wholly unrelated to the issue of federal question jurisdiction").

4

federal securities laws and evaluate the scope of the NYSE's duties, as defined under the Exchange Act and the regulations and rules thereto . . . ."). Such questions call for uniform resolution by a federal court. *See Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U.S. 71, 78 (2006) ("The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated.").

Exercise of federal jurisdiction here is entirely "consistent with congressional judgment about the sound division of labor between state and federal courts." *Grable*, 545 U.S. at 313. It would grossly disturb the balance of state and federal judicial power to permit state courts to regulate the conduct of NRSROs on an effectively national basis. Furthermore, there is no risk that the exercise of federal jurisdiction in this case would trigger a flood of other cases moving from state to federal courts.

## PROCEDURAL REQUIREMENTS

### I. TIMELINESS OF REMOVAL

Plaintiffs filed their Summons with Notice in the Supreme Court of the State of New York on July 9, 2013. The case was assigned docket number 652410/2013. On October 31, 2013 and November 1, 2013, Plaintiffs served copies of the Summons with Notice with a Notice of Commencement of Mandatory Electronic Filing on Defendants. Plaintiffs then filed their Complaint on November 11, 2013. Thus, removal is timely because Defendants filed this Notice of Removal within thirty (30) days of their receipt of a copy of the Complaint in this matter. *See* 28 U.S.C. § 1446(b). No proceedings have occurred in the state action, and Defendants have neither waived nor prejudiced their right to remove this action to this Court.

## II.   VENUE

This action is removable to this Court pursuant to 28 U.S.C. § 1441 in that the United States District Court for the Southern District of New York embraces the place where the action is pending.

## III.   STATE COURT PLEADINGS

Copies of all process and pleadings are attached hereto as Exhibit A pursuant to 28 U.S.C. § 1446(a).

## IV.   NOTICE TO PLAINTIFFS AND STATE COURT

Pursuant to 28 U.S.C. § 1446(d), a copy of this notice has been filed with the Clerk of the Supreme Court of the State of New York, and a copy shall be served upon Plaintiffs.

Dated: December 10, 2013                    Respectfully submitted,

Floyd Abrams
Charles A. Gilman
Jason M. Hall
**Cahill Gordon & Reindel LLP**
80 Pine Street
New York, New York 10005
Telephone: 212.701.3000
Facsimile: 212.269.5420
FAbrams@cahill.com
CGilman@cahill.com
JHall@cahill.com
*Attorneys for McGraw Hill Financial, Inc. and
Standard & Poor's Financial Services LLC*

Joshua M. Rubins
James J. Coster
Glenn C. Edwards
**Satterlee Stephens Burke & Burke LLP**
230 Park Avenue, 11th Floor
New York, New York 10169
Telephone: 212.818.9200

6

Facsimile: 212.818.9606
jrubins@ssbb.com
jcoster@ssbb.com
gedwards@ssbb.com
*Attorneys for Moody's Corporation, Moody's
Investors Service, Inc., and Moody's Investors
Service Limited*

Martin Flumenbaum
Andrew J. Ehrlich
Julia T.W. Wood
Frank D. D'Angelo
**Paul, Weiss, Rifkind, Wharton & Garrison
LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: 212.373.3000
Facsimile: 212.757.3990
mflumenbaum@paulweiss.com
aehrlich@paulweiss.com
jwood@paulweiss.com
fdangelo@paulweiss.com
*Attorneys for Fitch Group, Inc., Fitch Ratings,
Inc., and Fitch Ratings Limited*

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x

GEOFFREY VARGA and MARK LONGBOTTOM,
as Joint Official Liquidators of Bear Stearns High-
Grade Structured Credit Strategies (Overseas) Ltd. and
Bear Stearns High-Grade Structured Credit Strategies
Enhanced Leverage (Overseas) Ltd.,

                   Plaintiffs,

             - against -

McGRAW HILL FINANCIAL, INC. (f/k/a THE
McGRAW-HILL COMPANIES, INC. and d/b/a
STANDARD & POOR'S RATING SERVICES),
STANDARD & POOR'S FINANCIAL SERVICES
LLC, MOODY'S CORPORATION, MOODY'S
INVESTORS SERVICE, INC., MOODY'S
INVESTORS SERVICE LIMITED, FITCH GROUP,
INC., FITCH RATINGS, INC. (f/k/a FITCH, INC.),
and FITCH RATINGS LIMITED,

                Defendants,

BEAR STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES MASTER FUND, LTD. and
BEAR STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES ENHANCED LEVERAGE
MASTER FUND, LTD.,

             Nominal Defendants.

-----------------------------------------------------------------x

**SUMMONS WITH NOTICE**

Index No.: _____

Date Index No. Purchased
July 9, 2013

To the Persons Named as Defendants Above:

     PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to appear in this
action by serving a notice of appearance on the Plaintiffs at the address set forth below within 20
days after the service of this Summons (not counting the day of service itself), or within 30 days
after service is complete if the summons is not delivered personally to you within the State of
New York.

     YOU ARE HEREBY NOTIFIED THAT should you fail to answer or appear, a judgment
will be entered against you by default for the relief demanded below.

//
//
//
//
//

DATED: July 9, 2013

_____
Jordan W. Siev
C. Neil Gray
Reed Smith LLP
599 Lexington Avenue
New York, NY  10022-7650
Telephone: +1 212 521 5400
Facsimile: +1 212 521 5450

*Attorneys for Plaintiffs*

**Defendant's Address:**

McGRAW HILL FINANCIAL, INC.
(f/k/a THE McGRAW-HILL COMPANIES, INC.
d/b/a STANDARD & POOR'S RATING SERVICES)
c/o The Secretary of State of New York State
Department of State
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

STANDARD & POOR'S FINANCIAL SERVICES LLC
c/o The Secretary of State of New York State
Department of State
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

MOODY'S CORPORATION
c/o CT Corporation System
111 Eighth Avenue
New York, NY 10011

MOODY'S INVESTORS SERVICE, INC.
c/o CT Corporation System
111 Eighth Avenue
New York, NY 10011

MOODY'S INVESTORS SERVICE LIMITED
2 Minster Court
Mincing Lane, London  EC3R 7XB
United Kingdom

FITCH GROUP, INC.
c/o The Secretary of State of New York State
Department of State
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

FITCH RATINGS, INC. (f/k/a FITCH, INC.)
c/o The Secretary of State of New York State
Department of State
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

FITCH RATINGS LIMITED
30 North Colonnade
Canary Wharf, London E14 5GN
United Kingdom

BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT
STRATEGIES MASTER FUND, LTD.
Genesis Building 5th Floor
Georgetown
Grand Cayman

BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT
STRATEGIES MASTER FUND, LTD.
c/o Simon Whicker and Kristin Beighton
KPMG Cayman Islands, as Joint Liquidators
Century Yard
Cricket Square
Georgetown
Grand Cayman

BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT
STRATEGIES ENHANCED LEVERAGE MASTER FUND, LTD.
Intertrust Corporate Services (Cayman) Limited
190 Elgin Avenue
Georgetown
Grand Cayman

BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT
STRATEGIES ENHANCED LEVERAGE MASTER FUND, LTD.
c/o Simon Whicker and Kristin Beighton
KPMG Cayman Islands, as Joint Liquidators
Century Yard
Cricket Square
Georgetown
Grand Cayman

**Notice:**  The nature of this action is:

Plaintiffs, the Joint Official Liquidators of Bear Stearns High Grade Structured Credit
Strategies (Overseas) Ltd. and Bear Stearns High Grade Structured Credit Strategies Enhanced
Leverage (Overseas) Ltd. (together, the "Overseas Funds"), bring this action for common law
fraud on behalf of the Overseas Funds based on their investment, through the Nominal
Defendants, in purportedly "high-grade" securities improperly and fraudulently rated by
Defendants, which are nationally recognized statistical rating organizations, and, alternatively,
derivatively on behalf of the Nominal Defendants, the entities that invested in the securities in
question on behalf of the Overseas Funds, based on the same wrongdoing.

Defendants intentionally and knowingly misrepresented information concerning their
independence, the accuracy of their ratings, the quality of their models, and the extent of their
surveillance of prior-rated collateralized debt obligations (CDOs) and retail mortgage-backed
securities (RMBS).  Defendants, by omitting information they knew to be material from their
credit rating analyses, including the then-deteriorating quality of the mortgages underlying the
CDOs and RMBS at issue, offered a product and/or service, *i.e.*, a rating, that was materially
different from what they represented it would be.  As a result of Defendants' wrongdoing, the
securities in question were rendered virtually worthless, and the Overseas Funds and the
Nominal Defendants suffered losses exceeding $1 billion.

The relief sought is:  (1) damages in the amount of $1,121,439,055; (2) punitive
damages; and (3) pre- and post-judgment interest and reasonable Court costs, including
attorneys' fees.

Should Defendants fail to appear herein, judgment will be entered by default for the sum
of $1,121,439,055, with interest from the date of July 17, 2007, and the costs of this action,
including attorneys' fees.

**Venue:**  Plaintiffs designate New York County as the place of trial.  The basis of this designation
is:  Plaintiff Varga resides in New York County and Defendants (other than Moody's Investors
Service Limited and Fitch Ratings Limited) maintain their principal places of business in New
York County.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

GEOFFREY VARGA and MARK LONGBOTTOM,
as Joint Official Liquidators of Bear Stearns High-
Grade Structured Credit Strategies (Overseas) Ltd. and
Bear Stearns High-Grade Structured Credit Strategies
Enhanced Leverage (Overseas) Ltd.,

               Plaintiffs,

        - against -

McGRAW HILL FINANCIAL, INC. (f/k/a THE
McGRAW-HILL COMPANIES, INC. and d/b/a
STANDARD & POOR'S RATING SERVICES),
STANDARD & POOR'S FINANCIAL SERVICES
LLC, MOODY'S CORPORATION, MOODY'S
INVESTORS SERVICE, INC., MOODY'S
INVESTORS SERVICE LIMITED, FITCH GROUP,
INC., FITCH RATINGS, INC. (f/k/a FITCH, INC.)
and FITCH RATINGS LIMITED,

               Defendants,

BEAR STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES MASTER FUND, LTD., and
BEAR STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES ENHANCED LEVERAGE
MASTER FUND, LTD.,

               Nominal Defendants.

-------------------------------------------------------------------x

Index No.:  652410/2013

**COMPLAINT**

## TABLE OF CONTENTS

**Page**

DEFINED TERMS ............................................................................................................ iii

I.     PRELIMINARY STATEMENT ............................................................................ 1

II.    JURISDICTION AND VENUE ........................................................................... 6

III.   PARTIES ............................................................................................................. 6

      A.    Plaintiffs ................................................................................................. 6

      B.    Defendants ............................................................................................. 8

IV.   FACTUAL BACKGROUND ............................................................................. 10

      A.    The Marketing of the Funds ................................................................ 10

            1.    Initial Marketing of the High-Grade Funds ............................ 10

            2.    Initial Marketing of the High-Grade Enhanced Funds ........... 12

      B.    Description of the Rated Assets ........................................................... 13

            1.    Residential Mortgage-Backed Securities ................................. 13

            2.    Collateralized Debt Obligations .............................................. 16

      C.    The Rating Agencies' Roles ................................................................. 17

            1.    The Rating Agencies' Rating Scales ....................................... 19

                 a.   S&P ................................................................................ 19

                 b.   Moody's ......................................................................... 21

                 c.   Fitch ............................................................................... 22

            2.    The Rating Agencies' Unique and Specialized Knowledge Concerning the Credit Quality Underlying RMBS and CDOs ............. 23

            3.    The Rating Agencies Knew the Importance of their Ratings to Investors in RMBS and CDOs ............................................ 25

                 a.   S&P Knew that its Ratings were Material to and Relied Upon by Investors ................................................ 28

                 b.   Moody's Knew that its Ratings were Material to and Relied Upon by Investors ............................................. 30

                 c.   Fitch Knew that its Ratings were Material to and Relied Upon by Investors ............................................. 31

V.    THE RATING AGENCIES' FRAUD ............................................................... 32

      A.    The Rating Agencies Repeatedly Misrepresented their Purported Objectivity, Continuing Surveillance, and the Currency of their Models ............................... 34

            1.    S&P ........................................................................................... 36

            2.    Moody's ................................................................................... 47

            3.    Fitch ......................................................................................... 52

B. Contrary to Their Representations, the Rating Agencies Prioritized Profitability Over Objectivity and Accuracy ...................................................... 56

1. The Rating Agencies Allowed Business Concerns to Infiltrate and Corrupt the Objectivity and Accuracy of the Rating Process ....................... 56

a. S&P ..................................................................................... 60

b. Moody's ............................................................................... 63

c. Fitch .................................................................................... 70

2. The Rating Agencies' Motive for Sacrificing Objectivity and Accuracy is Clear — it was Profitable to do so .......................................................... 71

C. As a Result of the Rating Agencies' Sacrifice of Objectivity and Accuracy in Favor of Profitability, the Ratings Were Devoid of any Meaningful Factual or Statistical Basis, Recklessly Issued, and Knowingly False ................ 74

1. S&P .......................................................................................... 77

2. Moody's..................................................................................... 96

3. Fitch......................................................................................... 105

D. The Rating Agencies' Misrepresentations Regarding Specific Securities Purchased by the Funds ........................................................................... 107

1. Timberwolf................................................................................ 108

2. Octans II .................................................................................. 112

3. Tasman .................................................................................... 114

4. Lexington.................................................................................. 116

5. Commodore .............................................................................. 118

6. Adams Square Funding .............................................................. 120

7. Caldecot................................................................................... 122

8. Scorpius ................................................................................... 124

9. Pampelonne .............................................................................. 126

10. GSC ........................................................................................ 129

E. The Rating Agencies' Failure to Timely Downgrade, and the Resultant Collapse of the Funds................................................................................ 131

VI. DERIVATIVE ALLEGATIONS.................................................................... 138

CAUSE OF ACTION .................................................................................... 138

COUNT ONE (Fraud)................................................................................... 138

PRAYER FOR RELIEF ................................................................................ 141

JURY DEMAND .......................................................................................... 141

**DEFINED TERMS**

California Action:  An action styled California v. The McGraw-Hill Companies, Inc., et al., No. CGC-13-528491 (Cal. Sup. Ct. 2013).

Cayman Court:  Grand Court of the Cayman Islands.

CDOs:  Collateralized Debt Obligations.

Chapter 15 Petition:  Chapter 15 of Title 11 of the United States Bankruptcy Code.

COM (or Offering Memorandum):  Confidential Offering Memorandum.

Defendants:  S&P, Moody's, and Fitch.

DOJ Action:  An action styled United States v. McGraw Hill Companies, Inc., et al., No. 13-cv-00779 (C.D. Cal. 2013).

Domestic Funds:  The High-Grade Domestic Fund and the High-Grade Enhanced Domestic Fund.

Fitch:  Defendants Fitch Group, Inc., Fitch Ratings, Inc. (f/k/a Fitch, Inc.), and Fitch Ratings Limited.

Fitch's Code:  The Fitch Ratings Code of Conduct, published in April 2005.

Funds:  The Overseas Funds and the Master Funds.

High-Grade Domestic Fund:  Bear Stearns High-Grade Structured Credit Strategies Fund, L.P. (In Liquidation).

High-Grade Enhanced Domestic Fund:  Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P. (In Liquidation).

High-Grade Enhanced Funds:  The High-Grade Enhanced Domestic Fund, the High-Grade Enhanced Overseas Fund and the High-Grade Enhanced Master Fund.

High-Grade Enhanced Master Fund:  Bear Stearns High Grade Structured Credit Strategies Enhanced Leverage Master Fund Ltd. (In Liquidation).

High-Grade Enhanced Overseas Fund:  Bear Stearns High Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd. (In Liquidation).

High-Grade Master Fund:  Bear Stearns High Grade Structured Credit Strategies Master Fund Ltd. (In Liquidation).

High-Grade Funds:  The High-Grade Domestic Fund, the High-Grade Overseas Fund, High-Grade Master Fund.

High-Grade Overseas Fund: Bear Stearns High Grade Structured Credit Strategies (Overseas) Ltd. (In Liquidation).

IOSCO Code:  International Organization of Securities Commissions Code of Fundamentals for Credit Rating Agencies.

Joynt:  Stephen Joynt, the President and Chief Executive Officer of Fitch.

July 8th SEC Report:  Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies, published July 8, 2008.

July 28th SEC Letter:  Letter, dated July 28, 2003, from Leo C. O'Neill, President, Standard & Poor's, to the SEC, Attention:  Jonathon G. Katz, Secretary, including all attachments thereto.

Liquidators:  The joint official liquidators of the Overseas Funds, plaintiffs Varga and Longbottom.

Longbottom:  Plaintiff Mark Longbottom.

Master Funds:  High-Grade Master Fund and High-Grade Enhanced Master Fund.

May 2006 Report:  "The Fitch Code of Conduct: One Year On," Published May 2006.

McGraw-Hill:  Defendant McGraw-Hill Companies, Inc.

Moody's:  Defendants Moody's Corporation, Moody's Investors Services, Inc. and Moody's Investors Service Limited.

Moody's April 2006 Report:  Moody's Report on the Code of Professional Conduct, published April 2006.

Moody's Code:  Moody's Code of Professional Conduct published and adopted in June 2005.

Mooney:  Shannon Mooney, an S&P analyst.

OCIE:  The SEC Office of Compliance Inspections and Examinations, Division of Trading and Markets and Office of Economic Analysis.

Overseas Funds:  The High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund.

Rating Agencies:  Defendants S&P, Moody's, and Fitch.

RMBS:  Residential Mortgage-Backed Securities.

S&P:  Defendants McGraw-Hill, d/b/a Standard & Poor's Ratings Services, and Standard & Poor's Financial Services LLC.

SEC:  The U.S. Securities and Exchange Commission.

Shah:  Rahul Shah, an S&P analyst.

SPV:  Special Purpose Vehicle.

Varga:  Plaintiff Geoffrey Varga.

2005 S&P Code:  The Standard & Poor's Rating Services Code of Conduct, published October 2005.

Plaintiffs, Geoffrey Varga and Mark Longbottom, as Joint Official Liquidators (the "Liquidators") of Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. (In Liquidation) (the "High-Grade Overseas Fund") and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd. (In Liquidation) (the "High-Grade Enhanced Overseas Fund," and together with the High-Grade Overseas Fund, the "Overseas Funds"), by their attorneys, Reed Smith LLP, as and for their Complaint against the above-named Defendants, respectfully allege as follows:

## I.    PRELIMINARY STATEMENT

1.      "It could be structured by cows and we would rate it," crowed an S&P employee to a co-worker in a text message.  "[Our] model def[initely] does not capture half of the ris[k]," he conceded.  Quite matter-of-factly, a Moody's employee admitted in an internal document that "we sold our soul to the devil for revenue."  Nonetheless, the Defendants' mission, as stated in an article and an e-mail, was clear — "[d]on't kill the golden goose," and "[l]et's hope we are all wealthy and retired by the time this house of cards falters."  Indeed, recognizing the full breadth and the implications of their wrongdoing, an S&P employee pleaded in an e-mail:  "Lord help our f***ing scam" (expletive partially redacted).

2.      These quotes are not the punch line to a bad joke; rather, they are statements made by representatives of Defendants — each a nationally recognized statistical rating organization (together, the "Rating Agencies") — that are the razor-sharp tip of an iceberg of evidence that, at the same time these Rating Agencies were issuing their top, virtually risk-free ratings on numerous complex securities, each of these very same Rating Agencies (but not the investing public) knew the ratings were false, and that the collapse of the "house of cards" created by their fraudulent ratings was imminent.

3.     This action is brought by victims of this admitted scam perpetrated by each of the Rating Agencies, and seeks to recover damages in connection with more than $1 billion of losses sustained by the Overseas Funds and the Master Funds (defined below, and referred to collectively as "the "Funds") they "fed" into, as a direct and proximate result of the serial fraudulent misconduct of the Rating Agencies in assigning ratings which led the Funds to believe the securities at issue were far less risky than the Rating Agencies knew them to be.

4.     Indeed, as their very names suggest, the Funds were intended to be "high-grade" funds that were structured to invest primarily in the highest quality securities.  Specifically, the Funds' stated strategy was to be invested in a portfolio of securities of which at least 90% had the highest rating available, namely "AAA," "AA," or "AA-," or equivalent ratings — meaning that each security was of the highest credit quality, and the risk of its default was extremely low.

5.     Given the importance to the Funds of the rating assigned to the structured finance products in which they invested — including, but not limited to, collateralized debt obligations ("CDOs") and residential mortgage-backed securities ("RMBS") — the Funds relied upon each of the Rating Agencies' supposed independent assessments of the default risk of the securities on which they gave their ratings.  The Rating Agencies were paid to identify and quantify the risks associated with structured financial products like CDOs and RMBS, and continually and repeatedly represented that their ratings of such securities were independent, objective, and the result of the highest quality credit analyses.  For example, the Rating Agencies each consistently represented that their ratings were "high-quality," and that they were committed as businesses to "independence," "integrity," and "transparency."  Each of the Rating Agencies consistently and routinely touted these representations, and investors in those financial products, such as the Funds, relied upon these representations.  Indeed, the Funds would not and, following the Funds'

investment strategy, could not have purchased the securities at issue absent the Rating Agencies' affirmative representations as to their credit quality.

6.      In reality, the Rating Agencies and their ratings secretly were far from independent and objective.  Instead, as the Rating Agencies knew — but the Funds did not and could not know — the Rating Agencies each repeatedly relaxed their rating standards to protect their share of the lucrative ratings market and to accommodate the desires — and even whims — of the issuers of the very securities they rated, who paid them for these ratings, thereby standing the entire concept of "independence" on its head.  Each of the Rating Agencies was motivated to assign top ratings to these structured finance products — despite the Rating Agencies' unique and specialized knowledge of material information indicating that the products did not deserve such ratings — in order to gain market share and curry favor with the large financial institutions that paid them billions of dollars in return.

7.      As Sean Egan, the managing director of Egan-Jones Ratings stated in his testimony before the United States House Committee on Oversight and Government Reform on October 22, 2008, "[t]his egregious conflict of interest may be the single greatest cause of the economic crisis."  The conflict of interest likewise was the cause of the losses which the Funds seek to recover herein.

8.      Each of the Rating Agencies knew that their representations of independence, objectivity, and accuracy were false, misleading, and harmful to market participants such as the Funds, who relied upon them for neutral and impartial assessments.  The Rating Agencies' knowledge is exemplified by, among other things, the internal e-mails and statements by the analysts responsible for the ratings in question, including those outlined above, among many

others.  Indeed, during the height of their fraud, one such analyst presciently stated in 2006 that "I think things are going to get mighty ugly next year!"

9.      The Rating Agencies each further represented that their models for credit analysis were up-to-date, and that they would conduct ongoing surveillance to ensure that prior ratings remained accurate.  Yet, they each knowingly allowed their competition for increased market share, and the astronomical fees they earned for assigning top ratings, to influence and obstruct the development of new models and their surveillance of prior-rated securities.  Specifically, to keep themselves in good standing with the issuers who paid them, the Rating Agencies purposely delayed developing and implementing new models and surveillance, as they knowingly sought to avoid ratings downgrades.  Instead, each of the Rating Agencies purposely continued to use outdated data and models, which made the Rating Agencies' surveillance faulty or non-existent. As a result of this conduct, and because the Rating Agencies were beholden to the very issuers of the securities they rated — and who paid their fees — the Rating Agencies each issued improperly inflated ratings at issuance and/or purposely failed to downgrade the securities, despite knowing such downgrades were warranted.

10.     In the time period leading up to, and even during, the collapse of the Funds in July 2007, the Rating Agencies systematically and intentionally disregarded material information unknown to the Funds concerning the then-deteriorating U.S. housing market, and the concomitant deterioration of the quality of the mortgages — particularly subprime mortgages — underlying the structured finance products they rated.  As a result, the Rating Agencies each maintained the "AAA" and "AA" or equivalent ratings on the structured finance products they rated and the Funds maintained their investment in those securities — resulting in over a billion dollars in losses.  Such losses were the direct result of each of the Ratings Agencies' misconduct.

11.     By intentionally and knowingly misrepresenting information concerning their independence, the accuracy of their ratings, the quality of their models, and the extent of their surveillance of prior-rated CDOs and RMBS, and by omitting information they knew to be material from their credit rating analyses, including the then-deteriorating quality of the mortgages underlying the CDOs and RMBS at issue herein, each of the Rating Agencies offered a product and/or service (*i.e.*, a rating) that was materially different than what they represented it would be.   The Rating Agencies each knowingly and deceptively assigned top ratings to the structured financial products when such ratings were, in fact, unwarranted, in an effort to remain competitive with each other, generate massive profits for themselves, and cover up prior misdeeds.   Put simply, the Rating Agencies engaged in a massive fraud upon the market, and specifically upon the Funds.

12.     The Funds relied upon the Rating Agencies' false representations both in investing in, at a minimum, the securities listed on Appendix A hereto, and in maintaining those investments.  Each of the securities listed on Appendix A was initially given among the highest, investment grade ratings available by the Rating Agencies, which was an "AAA" or "AA" rating at S&P, or the equivalent highest ratings at Moody's or Fitch.   But despite the fact that the Rating Agencies gave the securities on Appendix A these high ratings, and despite their repeated representations that these ratings were independent and accurate, each of the Rating Agencies knew these ratings were false, based upon information regarding the mortgages and other assets underlying these securities to which the Funds were not privy.

13.     In reliance upon the Rating Agencies' knowing and intentionally fraudulent misrepresentations, the Funds invested in and were exposed to risk from structured investment

products that were overrated and far riskier than their ratings suggested.  As a result, the Funds suffered losses exceeding $1 billion.

14.     Plaintiffs thus bring this action (i) on behalf of the Overseas Funds based on their investment, through the Master Funds, in purportedly "high-grade" securities improperly and fraudulently rated by the Rating Agencies and, alternatively, (ii) on behalf of the Master Funds, the entities which invested in the securities in question on behalf of the Overseas Funds, based on this same wrongdoing.

## II.      JURISDICTION AND VENUE

15.     Jurisdiction is proper because Defendants' (other than Moody's Investors Service Limited and Fitch Ratings Limited) principal places of business are located in New York County.  This Court has jurisdiction over each of the Defendants because each of them transacts business within the State of New York within the meaning of C.P.L.R. § 302(a)(1) and each of them committed tortious acts inside the State of New York or outside the State of New York causing injury, *inter alia*, within the State of New York within the meaning of C.P.L.R. §§ 302(a)(2) and 302(a)(3).  The amount in controversy exceeds $150,000.

16.     Venue is proper in this Court because Plaintiff Geoffrey Varga is a resident of New York County and Defendants (other than Moody's Investors Service Limited and Fitch Ratings Limited) maintain their principal places of business in New York County.

## III.     PARTIES

### A.     Plaintiffs

17.     Plaintiffs Geoffrey Varga ("Varga") and Mark Longbottom ("Longbottom") are the Liquidators of each of (i) the High-Grade Overseas Fund and (ii) the High-Grade Enhanced Overseas Fund.  Varga and Longbottom both are partners of Kinetic Partners, a global

professional services firm focused exclusively on the financial services industry.  Varga is the Global Head of Kinetic Partners' Corporate Recovery group and a member of the firm's Executive Board.  He is a citizen of Canada and a resident of New York.  Longbottom is the resident partner of Kinetic Partners' office in the Cayman Islands.  He is a citizen of the United Kingdom and a resident of the Cayman Islands.

18.     Plaintiff Varga and William Cleghorn were appointed as liquidators of the Overseas Funds by the Grand Court of the Cayman Islands (the "Cayman Court") by Order dated March 20, 2008.  By Orders of the Cayman Court dated June 1, 2010, Plaintiff Longbottom replaced William Cleghorn as one of the joint official liquidators of the Overseas Funds due to William Cleghorn's retirement.  Under Cayman law, Plaintiffs Varga and Longbottom have all rights and power to act for the Overseas Funds, including, without limitation, the power to bring suit to recover for losses caused to those funds by third parties.

19.     The Overseas Funds are both Cayman Islands exempted companies, organized under the Companies Law of the Cayman Islands.  Prior to the events here complained of, they operated, along with the Bear Stearns High-Grade Structured Credit Strategies Fund, L.P. (In Liquidation) ("High-Grade Domestic Fund") and the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P. (In Liquidation) ("High-Grade Enhanced Domestic Fund," and together with the High-Grade Domestic Fund, the "Domestic Funds"), as "feeder funds" for the Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd. (In Liquidation) (the "High-Grade Master Fund"), and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund Ltd. (In Liquidation) (the "High-Grade Enhanced Master Fund," and together with the High-Grade Master Fund, the "Master Funds").   As

previously noted, the Overseas Funds and the Master Funds are referred to herein collectively as the "Funds."

20.    At all relevant times, the Overseas Funds have been shareholders/investors in the Master Funds.  The Overseas Funds, which operated as "feeder funds," did not trade directly, but instead invested all of their assets in the Master Funds, and accomplished all of their investment and trading activity through their investment in the Master Funds.  The Master Funds were formed for the sole purpose of achieving administrative efficiencies and conducting trading activities on behalf of the Overseas Funds, among others.  The Overseas Funds' investments in the Master Funds were and are each of their respective sole assets.

**B.    <u>Defendants</u>**

21.    Defendant McGraw Hill Financial, Inc., formerly known as The McGraw-Hill Companies, Inc. ("McGraw-Hill"), is a New York corporation, with its principal place of business in New York, New York.

22.    McGraw-Hill does business as, among others, Standard & Poor's Ratings Services.  Standard & Poor's Ratings Services is comprised of:  (i) a separately identifiable business unit within Standard & Poor's Financial Services LLC; and (ii) the credit rating business housed within certain other wholly owned subsidiaries, or businesses continuing to operate as divisions, of McGraw-Hill.

23.    Defendant Standard & Poor's Financial Services LLC is a wholly owned subsidiary of McGraw-Hill, and is a Delaware limited liability corporation with its principal place of business in New York, New York.  Standard & Poor's Financial Services LLC was formed on November 18, 2008 to house, effective January 1, 2009, certain businesses previously operating as divisions of McGraw-Hill.

24.     McGraw-Hill, Standard & Poor's Ratings Services, and Standard & Poor's Financial Services LLC, and each of their affiliates and subsidiaries who are or were involved in issuing ratings, are referred to herein, collectively, as "S&P."  S&P rated, and represented to the public that it continued to monitor, certain of the structured finance products in which the Funds invested, as set forth on Appendix A.

25.     Defendant Moody's Corporation is a Delaware corporation, with its principal place of business in New York, New York.

26.     Defendant Moody's Investors Service, Inc. is a wholly owned indirect subsidiary of Moody's Corporation, and is a Delaware corporation with its principal place of business in New York, New York.

27.     Defendant Moody's Investors Service Limited is a wholly owned indirect subsidiary of Moody's Corporation, and is a United Kingdom Private Limited Company, with its principal place of business in London, England.

28.     Moody's Corporation, Moody's Investors Service, Inc., and Moody's Investors Service Limited, and each of their affiliates and subsidiaries who are or were involved in issuing ratings, are referred to herein, collectively, as "Moody's."  Moody's rated, and represented to the public that it continued to monitor, certain of the structured finance products in which the Funds invested, as set forth on Appendix A.

29.     Defendant Fitch Group, Inc. is a Delaware corporation, with its principal place of business in New York, New York.

30.     Defendant Fitch Ratings, Inc. (formerly known as Fitch, Inc.) is a subsidiary of Fitch Group, Inc., and is a Delaware corporation, with its principal place of business in New York, New York.

31.     Defendant Fitch Ratings Limited is a subsidiary of Fitch Ratings, Inc., and is a United Kingdom Private Limited Company, with its principal place of business in London, England.

32.     Fitch Ratings, Inc. and Fitch Ratings Limited, among other Fitch Group, Inc. affiliates and subsidiaries, issue ratings under the trade name Fitch Ratings.

33.     Fitch Group, Inc., Fitch Ratings, Inc., and Fitch Ratings Limited, and each of their affiliates and subsidiaries who are or were involved in issuing ratings, are referred to herein, collectively, as "Fitch."  Fitch rated, and represented to the public that it continued to monitor, certain of the structured financial products in which the Funds invested, as set forth on Appendix A.

34.     Moody's, S&P, and Fitch are referred to herein collectively as "Defendants" or the "Rating Agencies."

## IV.     FACTUAL BACKGROUND

### A.     The Marketing of the Funds

#### 1.     *Initial Marketing of the High-Grade Funds*

35.     As of 2003, housing prices were increasing at a generally brisk pace throughout the United States.  The Funds sought to capitalize on the booming United States housing market through the existing, sizeable, and increasingly efficient CDO, RMBS, and related structured products markets.

36.     In March 2003, the High-Grade Domestic Fund and the High-Grade Overseas Fund (together with the High-Grade Master Fund, the "High-Grade Funds") were created and marketed to a select group of institutional and otherwise eligible investors.  The High-Grade

Funds were designed to raise money to invest in the High-Grade Master Fund.  The High-Grade

Master Fund, in turn, invested the capital it received from these two "feeder funds."

37.    The High-Grade Overseas Fund Confidential Offering Memorandum ("COM")

outlined the High-Grade Funds' investment strategy, with emphasis on the "high grade" nature

of the collateral.  Specifically, in the High-Grade Overseas Fund COM, and in sales pitches

concerning the High-Grade Funds, the credit quality of securities in which the High-Grade Funds

would invest was touted as a principal rationale for investing.

38.    For example, with regard to the quality of securities in which the High-Grade

Funds would invest, the following representations were made:

> [T]he Master Fund intends to concentrate its investments in the investment-grade
> classes of structured finance securities.  For all investments . . . the Master Fund
> has targeted a portfolio rating composition of approximately 90% structured
> finance securities rated from AAA to AA- by Standard & Poor's, from Aaa to
> Aa2 by Moody's or from AAA to AA- by Fitch.  The 10% balance of the
> portfolio . . .  may be rated below such ratings or be unrated.  The above
> percentages are target concentrations only.  The Master Fund will not be required
> to sell any security that is downgraded subsequent to its purchase by the Master
> Fund.
>
> * * *
>
> Targeted Portfolio Characteristics, Credit Quality:  At least 90% 'AAA' and
> 'AA.'
>
> * * *
>
> [The High-Grade Funds' p]rimary focus is to buy and hold 'AAA' and 'AA'
> structured finance securities.
>
> * * *
>
> Credit Quality:  At least 90% 'AAA' and 'AA-' structured finance securities with
> up to 10% in higher yielding lower rated securities.

39.    The High-Grade Funds relied on the ratings issued by the Ratings Agencies — most notably their AAA and AA or equivalent ratings — in selecting and purchasing securities that complied with this mandate.

40.    The High-Grade Funds did in fact invest in securities that were given such AAA and AA or equivalent ratings by the Defendants.  However, while the tranches of CDOs to which the High-Grade Funds were exposed appear to have been individually deemed by the Ratings Agencies to be among the safest available — assigned AAA or AA ratings or their equivalents by the Rating Agencies — due to their unique knowledge and capabilities, the Rating Agencies knew, and solely were able to know, that as a result of the downturn in the housing market that began in 2005 and continued thereafter, the CDOs and RMBS reflected on Appendix A hereto, among others, were far riskier than indicated by the top ratings the Rating Agencies assigned to them.

41.    Thus, although marketed as relatively safe, conservative investment funds seeking to obtain a moderate rate of return for investors — "high current income and capital appreciation relative to LIBOR" — the High-Grade Funds' investment portfolio, in fact, was at all relevant times far riskier.

    2.    *__Initial Marketing of the High-Grade Enhanced Funds__*

42.    The High-Grade Enhanced Domestic Fund and the High-Grade Enhanced Overseas Fund (together with the High-Grade Enhanced Master Fund, the "High-Grade Enhanced Funds") were created in the summer of 2006 as a continuation and expansion of the High-Grade Funds, and were likewise marketed to a select group of institutional and high net worth investors.

- 12 -

43.     These new "enhanced" funds were similarly marketed as relatively safe investments because they — like the High-Grade Funds — would invest in the "safest" tranches of structured finance securities *as measured by Ratings Agency rating levels.*

44.     Indeed, the August 2006 COM for the High-Grade Enhanced Overseas Fund made the following representations regarding the quality of the securities in which the High-Grade Enhanced Overseas Fund would invest:

> [T]he Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities.  For all investments . . . the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA- by Standard & Poor's, from Aaa to Aa2 by Moody's or from AAA to AA- by Fitch.  The 10% balance of the portfolio . . . may be rated below such ratings.  The above percentages are target concentrations only.

45.     The High-Grade Enhanced Funds thus likewise primarily invested in AAA and AA, or equivalent, rated structured finance securities, and relied upon the Rating Agencies' rating of such securities to make those investments.  But again, unbeknownst to the High-Grade Enhanced Funds, but known to the Rating Agencies, these securities were in fact far riskier than the ratings the Rating Agencies attributed to them would indicate.

**B.     Description of the Rated Assets**

**1.     *Residential Mortgage-Backed Securities***

46.     At all relevant times, residential mortgage-backed securities, or RMBS, were structured debt securities collateralized by pools of individual residential mortgages.  By design, payments on the underlying mortgage loans provided funds to pay RMBS investors back their investments, plus interest.

47.     To issue an RMBS, an arranging entity and/or an investment bank representing an arranging entity bundled large numbers of residential mortgage loans, typically several hundred

to several thousand individual mortgage loans, into a loan pool held by a trust.  (The term "issuer" is used herein to refer collectively to the entities that created and marketed a structured debt security; for an RMBS, these entities generally were the arranging entity, the investment bank, and the trust.)  The issuer typically issued different classes of notes, commonly referred to as "tranches," which are collateralized by the mortgage loan pool.  The different tranches paid different interest rates corresponding to the different levels of credit protection afforded each particular tranche.

48.    The primary source of credit protection was "subordination," which created a hierarchy of cash flows and loss absorption among tranches.  Investors who purchased the most senior tranche, which generally had the highest credit rating and paid the lowest interest rate in the structure, were the first to be paid from the cash flow of the underlying collateral.  Investors who purchased more junior tranches, which generally were more risky, had lower credit ratings, and paid higher interest rates, were typically paid only after investors in the more senior tranches.  Thus, defaults and losses on underlying collateral affected the more junior tranches first; only to the extent defaults and losses could not be absorbed by more junior tranches would they affect the senior tranches.

49.    Other common sources of credit protection included "over-collateralization," a structure by which the principal balance of the mortgage loan pool exceeded the principal balance of the notes issued by the trust, and "excess spread," a structure by which the total interest expected to be received on the underlying mortgage loans exceeded the total interest payments to be made to the RMBS investors as well as the administrative expenses of the trust.

50.    The Rating Agencies generally characterized RMBS by the types of mortgage contained in their underlying loan pools.  Prime RMBS generally carried the least risk.  Non-

prime RMBS, including RMBS containing "Alt-A", "second-lien", and "subprime" loans, generally presented more risk than prime RMBS.

51.     The loan pools underlying prime RMBS were typically comprised of first-lien mortgage loans that generally satisfied traditional credit guidelines with borrowers considered good credit risks; for example, borrowers with high credit scores, indicating that they were more likely to pay back their loans.

52.     The loan pools underlying Alt-A RMBS were typically comprised of first-lien mortgage loans that satisfied some of the traditional credit guidelines, but had aspects that indicated greater credit risk; for example, the mortgage loans had less loan documentation or more self-employed borrowers.   Because of non-standardization in the Alt-A market, Fitch subcategorized Alt-A RMBS into three subclasses:  Prime Alt-A, A-Alt-A and Alt-B.

53.     The loan pools underlying second-lien RMBS were typically comprised of second-lien mortgage loans, which were riskier than first-lien mortgage loans.  If the borrower did not pay on the loans and a lender had to sell the residence to collect on the loans, the second mortgage was subordinate to the first, meaning that it was not repaid unless and until the first mortgage was paid in full.  Some second-lien RMBS were comprised in large part of closed-end second-lien mortgage loans, which were second mortgages taken out to enable borrowers to qualify for their first mortgages; for example, the mortgages were used to fund, either partially or entirely, a down payment required by the first-lien mortgage lender.

54.     The loan pools underlying subprime RMBS were typically comprised of mortgage loans made to borrowers who had histories of delinquency, limited credit histories, or other credit problems such that they posed greater credit risks.

## 2.   *Collateralized Debt Obligations*

55.     At all relevant times, collateralized debt obligations, or CDOs, were structured debt securities collateralized by pools of other debt securities, often including other structured debt securities (like RMBS), and/or in some instances credit derivatives.

56.     To issue CDOs, an arranging entity, and/or an investment bank representing an arranging entity, typically created a special purpose vehicle ("SPV") that, through a trust acting at the direction of the SPV, purchased collateral and issued CDO notes.  (As noted above, the term "issuer" is used herein to refer collectively to the entities that created and marketed a structured debt security; for a CDO, these entities were the arranging entity, the investment bank, the SPV, and the trust.)  As with RMBS, the CDO issuer typically issued different classes of notes, often referred to as "tranches," collateralized by the underlying asset pool.  These different tranches also paid different interest rates corresponding to the different levels of credit protection afforded each particular tranche.  As with RMBS, typical sources of credit protection were subordination, over-collateralization, and excess spread.

57.     Generally, CDOs fall into one of four categories:  cash CDOs (also referred to as cash flow CDOs), synthetic CDOs, hybrid CDOs, and bespoke CDOs.

58.     Cash CDOs are collateralized by pools of existing debt securities.

59.     In many cases, the debt securities providing collateral for cash CDOs included, but were not limited to, different tranches of multiple RMBS.

60.     Synthetic CDOs are collateralized by credit derivatives, including, in many instances, credit default swaps, which were insurance contracts in which investor funds and commitments for investor funds were used to insure third parties against the default of an underlying asset in exchange for premium payments.

61.     Hybrid CDOs are collateralized by combinations of debt securities, including but not limited to RMBS, and credit derivatives.

62.     In many cases, the debt securities that are the subject of credit default swaps providing collateral for synthetic and hybrid CDOs include different tranches of multiple RMBS.

63.     Bespoke CDOs are created for a single or small group of investors and are designed to allow investors to target a specific risk/return profile.

64.     At all relevant times, many of the RMBS tranches that were pooled and re-securitized into cash and/or hybrid CDOs rated by the Rating Agencies, or that were the subject of credit default swaps that were pooled and re-securitized into synthetic and/or hybrid CDOs rated by the Rating Agencies, were riskier, more junior, non-prime RMBS tranches.

65.     CDOs and RMBS are highly complex financial products, generally containing multiple layers of underlying assets that are nearly impossible for an investor to independently analyze.   In discussing CDOs comprised of other CDOs, or $CDO^2$ (a category into which multiple instruments owned by the Funds fit), Warren Buffet said:  "If you take one of the lower tranches of the CDO and take 50 of those and create a CDO squared, you're now up to 750,000 pages to read to understand one security.  I mean, it can't be done.  When you start buying tranches of other instruments, nobody knows what the hell they're doing."

**C.     The Rating Agencies' Roles**

66.     At their inception, the Rating Agencies were conservative institutions more like governmental entities or publishers than market actors.  The Rating Agencies often likened themselves to reporters.  That is because, in the past, they provided unsolicited insight on the creditworthiness of corporations and had a subscription-based business model.  Their evaluations

were often derived from publicly available information such as filings with the U.S. Securities and Exchange Commission ("SEC").

67.     Over time, the Rating Agencies earned the trust of the marketplace for their purported integrity and unbiased approach in evaluating bonds.  In 1975, the SEC provided the Rating Agencies a special status of "nationally recognized statistical rating organization," or NRSRO, to help ensure the integrity of the ratings process.  According to the SEC, the "single most important factor" to granting NRSRO status is that the rating organization is recognized "in the United States as an issuer of credible and reliable ratings by the predominant users of securities ratings," and that part of awarding the NRSRO label to a company hinges on the rating organization's "independence from the companies it rates."  Thus, in connection with their respective applications and re-applications for NRSRO recognition, each of the Rating Agencies was required to assure the SEC that it had "policies and procedures to address and manage conflicts of interest."

68.     As NRSROs, the Rating Agencies play a unique and critical role in the global financial system.  Market participants, including investors such as the Funds, rely upon the Rating Agencies for an impartial and accurate assessment of the credit worthiness of the financial products to which their ratings are assigned.

69.     As Congressman Harry Waxman stated on October 22, 2008, in his opening statement to the House Committee on Oversight and Government Reform:  "The leading credit rating agencies — Standard and Poor's, Moody's and Fitch — are essential financial gatekeepers."  Congressman Waxman elaborated further:

> [C]redit rating agencies occupy a special place in our financial markets.  Millions of investors rely on them for independent, objective assessments.

70.     There is no question that, as market participants, the Funds did, in fact, rely upon the Rating Agencies for their independent and objective assessments of the credit risks associated with the structured financial products described herein.

71.     As Frank Raiter, the Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P from March 1995 to April 2005, confirmed, "Moody's, S&P and Fitch [] enjoyed a unique position in the financial markets . . . operat[ing] without competition, a situation that fostered a culture of complacency regarding their responsibilities to provide reliable and timely information to the financial markets."

72.     Given their special role in the financial markets, and in particular, the market for CDOs and RMBS as described further herein, as well as the absence of any other true competitors, the Rating Agencies' conduct caused substantial damage to the Funds when the CDOs and RMBS at issue collapsed and were rendered virtually worthless.

1.     ***The Rating Agencies' Rating Scales***

a.     **S&P**

73.     S&P rates RMBS and CDO tranches using a letter-grade scale ranging from AAA, the highest rating, to D, the lowest.

74.     During the relevant time period, S&P represented that its credit ratings reflected its current opinion of creditworthiness — that is, the ability to timely pay interest and principal — of the different tranches of RMBS and/or CDOs.

75.     During the relevant time period, S&P announced its credit ratings to the public and published them on S&P's website.

76.     During the relevant time period, S&P represented to investors, including the Funds, that its AAA rating of a debt security indicated an "EXTREMELY STRONG capacity to meet its financial commitments," and was "the highest issuer credit rating assigned by" S&P.

77.     Traditionally, debt securities bearing AAA ratings were considered the safest, roughly comparable in risk to federal treasury bills, with a less than 1% probability of incurring any defaults over the life of the debt security.  As Congressman Waxman stated on October 22, 2008 to the House Committee on Oversight and Government Reform:  "A triple-A rating has been regarded as the gold standard for safety and security for [debt obligations] for nearly a century."

78.     S&P represented that debt securities it rated "AAA" should, on average, be able to withstand economic conditions similar to those of the Great Depression.  According to S&P, "'AAA' rated entities/securities typically should be able to withstand an extreme level of stress . . . and still meet financial obligations."  S&P similarly represented that AA-rated debt securities have a "very strong capacity to meet financial commitments."

79.     Each grade level down from AA indicated a decrease in creditworthiness and an increase in risk of default.

80.     S&P also modified its credit ratings between "AA" and "CCC" by attaching a plus (+) sign, indicating an incrementally higher credit rating, or a minus (-) sign, indicating an incrementally lower credit rating.

81.     S&P defined investments rated by S&P as "BBB-" and higher as "investment grade."   S&P defined those with ratings below "BBB-" as "non-investment grade" or "speculative grade."

b.      **Moody's**

82.     During the relevant time period, Moody's rated RMBS and CDO tranches using a letter-grade scale ranging from Aaa, the highest rating, to C, the lowest.  Moody's represented to investors, including the Funds, that a Aaa-rated debt security was of the "highest quality," and had "minimal credit risk."   Moody's likewise represented to investors that a Aa-rated debt security was of "high quality and subject to very low credit risk."

83.     According to Jerome Fons ("Fons"), who was a Moody's Managing Director in the Credit Policy Group and worked at Moody's for 17 years:  "[t]riple-As had historically been very stable ratings through time . . . there was an implicit compact . . . that the triple-A was to be something that was to last at least for several years without losing that rating."

84.     During the relevant time period, Moody's announced its credit ratings to the public and published them on Moody's website.

85.     Each grade level down from Aa indicated a decrease in creditworthiness and an increase in risk of default.

86.     Moody's also modified its credit ratings between "Aa" and "Caa" by attaching numerical modifiers of "1," "2" or "3."  The modifier "1" indicates that the obligation ranks on the higher end of its ranking category.  The modifier "2" indicates a mid-range ranking.  The modifier "3" indicates a ranking on the lower end of that ranking category.

87.     Moody's defined investments rated by Moody's as "Baa3" and higher as "investment grade."  Moody's defined investments with ratings below "Baa3" as "speculative grade."

88.     A higher Moody's credit rating on a particular tranche of a CDO and/or RMBS corresponds to a lower coupon (*i.e.*, interest) rate that the issuer was obligated to pay the buyer/investor.

c.     **Fitch**

89.     During the relevant time period, Fitch rated RMBS and CDO tranches using a letter-grade rating scale ranging from AAA, the highest rating, to D, the lowest.

90.     Fitch represented to investors, including the Funds, that a AAA-rated debt security was of the "highest credit quality" and "denote[d] the lowest expectation of default risk."   According to Fitch, a AAA rating is assigned only in cases of exceptionally strong capacity for payment of financial commitments.   Fitch represented to investors, including the Funds, that a AA rating similarly denoted "expectations of low default risk," indicated a "very strong capacity for payment of financial commitments," and indicated that the subject security was "not significantly vulnerable to foreseeable events."

91.     Each grade level down from AA indicated a decrease in creditworthiness and an increase in risk of default.

92.     Fitch also modified its credit ratings between "AA" and "CCC" by attaching a plus (+) sign, indicating an incrementally higher credit rating, or a minus (-) sign, indicating an incrementally lower credit rating.

93.     The centerpiece of Fitch's CDO rating methodology is the Fitch Default VECTOR model, a portfolio analytics tool that uses Monte Carlo simulations incorporating default probability, recovery rate assumptions, and asset correlation to calculate potential default and loss distributions.

*     *     *

94.     All of the securities listed on Appendix A were given a AAA, AA, AA-, or equivalent ratings by one or more of the Rating Agencies.  As noted above, the Funds specifically relied on the accuracy of ratings issued by the Ratings Agencies, and in particular "AAA," "AA," "AA-," or comparable "high-grade" ratings, when making their investment decisions.

2.     ***The Rating Agencies' Unique and Specialized Knowledge Concerning the Credit Quality of the Collateral Underlying RMBS and CDOs***

95.     The Rating Agencies had unique and superior knowledge concerning the assets (consisting of hundreds or thousands of individual loans) which underlay each of the CDOs and RMBS they rated, including those at issue in this action and listed on Appendix A.

96.     Market participants, such as the Funds, did not and could not know the loan level detail of the mortgages underlying the structured financial products at issue.  Instead, market participants received only general descriptions of the categories and quality of collateral backing CDOs and RMBS.

97.     Conversely, the Rating Agencies possessed detailed loan level data, including origination and performance data, concerning the U.S. mortgage loans that served as the collateral for CDOs and RMBS.  Indeed, in many instances, the collateral underlying the CDOs and RMBS was itself assigned a rating by the Rating Agencies and, thus, was subject to the supposedly rigorous analysis the Rating Agencies purported to undertake in connection with assigning ratings thereto.

98.     Moreover, the Rating Agencies were specifically provided information by the issuers of the securities they rated, which was not available to investors.  As Moody's President admitted in a statement to the SEC on November 21, 2002, ratings included confidential information not available to investors:

Although issuers are not obligated to provide information to us, in most instances they have proven to be an important source of input for our rating opinions.  Our ability to consider sensitive information judiciously, and not to unnecessarily reverse ratings over short periods of time because we are "surprised" by new information, is highly valued by most market participants, including many regulatory bodies.  Consequently, it is important that issuers be given the opportunity to discuss their business with us in an unfettered manner.  For example, if issuers feel that they are prohibited from having confidential or hypothetical "what if" discussions with Moody's, we will be less informed, we will provide less timely market evaluations, and we will inevitably be more reactive and less considered in our rating analysis.  Such reactiveness in ratings would increase volatility and decrease transparency in the capital market.

Issuers have historically been able to provide non-public information to rating agencies for the purpose of assigning or maintaining a rating.  Recently, Regulation Fair Disclosure (Reg. FD) expressly permitted issuers to continue to discuss confidential information with us.  As a result, our ratings at times incorporate information that is not public.  In such circumstances, we do not disclose the actual non-public information itself.  Rather, if in our opinion the non-public information impacts the risk profile of an issuer or a debt instrument, it will be reflected only in our public rating.  Our underlying motivation is to strike an appropriate balance between receipt and preservation of confidential information (allowing judicious rating decisions), with serving market efficiency, transparency, and investor protection by providing an independent and up-to-date risk assessment.

99.    Moody's Ray McDaniel made similar admissions in Testimony before the House

Subcommittee on Capital Markets, Insurance and Government-Sponsored Enterprises on

September 30, 2009.  He stated:

Unlike in the corporate market, where investors and other market participants can reasonably develop their own informed opinions based on publicly available information, in the structured finance market, there is insufficient public information to do so.  Disclosure requirements for publicly offered securities do not require the public dissemination of sufficient information about the structure or underlying assets of a securitization to make reliable analysis possible.  Indeed, under this limited information disclosure model, [credit rating agencies] must ask for additional information to analyze and rate securities.

In the absence of sufficient data, investors are unable to conduct their own analysis and develop their own independent views about potential or existing investments.

100.    In a September 2007 document entitled "Moody's Ratings Performance and Processes in Structured Finance Following Problems in the U.S. Subprime Mortgage Sector," Moody's admitted again that "[s]ponsors of many structured securities . . . do not publicly detail underlying assets to investors — in large part because neither investor demands nor securities laws have typically required them to do so."

101.    In his White Paper on Rating Competition and Structured Finance, dated January 10, 2008, Fons explained that:

> Investors rely on agency ratings when making purchase decisions because of the opacity . . . . Moreover, the tools to analyze credit risk, even with transparent assets, are beyond the grasp of many investors. Rating methods are quite technical, often relying on advanced statistical techniques. Documentation supporting a transaction can be equally daunting, reading more like a legal brief than helpful financial guidance.

102.    The Rating Agencies specifically represented to the investing public that they carefully evaluated underlying loan level information and other information not available to the public when assigning a rating to the structured financial products, including CDOs or RMBS, described herein. Indeed, a critical factor in evaluating the creditworthiness of a CDO and assigning an appropriate rating thereto was the rating of the underlying RMBS.

103.    Lacking the same level of information, market participants, including the Funds, necessarily relied upon the Rating Agencies' representations that they would and did evaluate all relevant and material information before assigning a rating and, thereafter, conduct surveillance to assess the continuing credit quality of the assets rated.

**3.    _The Rating Agencies Knew the Importance of their Ratings to Investors in RMBS and CDOs_**

104.    The Rating Agencies were well aware that investors such as the Funds did not have the access that the Rating Agencies did to the underlying loan data, and that investors relied

solely upon the Rating Agencies to analyze this data.  For example, in October 22, 2008, written

testimony to the U.S. House of Representatives, former S&P executive Fons  testified:

> Market participants relied heavily on the rating agencies when purchasing
> subprime related assets for at least three reasons. . . .  First, subprime RMBS and
> their offshoots offer little transparency around the composition and characteristics
> of the underlying loan collateral [in that] [p]otential investors are not privy to the
> information that would allow them to understand clearly the quality of the loan
> pool [and] [l]oan-by-loan data, the highest level of detail, is generally not
> available to investors. . . .  Second, the complexity of the securitization process
> requires extremely sophisticated systems and technical competence to properly
> assess risk at the tranche level. . . .  Third, rating agencies had a reputation, earned
> over nearly *one century*, of being honest arbiters of risk.

105.    RMBS and CDOs were marketed and sold primarily to financial institutions and

other qualified institutional investors.

106.    A key step in the process of creating and selling RMBS and CDOs to financial

institutions and other qualified institutional investors was obtaining credit ratings for each RMBS

and CDO tranche (with the exception of the most junior "equity" tranches, which typically did

not receive a rating and provided credit protection to all of the more senior tranches).

107.    Prior to the release of a rating, the Rating Agencies customarily prepared and

issued a "Pre-Sale Report," or similar document, that summarized the deal ("Pre-Sale Report").

The Pre-Sale Report was intended to provide comfort to potential investors that a rating by the

Rating Agency was forthcoming, and indicated the anticipated rating.  Upon information and

belief, one or more of the Rating Agencies issued a Pre-Sale Report with respect to, at least, each

of the securities listed on Appendix A, which indicated that a AAA, AA, or AA- rating, or the

equivalent rating, would be assigned to the security.  In fact, one or more of the Rating Agencies

assigned a AAA, AA, or AA- rating or its equivalent to each of the securities on Appendix A.

108.    The Pre-Sale Reports, or the information reflected therein, with respect to the

securities listed on Appendix A, were disseminated to a select group of investors, including the

Funds, who it was anticipated would purchase the securities in question.  The rating received or to be received as reflected in the Pre-Sale Reports was critical and material information relied upon by investors, including the Funds.

109.     On the security's closing date, a rating letter is prepared, signed by an analytical manager, and transmitted to the issuer.  The rating letter typically formalized the credit ratings issued by the Rating Agencies to the different tranches, and authorized the recipient of the rating letter to disseminate the credit ratings to interested parties.  Also, the Rating Agencies would customarily issue a press release and post it on their websites to announce the ratings.

110.     If any such rating was not confirmed, or was reduced or withdrawn, this would be considered an event of default, and the issuer would be required to refund investors their investment.

111.     To sell a particular RMBS or CDO tranche to a financial institution, it was typically necessary for that tranche to receive an "investment grade" credit rating — that is, a rating of BBB- (or its equivalent, depending on which Rating Agency assigned the rating) or higher.

112.     Moreover, pursuant to the terms of their offering materials, a number of investment vehicles, including the Funds at issue here, were required to or desired to only invest or invest primarily in securities with a particular rating (such as AAA or AA).

113.     As a result, investors in CDOs and RMBS such as the Funds relied upon credit ratings issued by NRSROs, including those issued by the Rating Agencies, when making decisions to purchase, sell, and/or hold RMBS and CDOs.  The ratings also assisted in the assessment of whether diversification and capital requirements reflected in offering materials for various funds and other structured financial products were satisfied.

114.     Indeed, as noted, the Funds' strategy involved them holding a certain percentage of AAA, AA, or AA- or equivalent rated securities, and they relied upon the Rating Agencies' ratings in making their investment decisions to comport with their portfolio composition targets.

      a.      **S&P Knew that its Ratings were Material to and Relied Upon by Investors**

115.     S&P knew that its ratings of structured finance securities were material to market participants and influenced investment decisions in a material way.   Thus, as alleged by the Department of Justice in <u>United States v. McGraw-Hill Companies, Inc. et al.</u>, No. CV 13-00779 DOC (JCGx) (C.D. Cal. 2013) (hereinafter the "DOJ Action," which was filed following a three-year investigation, involving the issuance of over twenty subpoenas, the production and review of millions of pages of documents, and the conduct of numerous depositions and witness interviews):

    (i)      In its January 5, 2006, CDO Strategic Plan, S&P listed "Financial Buyers" as one of "three fundamental revenue drivers for [CDO] ratings" and estimated that they represented "70% of the driving force behind the growth of the CDO ratings business."   S&P explained:

         These are investors or counterparties who for any number of reasons require the tranche of the transaction they invest in to have a credit rating.   The most common reason for the requirement is that a rating is required under the investment guidelines of the institution.   A second reason is that the counterparty/investor in the transaction is relying on the rating agency to interpret and identify the credit risk of the instrument being offered by the dealer/arranger.

    (ii)     In its January 5, 2006, CDO Strategic Plan, S&P further stated:

         Fundamentally, [investors and counterparties] rel[y] on S&P for review of the transaction, and for S&P to identify the credit risk (ratings) associated with the tranches they intend to purchase. They also rely on S&P to ensure that the ratings assigned remain consistent with the credit quality of the underlying portfolio and the credit enhancement afforded by the CDO structure throughout the lifetime of the rated debt.

(iii)   In a February 16, 2007, publication titled, "25 Years of Credit: The Structured Finance Market's Accumulated Wisdom," S&P described the role of credit rating agencies in the evolution of the Structured Finance Markets.  Specifically, S&P described a quandary facing investors trying to assess the creditworthiness of privately issued securities:

> The value of the underlying assets became paramount, as did the strength of the cash flows they produced and the stability of the transaction's legal structure created to properly assess the issuer's ability to pay its debts.  Enter the credit rating agencies, such as [S&P], which began to scrutinize these elements and assign ratings to the securitizations.  This enabled conservative investors, such as pension funds and insurance companies, to gauge the risk of structured finance investments without tying up valuable resources by having to analyze the underlying assets themselves.

(iv)   In an August 23, 2007, publication titled, "The Fundamentals of Structured Finance Ratings," S&P stated:

> [S]ecuritization works by providing buyers of risk with the risk they seek.  But how can they know this complex structured finance tranche carries a level of credit risk with which they are comfortable?

> By providing an objective and independent assessment and a universal scoring system that allows like for like comparisons of credit risk, rating agencies assist in this process . . . [T]he arrangers are selling to investors in each tranche a specific type of risk and . . . investors compare these tranches using the universal scoring system of the rating agency.

116.   S&P also recognized that investor perception that S&P's ratings accurately reflected credit risk was crucial to S&P's business, including its competition with other ratings agencies for market share.  Thus, for example, the DOJ Action alleges that in its January 5, 2006, CDO Strategic Plan, S&P stated:

> On a fundamental level, their reliance on ratings as a translator/explanation of credit risk ensures that rating agencies continue to play a critical role in the market.  Additionally, to the extent they place a higher value on S&P ratings, as compared to those of other agencies, they play a key role in ensuring that S&P continues its high ratings penetration and leading position in the ratings market.  To that extent a large portion of the CDO group's market outreach and publication effort is targeted to this customer group.

117.    An e-mail, dated October 18, 2004, from an S&P employee summarizes best

S&P's understanding of the importance of its ratings to investors.  In the context of a written

discussion concerning the importance of rating consistency, the employee noted that:

> [I]f there is no immediately accessible and understandable meaning to our ratings, then the value of our independent, third-party view is affected — why would anyone purchase a rating if it forces them to exhaustively pour through the documents to uncover all the potential carve-outs that may be hidden within?

**b.    Moody's Knew that its Ratings were Material to and Relied Upon by Investors**

118.    Moody's likewise knew that its ratings of structured finance securities were

material to investors.  For example:

(i)     In a May 25, 2006 document entitled "Comparing Ratings on Jointly-Rated U.S. Structured Finance Securities," Moody's explicitly acknowledged that "[i]nvestors rely on credit ratings . . . to make investment decisions."

(ii)    On February 8, 2005, Raymond McDaniel, Moody's CEO, testified before the Senate Banking Committee that:

> Moody's integrity and performance track record have earned the trust of capital participants worldwide.

(iii)   On October 22, 2008, Jerome Fons, a former Managing Director of Moody's, testified before the House of Representatives Committee on Oversight and Government Reform about Moody's corporate culture.  In particular, Fons testified that, historically, the corporate culture was premised upon the reliance investors placed upon Moody's for independent and accurate ratings.  He stated:

> Moody's reputation for independent and accurate ratings sprang from a hard-headed culture of putting investors' interests first.  Up until the late 1960s, the firm often refused to meet with rated companies.  Even through the mid-1990s, long after the firm and its competitors began to charge issuers for ratings, Moody's was considered the most difficult firm on Wall Street to deal with.

(iv)    Thus, according to Fons, Moody's knew that its "ratings [were] important, [its] ratings carr[ied] weight in the market."  Fons testified that Moody's understood that its "ultimate clients" were investors who relied upon its

- 30 -

ratings, "particularly an investor who hasn't bought a bond yet who [was] considering a purchase of a security."

119.    As alleged in <u>State of Connecticut v. Moody's Corp., et al.</u>, HHD-CV10-6008836-S (Conn. Super. Ct. 2010), in its 2005 Best Practices Handbook, Moody's specifically acknowledged its role vis-à-vis investors:  "We serve investors by providing them with timely credit research and independent, thoughtful, and accurate rating opinions on which they can base their investment decisions."

120.    In June 2005, Moody's published and adopted a "Code of Professional Conduct" ("Moody's Code"), in which Moody's again acknowledged that it played a critical role assisting investors with assessing risk.  Moody's noted that "[g]iven the vast amount of information available to investors today — some of it valuable, some of it not — Moody's helps investors and others sift through this information and analyze the credit risk they face when lending to a particular borrower, or when purchasing an issuer's debt or debt-like securities."

121.    According to a statement made by Eleanor Holmes Norton, a member of the Committee on Oversight and Government Reform, which held hearings on the Credit Rating Agencies and the Financial Crisis, "[a]t Moody's the profits quadrupled between 2000 and 2007.  In fact, Moody's had the highest profit margin of any company on the S&P for 5 years in a row.  And the reason that [Moody's is] so profitable is because so many investors rely on [Moody's] expertise and [Moody's] ratings as virtual gospel, scripture, whatever you want to call it.  They point to them time and again."

        **c.    Fitch Knew that its Ratings were Material to and Relied Upon by Investors**

122.    Fitch knew that investors considered Fitch's ratings of RMBS and CDOs to be material to their investment decisions.

123.    In April 2005, Fitch published the Fitch Ratings Code of Conduct ("Fitch's Code"), which stressed the importance of investor confidence in its ratings:  "Investor confidence in Fitch's ratings and research is difficult to win, and easy to lose, and Fitch's continued success is dependent on that confidence."

124.    In addition, on October 22, 2008, Stephen Joynt ("Joynt"), the President and Chief Executive Officer of Fitch, also testified before the House of Representatives Committee on Oversight and Government Reform.  Joynt testified that Fitch's ratings were valuable to investors:  "Fitch has and continues to produce much high quality research and ratings of value to many investors in many market segments."

125.    Joynt further noted he felt "quite responsible to provide [Fitch's] best opinion to investors and everyone in the market," admitting that Fitch was aware its ratings were material to and relied upon by investors.

## V.    THE RATING AGENCIES' FRAUD

126.    The Rating Agencies communicated to the Funds that the CDOs and/or RMBS reflected on Appendix A hereto, among others, had AAA, AA, or AA- or equivalent ratings, and the Funds relied upon those ratings when purchasing those securities and/or making their investments in the Funds.

127.    Investors, including the Funds, understood and reasonably believed — based on the Rating Agencies' representations — that these ratings meant:

     (i)     the CDOs and/or RMBS at issue had been rated by an objective, independent third-party whose impartiality was not impaired by any significant conflicts of interest;

     (ii)    the CDOs and/or RMBS at issue had been rated on the basis of current, accurate, and complete data and analysis, as well as reasonable and true models and assumptions, not mere "guess work" and speculation;

(iii)    the CDOs and/or RMBS at issue were low-risk investments;

(iv)    the CDOs and/or RMBS at issue were as safe, secure, and reliable as high quality corporate or government bonds;

(v)    the CDOs and/or RMBS at issue had a very low probability of default;

(vi)    the CDOs and/or RMBS at issue had a reasonably high likelihood of a high recovery in the event of default;

(vii)    the CDOs and/or RMBS at issue had an extremely low probability of transitioning to "junk" status; and

(viii)    the low rates of return offered by the CDOs and/or RMBS at issue were appropriate and reflected the true level of risk associated with the CDOs and/or RMBS at issue.

128.    The Rating Agencies communicated the false ratings for the securities listed on Appendix A, and others, at all relevant times through and including 2007.

129.    The Rating Agencies knew at all times that their ratings would be communicated directly to the Funds and other market participants through, *inter alia*, the Pre-Sale Reports and rating letters discussed above.  The Ratings Agencies further knew that the ratings would be confirmed via private placement memoranda and other written materials concerning the CDOs and/or RMBS at issue.

130.    The Rating Agencies knew at all times that investors, including the Funds, would and did reasonably rely on the false ratings in connection with the decision to invest, directly or indirectly, in CDOs and RMBS, and to maintain those investments, including the investments reflected on Appendix A hereto.

131.    Indeed, the Rating Agencies knew that their ratings were a critical investment characteristic of the CDOs and/or RMBS at issue, and further knew that it was common industry practice both to communicate and to rely upon this information as set forth above.

132.    The ratings ascribed to the securities on Appendix A were knowingly false because, in an effort to win market share and appease their clients, the Rating Agencies used flawed models and erroneous assumptions at all relevant times in connection with providing ratings and intentionally and/or recklessly ignored material information solely knowable by them concerning the deteriorating credit quality of the mortgages underlying the CDOs and RMBS at issue.

A.    **The Rating Agencies Repeatedly Misrepresented their Purported Objectivity, Continuing Surveillance, and the Currency of their Models**

133.    It was a condition to the sale of CDOs and/or RMBS, including those at issue, that they receive the rating required by the issuer.  However, a rating must be independent to have any value.  The ratings at issue here were not independent.

134.    The Funds and other investors placed their trust in the credit ratings largely because they were touted as objective, independent, and unbiased.

135.    Yet during the relevant time period, the same entities that issued the structured finance products that the Rating Agencies were rating paid the Rating Agencies billions of dollars in fees.  Indeed, in exchange for providing credit ratings on structured finance securities, the Rating Agencies charged issuers a fee based on the complexity and size of the structured finance security being rated.  This compensation model is commonly referred to as the "issuer pays" model.

136.    The issuer pays model created a tremendous conflict of interest and undermined the credibility of the ratings structures and surveillance of the CDOs and/or RMBS at issue and their constituent structured finance assets.

137.    Issuers of structured finance securities were well aware of the incentives built into the issuer pays model and used it to their advantage to get higher ratings from the Rating

Agencies.  If the issuer was unhappy with the credit enhancement levels or ratings proposed by, for example, Moody's, the issuer could inform Moody's of the credit enhancement levels or ratings proposed by either S&P or Fitch in order to influence the outcome of Moody's analysis. In such a situation, Moody's would be faced with the dilemma of either adjusting its analysis to win or retain the business, and therefore realizing additional revenue, or staying true to its original assessment and potentially losing the business.

138.    This practice is commonly known as "ratings shopping" because issuers offer the business of rating their structured finance security to competing rating agencies and usually gave the business to the firm (or firms) that found the least amount of credit enhancement necessary to achieve the rating levels desired by the issuer.

139.    On November 27, 2007, the former Chairman of the SEC, Arthur Levitt, Jr., pointed out the conflict of interest inherent in the "issuer pays" model:

> The subprime meltdown — which is still roiling the markets and the economic health of the world — is yet another example of what happens when independence and accountability is compromised among key market actors . . . of what happens when trust breaks down.

> Just like we did in the months after the implosion of Enron and WorldCom, we are now learning that a number of critical gatekeepers and market actors did not perform as we had hoped.

> First, consider the credit rating agencies.

> Until the 1970s, the business model of credit rating agencies was fairly straightforward: Investors bought a subscription to receive ratings which were then used to make investment decisions.

> But then the business model changed, and the issuers of securities themselves became the ones who paid to be rated . . . and as structured finance increased in popularity, it deepened this relationship between issuer and rater.

> Now, investors are relying on credit ratings to make informed investment decisions, but the credit rating firms are paid not by investors but by the companies they rate.  And as complex, structured debt products have increased in

popularity, the relationship between rater and issue became even closer — and the line between independent rater and paid advisor became blurred.

This very circumstance suggests that a potential conflict of interest between providing objective ratings and satisfying their corporate clients may be distorting the rating agencies judgment.  That they are both coach and referee.

140.    The Rating Agencies recognized the potential conflict of interest inherent in being selected and retained by the issuers whose RMBS and CDOs they rated.  Nevertheless, at all relevant times through at least mid-July 2007, the Rating Agencies repeatedly reassured investors, including financial institutions, and other participants in the financial markets, that their credit ratings, including those of RMBS and CDOs, were objective and independent, and that this potential conflict of interest, and the resulting incentives to favor issuers in order to maintain and increase market share and profits, would not and did not influence those ratings.

141.    During the relevant time period, the Rating Agencies also continually touted that they had up-to-date models designed to credibly and accurately assess the risk profiles of CDOs and RMBS.  The Rating Agencies likewise repeatedly assured market participants that they had robust surveillance processes and capabilities designed to ensure that their prior-issued ratings remained accurate and up-to-date.

142.    In fact, by virtue of their own internal policies, the Rating Agencies had an ongoing and continuing obligation to conduct surveillance of their ratings to make sure they continued to be accurate.

1.      _**S&P**_

143.    S&P gathered and restated its "established policies and procedures that are relevant to the rating and surveillance processes of Ratings Services" in a Code of Practices and Procedures dated September 2004 that S&P made "freely available to the public on [S&P's] public website."   The September 2004 Code of Practices and Procedures made several

representations regarding S&P's objectivity, independence, and freedom from conflicts of interest:

(i)    The introduction stated that S&P's "mission has always remained the same — to provide high-quality, objective, independent, and rigorous analytical information to the marketplace" — and that S&P "must continually strive for analytic excellence and must continuously evaluate its criteria, methodologies, and procedures, and modify or enhance them as necessary to respond to the needs of the global capital markets."  It further provides that S&P "endeavors to conduct the rating and surveillance processes in a manner that is transparent and credible and that also ensures that the integrity and independence of the ratings and surveillance processes are not compromised by conflicts of interest, abuse of confidential information or other undue influences."

(ii)   Section 3.1.1 stated:

Conflicts of interest or other undue influences if not managed properly could undermine Ratings Services' independence, objectivity and credibility.  Ratings Services is aware of the significant role it plays in the global securities markets and understands the public's concern about conflicts of interest and how such conflicts may affect the rating and surveillance processes.  Ratings Services endeavors to avoid conflicts of interest and, where this is not possible, has established policies and procedures to address the conflicts of interest through a combination of internal controls and disclosure.

(iii)  Section 3.1.2 stated:

In all analytic processes, Ratings Services must preserve the objectivity, integrity and independence of its ratings.  In particular, the fact that Ratings Services receives a fee from the issuer must not be a factor in the decision to rate an issuer or in the analysis and the rating opinion.

(iv)   Section 3.1.5 stated:

Ratings assigned by Ratings Services shall not be affected by an existing or a potential business relationship between Ratings Services (or any Non-Ratings Business) and the issuer or any other party, or the non-existence of such a relationship.

144.    S&P reaffirmed and further codified its representations regarding its ratings' objectivity, independence, and freedom from conflicts of interest in October 2005, when S&P

adopted the "Standard & Poor's Rating Services Code of Conduct" (the "2005 S&P Code").  The

2005 S&P Code was published on the S&P website and, in updated form, continued to be

published thereon throughout the relevant time frame.

145.   The 2005 S&P Code assured investors in S&P-rated products that S&P

"endeavors to conduct the rating and surveillance processes in a manner that is transparent and

credible and that also ensures that the integrity and independence of such processes are not

compromised by conflicts of interest, abuse of confidential information, or other undue

influences."  The 2005 S&P Code also noted that:

> [S&P] fully supports the essential purpose of the [International Organization of
> Securities Commissions Code of Fundamentals for Credit Rating Agencies
> ("IOSCO Code")], which is to promote investor protection by safeguarding the
> integrity of the rating process.  [S&P] believes that the [Code of Conduct] is
> consistent with the IOSCO Code and appropriately implements IOSCO's
> Statement of Principles Regarding the Activities of Credit Rating Agencies
> published in September 2003.

146.   One of the key principles set out in the IOSCO Code, which was first published in

December 2004, was the need for credit rating agencies to maintain independence from the

issuers that selected the rating agencies to rate their securities and were, therefore, the primary

source of the agencies' ratings business.  In particular, the IOSCO Code set forth the principle

that:

> [T]he essential purpose of the Code Fundamentals is to promote investor
> protection by safeguarding the integrity of the rating process.  IOSCO members
> recognize that credit ratings, despite their numerous other uses, exist primarily to
> help investors assess the credit risks they face when making certain kinds of
> investments.  Maintaining the independence of [credit rating agencies] vis-a-vis
> the issuers they rate is vital to achieving this goal.  Provisions of the Code
> Fundamentals dealing with [credit rating agency] obligations to issuers are
> designed to improve the quality of credit ratings and their usefulness to investors.[1]

---

[1] The IOSCO Code also emphasized that "[r]ating analyses of low quality or produced through a process of
questionable integrity are of little use to market participants," and that "[w]here conflicts of interest or a lack of

147.    Consistent with these principles, the 2005 S&P Code made several representations about the manner in which S&P maintained its objectivity and independence and avoided conflicts of interest posed by its relationships with issuers:

(i)    The Introduction stated that it was S&P's "mission" to:

provide high-quality, objective, independent, and rigorous analytical information to the marketplace.  In order to achieve its mission, Ratings Services strives for analytic excellence at all times, evaluates its rating criteria, methodologies and procedures on a regular basis, and modifies or enhances them as necessary to respond to the needs of the global capital markets.

(ii)    Section 2.1 stated:

Ratings Services shall not forbear or refrain from taking a Rating Action, if appropriate, based on the potential effect (economic, political, or otherwise) of the Rating Action on Ratings Services, an issuer, an investor, or other market participant.

(iii)    Section 2.2 stated:

Ratings Services and its Analysts shall use care and analytic judgment to maintain both the substance and appearance of independence and objectivity.

(iv)    Section 2.3 stated:

The determination of a rating by a rating committee shall be based only on factors known to the rating committee that are believed by it to be relevant to the credit analysis.

(v)    Section 2.4 stated:

Ratings assigned by Ratings Services to an issuer or issue shall not be affected by the existence of, or potential for, a business relationship between Ratings Services (or any Non-Ratings Business) and the issuer (or its affiliates) or any other party, or the non-existence of such a relationship.

---

independence is common at a credit rating agency and hidden from investors, overall investor confidence in the transparency and integrity of a market can be harmed."

148.    S&P's    November    2005    Analytic    Firewalls    Policy    reaffirmed    S&P's representations that its credit ratings would remain free from improper influences from issuers or other third parties:

> No employee of Standard & Poor's/McGraw-Hill shall attempt to exert improper influence on the opinions of an Equity Analyst or a Ratings Analyst.  In no circumstances shall an employee of Standard & Poor's/McGraw-Hill try to influence the opinion of an Equity Analyst or a Ratings Analyst by referring to the commercial relationship between Standard & Poor's/McGraw-Hill and any third party.

149.    In a February 2006 "Report On Implementation of Standard & Poor's Rating Services Code of Conduct," S&P again reaffirmed its representations regarding its ratings' objectivity, independence, and freedom from influence by any conflicts of interest posed by its relationships with issuers, stating:

> (i)      "[S&P] recognizes its role in the global capital markets and is committed to providing ratings that are objective, independent and credible;"

> (ii)     "It is a central tenet of [S&P] that its ratings decisions not be influenced by the fact that [S&P] receives fees from issuers.  To reinforce this central tenet, commencing in 2004, [S&P] separated in a more formal manner its commercial functions from its rating analytical functions;" and

> (iii)    "Standard & Poor's Ratings Services Code of Conduct . . . represented further alignment of its policies and procedures with the IOSCO Code of Conduct."

150.    In addition, S&P repeatedly made public representations regarding its ratings' objectivity, independence, and freedom from conflicts of interest to regulatory and legislative bodies:

> (i)      On July 28, 2003, in a letter to the SEC ("July 28th SEC Letter"), S&P stated: "[o]ver almost a century, S&P Ratings Services' mission has remained the same — to provide high-quality, objective, rigorous analytical information to the marketplace."  The letter continued:

> Underlying the credibility and reliability . . . of S&P Ratings Services' rating opinions is the market's recognition of the

independence, integrity, objectivity and quality of S&P Ratings Services' credit ratings, rating process and reputation . . . .

(ii)    The July 28th SEC Letter also stated that S&P believed:

[T]hat a critical factor in the success of the credit rating industry is the independence of the rating and analytic processes . . . from issuers and investors . . . .

(iii)   On November 5, 2003, Frank Raiter, the then Managing Director of Standard & Poor's Credit Market Services, testified before the House Subcommittee on Housing and Community Opportunity and the Subcommittee on Financial Institutions and Consumer Credit that: "Standard & Poor's believes that over the last century credit ratings have served the U.S. securities markets extremely well, providing an effective and *objective* tool in the market's evaluation and assessment of credit risk." (emphasis added).

(iv)   On February 8, 2005, the then-President of S&P testified at a U.S. Senate hearing that S&P "has a longstanding commitment to ensuring that any potential conflicts of interest do not compromise our analytical independence." She also stated, "[c]ritical to a credit rating agency's ability to serve this role in the market is its commitment to, and achievement of, the highest standards of independence, transparency and quality."

(v)    On April 17, 2007, in testimony at a United States Senate hearing, the then Managing Director of Residential Mortgage-Backed Securities for Standard & Poor's Rating Services stated that S&P's credit ratings were "grounded in the cornerstone principles of independence, transparency, credibility, and quality.  These principles have driven our long-standing track record of analytical excellence and objective commentary."

151.    At all relevant times, S&P represented to investors, including financial institutions, and other participants in the financial markets that its credit ratings of structured finance securities, including RMBS and CDOs, reflected its true current opinion of the credit risks posed by those securities. Thus, for example, as alleged in the DOJ Action:

(i)    S&P attached to its rating letters for structured finance securities "Terms and Conditions" that stated that "an issue rating reflects [S&P's] current opinion of the likelihood that payments of principal and interest will be made on a timely basis in accordance with the terms of the obligations."

(ii)     S&P pre-sale reports, outlined the particular factual analysis upon which a rating was based, including: "Appropriate asset and liability portfolio composition;" "Adequate market risk sensitivity tests;" "Adequate leverage and capital adequacy measures and triggers;" "Adequate liquidity;" "Operational review;" and "Legal documentation."

(ii)     The October 2005 S&P Code stated, "Ratings are current opinions regarding the future creditworthiness of issuers or issues."

(iii)    On or about June 8, 2007, in a publication titled "An Introduction to CDOs and Standard & Poor's Global CDO Ratings," S&P stated: "A [S&P] rating represents our opinion of the future creditworthiness (that is, the likelihood of default) of either an obligor in general or a particular financial obligation."

152.    As alleged in the DOJ Action, S&P reaffirmed its ratings' objectivity and independence and the importance thereof in an August 23, 2007 publication titled "The Fundamentals of Structured Finance Ratings," which also was posted on S&P's website. The publication further denied that S&P would weaken ratings criteria in effort to bolster market share:

> We are intensely aware that our entire franchise rests on our reputation for independence and integrity. Therefore, giving into "market capture" would reduce the very value of the rating, and is not in the interest of the rating agency.
>
> * * *
>
> [S&P] is paid by the issuers we rate . . . . Clearly, since there is a choice of rating agencies, the potential exists for a conflict of interest. In theory, one way to increase revenue would be for us to weaken our criteria to ensure that we are selected as the agency to rate a transaction or to ensure that a transaction that would not have been economically viable can take place. This would, of course, violate our internal rules . . . . [We] do not engage in such behavior.

153.    In a November 1, 2007 webinar, S&P similarly assured the public that its ratings are not merely based on the "gut" feeling of its analysts, but instead that its ratings are "developed out of an analysis of fact."

154.    S&P not only made these representations that its ratings were independent, objective, and based upon detailed factual analysis in public statements, on its website, and in

other public venues, but also through "road shows" and other personal interactions with large investors such as the Funds to, among other things, promote S&P's ratings and other products, answer questions about their methodologies, and build relationships with investors.

155. S&P also represented that it would monitor its ratings after an initial issuance.  In a draft of the CDO Strategic Plan, dated December 8, 2005, S&P stated that "[p]ost-issuance," it would "[m]onitor the performance of the transaction and the ratings assigned to the CDO liabilities for the lifetime of the rating notes, taking CreditWatch placements or upgrades/downgrades as required."

156. S&P also repeatedly reassured investors that it had an integrated surveillance process that would ensure that S&P's ratings of both RMBS and CDOs both then did and would continue to reflect S&P's most current view of their true credit risks.  Thus, for example, as alleged in the DOJ Action:

(i)      The 2005 S&P Code states that:

In accordance with Ratings Services' established policies and procedures for surveillance, unless the issuer requests a rating without surveillance, once a rating is assigned Ratings Services shall monitor on an ongoing basis and update the rating by: (a) regularly reviewing the issuer's creditworthiness; (b) initiating a review of the status of the rating upon becoming aware of any information that might reasonably be expected to result in a Rating Action (including withdrawal of a rating) consistent with the applicable rating criteria and methodology; and (c) updating on a timely basis the rating, as appropriate, based on the results of such review.

(ii)     On or about November 15, 2006, during a presentation to the Structured Finance Investor Council, an S&P executive represented that "S&P has an integrated surveillance process to ensure that RMBS assets in CDOs of ABS are appropriately monitored and reflect [S&P's] most current credit view."

(iii)    On or about February 15, 2007, an S&P senior analytical manager in US RMBS and an S&P RMBS Surveillance analyst conducted a teleconference in which they reassured investors that "[S&P] has an

integrated surveillance process to ensure the ratings on our rated RMBS bonds and CDO transactions reflect our most current credit view."

(iv)   On April 17, 2007, in testimony at a United States Senate hearing, the then Managing Director of RMBS for Standard & Poor's Rating Services stated that:

After a rating is assigned, S&P monitors or "surveils" the ratings to adjust for any developments that would impact the original rating. The purpose of this surveillance process is to ensure that the rating continues to reflect our credit opinion based on our assumption of the future performance of the transaction.

(v)   On or about June 8, 2007, in a publication titled "An Introduction to CDOs and Standard & Poor's Global CDO Ratings," S&P represented that S&P "has an integrated surveillance process to ensure the ratings on RMBS bonds and CDO transactions reflect our most current credit view."

(vi)   On July 10, 2007, Susan Barnes, Managing Director of S&P and the former North American Practice Leader for RMBS, stated that S&P had knowledge of the decline in performance of mortgages dating back to as early as 2005, and that S&P had adjusted its models to account for such declining performance:

Standard & Poor's has been actively monitoring trends in the housing market, the mortgage finance market, consumer credit and the overall economy to insure that its models, methodologies, criteria and analysis are fully informed.

This process enabled us to identify the trend of deteriorating credit quality of certain subprime mortgage loans in 2006 and adjust our criteria to require increased credit protection at that time.

This process also has helped us to further change our criteria for surveilling and rating RMBS transactions in light of the declining performance of loans issued since October 2005.

Nevertheless, S&P continued assigning unwarranted ratings to RMBS and/or failed to downgrade prior ratings.

157.   In July 2007, Ernestine Warner, the then head of RMBS surveillance for S&P, and Robert Pollsen, an S&P analyst, outlined in internal correspondence the following information regarding S&P's surveillance procedures for RMBS:

The surveillance process utilizes more than one approach.  Each month, all 2006 and 2005 vintage subprime and closed-end second lien deals are put through our 'exception' report filtering process.  Those deals are then further analyzed, having cash flow runs done for each deal, for those deals considered most 'at risk', due to high delinquencies, losses, or erosion in credit support.  Concurrently, surveillance works through a list of issuers, such that all major issuers are reviewed within 12-18 months, where every deal reviewed [sic], for that collateral type by that issuer[.]  In addition, each month all deals on external CreditWatch and internal watch are updated, with deals highlighted for each analyst to take action on classes, where necessary.

* * *

Deals are added to our CreditWatch lists when our cash flow analysis shows the ratings to be at risk. If delinquencies increase significantly or realized losses suddenly spike up, a deal not previously on CreditWatch may make its way onto our list.  Surveillance does not categorically put deals on CreditWatch just because of the financial difficulties of the Issuer or Servicer.  Only when those difficulties translate into poor performance do such deals get placed on CreditWatch.

* * *

We have been putting deals on CreditWatch if we expect a rating action within three to six months.  If we feel the rating on a particular class may need to be adjusted sometime *after* six months, then we put that deal on 'internal watch' for monthly or quarterly review (depending upon the timing of the likelihood of rating action).

158.    The DOJ Action alleges that in November 2003, S&P assured investors, including financial institutions, that it regularly updated its RMBS models, including its Loan Evaluation and Estimate of Loss System or "LEVELS" model, to reflect the changing and riskier underlying collateral.   In particular, in a publication posted on its website on November 5, 2003, S&P represented:

As the U.S. RMBS market continues to grow in issuance and complexity, the use and precision of mortgage risk assessment models takes on greater importance.  In such an environment, refinements and innovations to these models are an ongoing challenge.  *By regularly updating its mortgage risk assessment models, Standard & Poor's adjusts to the many intricacies that characterize this evolving market.*

159.     According to testimony given by Susan Barnes, LEVELS purportedly "embodies and reflects [S&P's] analytical assumptions and criteria. . . .   Based on [ ] individual loan characteristics, the LEVELS model calculates probabilities of default and loss realized upon default.  The assumptions and analysis embodied in the LEVELS model are under regular review and are updated as appropriate to reflect our current thinking about rating residential mortgages."

160.     The DOJ Action alleges that in April 2004, S&P publicly announced changes to LEVELS by posting on its website a document — titled "Taking U.S. Mortgage Analytics to New LEVELS" — that described in detail the alleged increased accuracy of S&P's soon to be released Levels 6.0.

161.     Almost three years later, in March 2007, S&P finally announced the release of LEVELS 6.0, a purportedly enhanced version of the LEVELS program effective for RMBS rated after July 1, 2007, which resulted in changes to credit enhancement requirements for first-lien, prime, Alt-A, subprime and second-lien transactions.  According to S&P, "with LEVELS 6.0, closed-end, second-lien loans will now run seamlessly with first-lien loans."

162.     Further, on July 1, 2006, S&P publicly stated that it had launched version 3.2 of its CDO Evaluator modeling application and represented that the new model "aims to bring the assumed default curve in line with actual defaults."

163.     In sum, S&P repeatedly claimed that:   (i) its ratings were objective and independent; (ii) its ratings were based on detailed factual analyses; (iii) its ratings were produced using sophisticated modeling platforms which were consistently updated; and (iv) it conducted ongoing surveillance to insure the continued accuracy of its ratings  In fact, none of these representations were true.

2.      *__Moody's__*

164.    Moody's likewise vouched for the independence of its ratings and vowed that its ratings were free from influence of any conflicts of interest.

165.    In its 2003 Annual Report, Moody's noted that:  "Moody's recognizes the vital role that credit rating agencies play in the capital markets.  We carefully manage the potential conflicts of interest inherent in our business model, where the issuers we rate provide most of our revenue.  We . . . appreciate the need to treat all market participants — issuers, intermediaries, and investors — professionally and fairly."

166.    In Moody's 2005 Annual Report, Raymond McDaniel, Moody's CEO, publicly reiterated Moody's emphasis on independence and objectivity when he stated:

> Moody's is committed to reinforcing among all relevant stakeholders — debt issuers, the investment community, employees, governmental authorities and shareholders — a sense of trust in the accuracy, independence and reliability of Moody's products and services, and our stewardship of the business.  To do this, we must keep pace with innovations in dynamic global financial markets, deliver products and services that sustain Moody's relevance, and enhance the perception that Moody's helps facilitate the fairness and efficiency of credit markets worldwide.

167.    Mr. McDaniel went on to emphasize as follows:  "I can do no better than to repeat the commitment in our shareholder letter of last year:  *most importantly, we remain committed to upholding the independence and integrity of our business*."

168.    Moody's vow of independence, objectivity, and integrity was codified in June of 2005, when it adopted the Moody's Code.  Moody's Code was and, in updated form, continues to be published on the Moody's public website, www.moodys.com.

169.    Specifically, Moody's Code stated that it was adopted "to enhance market understanding and confidence" in Moody's credit ratings and that Moody's seeks "to protect the integrity of the rating process."   Moody's further represented that it would "maintain[]

- 47 -

independence in its relationships with Issuers."  Moody's Code additionally provided that Moody's and its analysts "will take steps to avoid issuing any credit analyses, ratings or reports that knowingly contain misrepresentations or are otherwise misleading as to the general creditworthiness of an Issuer or obligation."

170.   In the April 2006 Report on the Code of Professional Conduct for Moody's ("Moody's April 2006 Report"), Moody's noted:

> Moody's Code sets forth the overall policies through which we seek to further our objective to protect the integrity, objectivity and transparency of our credit rating process.  The Code reflects the guidance provided in the [IOSCO] Code of Conduct . . . Moody's endorses the principles expressed in the IOSCO Code, and we are committed to implementing them through our own Code.

171.   The Moody's Code emphasizes the manner in which Moody's maintains its independence and avoids conflicts of interest with issuers.  For instance:

(i)    Section 1.12 of Moody's Code states:

> Moody's and its Employees will deal fairly and honestly with Issuers, Investors, other market participants, and the public.

(ii)   Section 2.1 of Moody's Code states:

> Moody's will not forbear or refrain from taking a Credit Rating action based on the potential effect (economic, political or otherwise) of the action on Moody's, an Issuer, an Investor, or other market participants.

(iii)  Section 2.2 of Moody's Code states:

> Moody's and its Analysts will use care and professional judgment to maintain both the substance and appearance of independence and objectivity.

(iv)   Section 2.3 of Moody's Code states:

> The determination of a Credit Rating will be influenced only by factors relevant to the credit assessment.

 (v) Section 2.4 of Moody's Code states:

> The Credit Rating Moody's assigns to an Issuer, debt or debt-like obligation will not be affected by the existence of, or potential for, a business relationship between Moody's (or its affiliates) and the Issuer (or its affiliates), or any other party, or the non-existence of any such relationship."

172. At all relevant times, Moody's represented to investors, including financial institutions, and other participants in the financial markets that its credit ratings of structured finance securities, including RMBS and CDOs, reflected its true current opinion of the credit risks posed by those securities.  Thus, for example:

 (i) The Moody's April 2006 Report stated, "we use the term 'Credit Rating' to mean, as defined in the Code, Moody's current opinion regarding the relative future creditworthiness of an entity, a credit commitment, a debt or debt-like security, or an issuer of such obligations . . . ."

 (ii) Moody's April 2006 Report further stated that "Moody's company bond ratings are intended to be 'accurate' and 'stable' measures of relative credit risk, as determined by each Issuer's relative fundamental creditworthiness and without reference to explicit time horizons."

 (iii) In Moody's 2007 Annual Report, Moody's re-emphasized that its "ratings are and will remain powerfully accurate predictors of future creditworthiness."

173. In a similar vein, in a February 23, 2008, document entitled "The Desired Meaning of Triple-A," Moody's represented that its ratings are based on "data and information needed to analyze the credit risk" and that such data and information "must be adequate to eliminate substantially all data-related uncertainty about future performance across a range of scenarios."

174. Moody's also repeatedly reassured investors that it was updating its models to ensure that Moody's ratings of both RMBS and CDOs would continue to reflect Moody's most current view of their true credit risks.  Thus, for example:

(i)     On September 26, 2005, Moody's published "Moody's Modeling Approach to Rating Structured Cash Flow CDO Transactions" in which Moody's announced that it strived to stay at the forefront of the CDO market and improve its credit risk evaluations:

To stay at the forefront of the CDO market, Moody's strives to develop new and refined methodologies as the market evolves and our understanding on the nature of financial products expands.

* * *

The Correlated Binomial Method introduces the asset correlation as an explicit modeling parameter and matches its loss distribution closely with the simulated one from the CDOROM, leading to a significantly improved analytical precision in credit risk evaluation.

(ii)    According to Moody's 2006 Annual Report, Moody's developed and introduced "improved methodologies for evaluating collateralized loan obligations that incorporate loss given default data from Moody's Corporate Finance Ratings Group."  The 2006 Annual Report further touts that "other successful new products stem from the efforts of specialized Moody's research teams who are dedicated to surveying market needs and designing responsive tools."

(iii)   In Moody's 2007 Annual Report, Moody's assured investors that it had taken several steps to mitigate "perfect storm" situations in the future. The 2007 Annual Report explains that "Moody's ongoing review of models and methodologies will explicitly address the quality and completeness of underlying data and consider the sensitivity of results to a range of input error."

175.    Moody's also made representations concerning its surveillance activities and capabilities.  For instance:

(i)     On September 26, 2007, Michael Kanef, Group Managing Director of Moody's Investors Service, testified before the Senate Committee on Banking, Housing and Urban Affairs that:

Moody's monitors its ratings on all securitization tranches on a monthly basis, and, as appropriate, considers the need for a ratings change.   Monitoring is performed by a separate team of surveillance analysts who are not involved in the original rating of the securities, and who report to the chief credit officer of the Asset Finance Ratings Group.  We generally receive updated loan performance statistics on a monthly basis for every collateral pool

for each transaction we have rated. We assess this information using quantitative models and flag potential rating "outliers" — securities whose underlying collateral performance indicates that the outstanding rating may no longer be consistent with the current estimated risk of loss on the security. Once a specific rating is flagged, a Moody's surveillance analyst will further investigate and discuss the status of the transaction with senior members of the team who together determine whether a rating change should be considered.

(ii)     An "Examination Report for Moody's Investor Services, Inc.," which is based on an August 31, 2007, examination by SEC, reveals that:

For both RMBS and CDO Moody's uses automated surveillance tools that on a monthly basis flag for review securities whose performance indicates that their current credit rating may not be consistent with the current estimated expected loss. Aside from its monthly outlier screening, Moody's also regularly performs ratings sweeps by issuer and/or origination year, where Moody's looks at each outstanding deal individually. Once a rated instrument is selected based on the automated surveillance tools, a Moody's surveillance analyst will further investigate the status of the transaction and present findings to a ratings committee. If the rating committee believes that a rating may need to be adjusted, then the securities are placed on review for a potential downgrade or upgrade.

(iii)    Moody's April 2006 Report states that:

Once a credit rating has been published, Moody's monitors the rating on an ongoing basis and will modify it "as necessary in response to changes in our opinion of the creditworthiness of the issuer or issue." Moody's has analytical staff dedicated to monitoring the performance of existing transactions in certain assets types, such as credit card, commercial mortgage and collateralized debt obligation transactions. Monitoring includes qualitative approaches and quantitative approaches, such as models that allow the monitoring staff to compare actual asset performance against the performance expected at the time of the rating assignment.

(iv)     A draft op-ed piece to be pitched to The New York Times and circulated internally at Moody's on August 30, 2007, represents that:

Ratings are not designed to be static . . . . If expectations for performance of the underlying asset pool in the case of securitizations . . . deviates from expectations held at the time of

the initial rating, we will factor those changes into our analysis and adjust our ratings accordingly.

176.    In sum, Moody's likewise repeatedly claimed that (i) its ratings were objective and independent; (ii) its ratings were based on detailed factual analyses; (iii) its ratings were produced using sophisticated modeling platforms which were consistently updated; and (iv) it conducted ongoing surveillance to insure the continued accuracy of its ratings.    These representations were untrue.

### 3.    *Fitch*

177.    In a letter to the SEC, dated November 12, 2002, Stephen Joynt vouched for Fitch's objectivity and independence:

[W]e emphasize independence and objectivity because our independent, unbiased coverage of the companies and securities we rate is important to our research subscribers and the marketplace in general.

Fitch goes to great efforts to ensure that our receipt of fees from issuers does not affect our editorial independence.

178.    Fitch's vow of objectivity and independence was codified in April 2005, when it adopted Fitch's Code for its rating practices.  Fitch's Code was and, in updated form, continues to be available on Fitch's public website, www.fitchratings.com.

179.    The first paragraph of Fitch's Code confirms that Fitch:

[I]s committed to providing the world's securities markets with objective, timely, independent and forward-looking credit opinions.  Fitch is dedicated to several core principles — objectivity, independence, integrity and transparency.  Investor confidence in Fitch's ratings and research is difficult to win, and easy to lose, and Fitch's continued success is dependent on that confidence.

180.    Section 2.1 of Fitch's Code confirms that ratings shall be based only on established criteria and methodologies:

The rating analysis and any rating action shall be based on Fitch's established criteria and methodologies, applied consistently, and shall be influenced only by factors relevant to such rating analysis and rating action.

181.    Section 2.11 of Fitch's Code addresses conflicts of interest and admonishes that:

All employees must use special care to avoid even the appearance of a conflict. An appearance of a conflict arises when a reasonable investor or issuer could believe that other interests, responsibilities or duties of the employee give rise to bias even if the employee believes that he or she can make an unbiased decision.

\* \* \*

Fitch and all its employees shall deal fairly and honestly with issuers, investors, other market participants and the public.  Fitch shall structure all reporting lines for Fitch employees to eliminate or effectively manage actual and potential conflicts of interest.

Analysts should be held to high standards of integrity, and Fitch shall not employ individuals where there is evidence that they have compromised integrity.

182.    With respect to Fee Discussions and Arrangements, Section 2.12 of Fitch's Code provides:

Fitch shall make every effort to manage the potential conflict arising from the payment of fees by issuers and ensure that Fitch's receipt of fees from issuers does not impair the independence, objectivity or integrity of its ratings and rating action.

183.    Section 2.12 of Fitch's Code further provides that:

Fitch shall not base any fees on the success of a bond issuer achieving any particular rating or other result.

184.    In addition, Fitch's Code is clear that analyst compensation shall not be tied to Fitch's revenue:

An analyst shall not be compensated or evaluated on the basis of the amount of revenue that Fitch derives from issuers or securities that the analyst rates or with which the analyst regularly interacts.

185.    In its May 2006 publication concerning the implementation of Fitch's Code, entitled "The Fitch Code of Conduct: One Year On," ("May 2006 Report") Fitch confirmed that "[t]he independence of [its] rating work is of primary importance."

- 53 -

186.    At all relevant times, Fitch represented to investors, including financial institutions, and other participants in the financial markets that its credit ratings of structured finance securities, including RMBS and CDOs, reflected its true current opinion of the credit risks posed by those securities.  Thus, for example:

(i)      In the May 2006 Report, Fitch stated that it "remains committed to providing the world's securities markets with objective, timely, independent and forward-looking credit opinions."

(ii)     In an August 2007 publication, entitled "Inside the Ratings: What Credit Ratings Mean," Fitch stated that its: "credit ratings provide an independent, timely and prospective opinion on the creditworthiness of an entity or transaction."

187.    During the relevant time period, Fitch repeatedly reassured investors that it was updating its models and employed surveillance processes to ensure that Fitch's ratings of both RMBS and CDOs would continue to reflect Fitch's most current view of their true credit risks. Thus, for example:

(i)      In a November 9, 2000, publication entitled "Rating Criteria for Cash Flow ABS/MBS CDOs," Fitch boasted about its surveillance capabilities:

Surveillance is an integral part of the rating process.  Ratings are reviewed periodically for any necessary adjustments.  Fitch monitors all ABS/MBS CDOs on a monthly basis, tracking compliance with portfolio guidelines, cash flow generation, and collateral quality.  Fitch expects some deterioration in portfolios over time.  This deterioration is built into Fitch's default tests. Prices at which assets are purchased and sold are closely monitored.  This ongoing surveillance provides investors with comfort concerning the continued accuracy of the rating, especially during periods of market turmoil.

(ii)     In a September 13, 2004, publication entitled "Global Rating Criteria for Collateralised Debt Obligations," Fitch introduced its Default VECTOR Model for rating CDOs.  According to Fitch, VECTOR:

[A]llows greater precision and granularity in portfolio risk modeling when evaluating and rating a CDO.  It also addresses new structures in the market, such as recent synthetic structures and basket trades.

(iii)    In the same publication, Fitch promised that its rating criteria "draw on Fitch's comprehensive experience of the performance impact of all types of structural features, capitalizing on its in-depth empirical research since the advent of the CDO market."   Fitch also promised that after a transaction has closed, it "will monitor [] CDO's performance and adherence to guidelines through ongoing surveillance."

(iv)    Fitch further asserted in that publication that:

Monitoring the performance of a CDO is a critical part of maintaining the ratings on a transaction over its life.  Reviewing the composition and performance of a portfolio on a regular basis allows Fitch to pass on accurate and timely information and commentary to subscribers . . .  Outstanding ratings are formally reviewed annually, but may be reviewed more frequently, as warranted by events, to maintain timely ratings on all Fitch rated CDOs.  The result of every review will be communicated in a press release.

(v)    In a July 2006 publication, "The Rating Process," Fitch stated:

Unless they are of a 'point-in-time nature, Fitch's ratings are monitored on an ongoing basis and Fitch is staffed to ensure that this is possible.  Analysts in all groups will initiate a rating review whenever they become aware of any business, financial, operational or other information that they believe might reasonably be expected to result in a rating action, consistent with the relevant criteria and methodologies. . . . .  Consequently, the review process should be regarded as a continuous one.  Ratings are also subject to formal periodic reviews.

* * *

188.    For structured finance transactions, in most cases, surveillance is conducted by a dedicated surveillance analyst after publication, not the primary analyst who formulates the initial rating recommendations.

189.    In sum, Fitch made similar representations regarding its alleged objectivity and independence, factual analysis, surveillance capabilities, and models.   These representations were false.

**B.**     **Contrary to Their Representations, the Rating Agencies Prioritized Profitability Over Objectivity and Accuracy**

190.    The Funds relied upon the Rating Agencies' numerous and repeated representations regarding, among other material things, their asserted independence and their commitment to conduct ongoing surveillance of prior-rated securities to ensure their ratings were and remained accurate.

191.    Notwithstanding their repeated assurances to the contrary, serious conflicts of interest at the Rating Agencies existed at all relevant times and now have been revealed.  These conflicts, at all relevant times, resulted in the issuance of fraudulent ratings.  Moreover, due in large part to their conflicted loyalties to the issuers of structured financial products, and contrary to their representations, the Rating Agencies failed to conduct surveillance of prior-rated securities and/or update the prior ratings pursuant to their own internal procedures.  The result was that the Rating Agencies issued and/or maintained ratings with intentional and/or reckless disregard for their accuracy.

**1.**     ***The Rating Agencies Allowed Business Concerns to Infiltrate and Corrupt the Objectivity and Accuracy of the Rating Process***

192.    Contrary to their repeated representations regarding their supposed objectivity and independence, as revealed by the numerous investigations conducted following the subprime crisis, the Rating Agencies allowed concerns of profitability and market share to infiltrate and corrupt the rating process.

193.    For example, on June 11, 2008, former Chairman Cox made the following remarks concerning the Rating Agencies and the role that their business interests played in the ratings process:

> When the Congress passed the Credit Rating Agency Reform Act a year and a half ago, it was well understood that certain conflicts of interest were hardwired

into the rating agency business model.  But we have learned since then that the ratings of structured products in the subprime area made those conflicts of interest even more acute.  That's because structured products were specifically designed for each tranche to achieve a particular credit rating — and the ratings agencies then made a lucrative business of consulting with issuers on exactly how to go about getting those ratings.  Selling consulting service to entities that purchased ratings became a triple-A conflict of interest.

194.    On July 8, 2008, following a ten-month investigation, the SEC released a report concerning the Rating Agencies (the "July 8th SEC Report").  In summarizing its "factual findings, observations and recommendations from the examinations," the SEC highlighted that: "**[a]nalysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal.**"  (emphasis in original).

195.    The July 8th SEC Report also stated that:  **"Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."**  (emphasis in original). Although the July 8th SEC Report does not reveal the identity of its sources, it provides the following examples of the pervasive influence of business concerns on the ratings process:

(i)     A senior analytical manager in the Structured Finance group [at one firm] wrote:  "I am trying to ascertain whether we can determine at this point *if we will suffer any loss of business* because of our decision [on assigning separate ratings to principal and interest] and if so, how much?" "Essentially, [names of staff] ended up agreeing with your recommendations but *the CDO team didn't agree with you because they believed it would negatively impact business*."

(ii)    "In another e-mail, following a discussion of a competitor's market share, an employee of [one] firm states that *aspects of the firm's ratings methodology would have to be revisited to recapture market share from the competing rating agency*."

(iii)   "An additional e-mail by an employee stated, following a discussion of losing a rating to a competitor, *'I had a discussion with the team leaders here and we think that the only way to compete is to have a paradigm shift in thinking, especially with the interest rate risk.'*"

(emphasis added) (footnotes omitted).

196.     The July 8th SEC Report also revealed that ratings analysts improperly were involved in fee negotiations: "[I]n some instances, analysts discussed fees for a rating."  The SEC gave the following examples of this problem, again without revealing the identity of its sources:

      (i)     "At one firm, an analyst wrote to his manager asking about whether the firm would be charging a fee for a particular service and what the fee schedule will be."

      (ii)     "At another firm, a business manager in the RMBS group wrote to several analysts:  '. . . if you have not done so please send me any updates to fees on your transactions for this month.  It is your responsibility to look at the deal list and see what your deals are currently listed at.'"

      (iii)     "At two rating agencies, there were indications that analysts were involved in fee discussions with employees of the rating agency's billing department."

(footnotes omitted).

197.     The July 8th SEC Report made the following observations with respect to all three Rating Agencies:

> At one firm, internal communications appear to expose analytical staff to this conflict of interest by indicating concern or interest in market share when firm employees were discussing whether to make certain changes in ratings methodology.  In particular, employees discussed concerns about the firm's market share relative to other rating agencies, or losing deals to other rating agencies.

198.     In sum, as stated by former SEC Chairman Cox in his April 22, 2008 statement to Congress:

> The rating agencies' performance in rating these structured credit products has called into question their credit ratings generally as well as the integrity of the ratings process as a whole.

199.     Former employees of the Rating Agencies confirm that the Rating Agencies knew their ratings for CDOs and/or RMBS, including those at issue herein, were marred by conflicts of

- 58 -

interest and, therefore, did not accurately reflect the Rating Agencies' true assessment of risk. As reported in a September 25, 2008, Bloomberg article:

(i)     "'I knew it was wrong at the time'" said Richard Gugliada, a former Managing Director of the S&P CDO Group.

(ii)    Gugliada further stated: "It was either that or skip the business. That wasn't my mandate. My mandate was to find a way. Find the way."

200.    Similarly, on September 24, 2008, Bloomberg reported that a former S&P Manager Director commented that:  "[S&P] thought they had discovered a machine for making money that would spread the risks so far that nobody would ever get hurt."

201.    Additional internal e-mails reflect the continual erosion of objectivity at S&P in favor of profitability.

202.    For example, a May 2004 internal S&P e-mail regarding "Competition with Moody's," reveals the pressure inherent in S&P's culture to compete for business at the expense of ratings accuracy:

We just lost a huge Mizuho RMBS deal to Moody's due to a huge difference in the required credit support level . . . [which] was at least 10% higher than Moody's . . . . [Moody's] ignored commingling risk and for interest rate risk they took a stance that if the interest rate rises they will just downgrade the deal . . . . I had discussion with the team leads here and we think that ***the only way to compete is to have a paradigm shift in thinking***." (emphasis added).

203.    S&P's focus on profitability is further exemplified by a draft of S&P's CDO Strategic Plan, dated December 8, 2005, in which S&P reports that the "primary customers" of the CDO group are bankers as "[t]his group continues to be responsible for the vast majority of revenue, including all initial deal rating fees paid to S&P."  Investors are reported as mere "secondary customers."

204.    Typical of the Rating Agencies' thinking throughout the relevant period is a June 15, 2007, S&P internal memo, regarding "S&P Vulnerabilities In A Downturn," stating that it

experienced "a gradual shift from rules based to principals based analytical methodologies, ***and an increase in internal management pressures to maintain or grow market share while also growing margins.*"* (emphasis added).

      **a.**      **S&P**

205.    As alleged in <u>California v. The McGraw-Hill Companies, Inc. et al.</u>, No. CGC-13-528491 (Cal. Super. Ct. 2013) ("California Action"), a new Global Structured Finance Criteria Process, circulated to S&P's top managers in July 2004, and authored by senior executives Joanne Rose and Tom Gillis, explicitly tied new ratings criteria to business relationships.  It did so under the euphemism "market appropriateness."  According to the California Action, the document included a directive that required new ratings criteria proposals to include an explanation of "[d]esired [o]utcome," and "should indicate what influence the adoption of the [new] criteria will have on default rates, rating volatility, ***and market perception and reaction***." (emphasis added).

206.    This new process for proposed criteria changes met with opposition, but was adopted nonetheless.  For example, the DOJ Action alleged that Frank Raiter, an S&P Managing Director and head of the Residential Mortgage Rating Group — outraged at this new practice — sent an e-mail to senior executives stating "***we NEVER poll [investors, issuers, and investment bankers] as to content or acceptability***!" (emphasis in original).  Mr. Raiter added:

> What do you mean by 'market insight' with regard to a proposed criteria change?  What does 'rating implication' have to do with the search for truth?  Are you implying that we might actually rate or stifle 'superior analytics' for market considerations?  Inquiring minds want to know."

207.    Yet despite this warranted criticism, according to the DOJ complaint, the new criteria which specifically required consideration of profitability and market share ultimately was adopted.

208.    In August 2004, for example, an S&P Managing Director sent an e-mail to other high level managers, including Richard Gugliada, the Managing Director of the CDO Group, stating that:  "[w]e are meeting with your group this week to discuss adjusting criteria for rating CDOs of real estate assets this week *because of the ongoing threat of losing deals.*" (emphasis added).  This, according to Mr. Gugliada, led to S&P lowering its criteria to accommodate clients.  According to Mr. Gugliada, by 2006, S&P had repeatedly eased its rating standards in "a market-share war where criteria were relaxed."

209.    This change in criteria led to the loosening of ratings standards and the issuance of ratings which were knowingly false.  Indeed, analysts at the Rating Agencies repeatedly expressed anxiety about the lax ratings they were assigning securities.

210.    A June 14, 2005, e-mail from S&P director Frank Parisi warned about adjusting criteria and rating standards for business purposes:  "Screwing with criteria to 'get the deal' is putting the entire S&P franchise at risk — it's a bad idea."  Yet Mr. Parisi's warnings went unheeded, and S&P went ahead and let business concerns dictate its ratings criteria anyway.

211.    One S&P senior executive went so far as to state that S&P "felt more like the Wild West," and admitted that tightening rating criteria "puts a crimp on the business."

212.    Mr. Gugliada explained in a September 25, 2008, Bloomberg article, entitled "'Race to Bottom' at Moody's, S&P Secured Subprime's Boom, Bust," that when the subject of tightening S&P criteria did come up, the co-director of CDO ratings, Dave Tesher, said: "don't kill the golden goose."

213.    This loosening of ratings criteria to accommodate issuers and increase profitability was directly contrary to S&P's numerous and repeated representations regarding its alleged independence and objectivity.  Moreover, as detailed herein, this loosening of ratings

criteria led to the failure by S&P to provide accurate ratings and/or timely downgrades of the securities in which the Funds invested, leading to hundreds of millions in losses.

214.   The following instant message conversation on April 5, 2007, between Rahul Shah ("Shah") and Shannon Mooney ("Mooney") — two S&P analysts — describing S&P's rating of an investment and its constituent securities, demonstrates that they knew the ratings they were issuing were inaccurate and contrary to S&P's public representations regarding independence and objectivity:

| | |
|---|---|
| Shah: | btw - that deal is ridiculous |
| Mooney: [sic] | i know right . . . model def[initely] does not capture half of the rish |
| Mooney: | risk |
| Shah: | we should not be rating it |
| Mooney: | we rate every deal |
| Mooney: | ***it could be structured by cows and we would rate it*** |
| Shah: | but there's a lot of risk associated with it - ***I personally don't feel comfy signing off as a committee member.*** |

(emphasis added).

215.   On December 15, 2006, Chris Meyer, an S&P analytical manager in the same group as Shah and Mooney, expressed similar sentiments in an e-mail he wrote to a senior analytical manager, noting that the rating agencies continue to create an "even bigger monster — the CDO market.  ***Let's hope we are all wealthy and retired by the time this house of cards falters***." (emphasis added).

216.   Significantly, S&P worked to *conceal* its weakening ratings criteria.  For example, the California Action alleges that a July 2004 memo discouraged e-mail communications among those involved in the rating committee process and required that all

ratings committee work be done in person or by phone.  The purpose of this policy was to attempt to conceal any doubting and/or dissenting opinions.

217.    The California Action alleges that this e-mail policy further prohibited any discussion or critique of ratings after they were issued.  The policy stated as follows:

> Second-guessing or revisionist history concerning a particular rating decision that was reached in accordance with Standard & Poor's policies and procedures is inappropriate behavior irrespective of the method of communication chosen. Similarly, commenting on rating decisions in which you were not directly involved or have sufficient knowledge of is inappropriate.

### b.    Moody's

218.    This conflict of interest between independence and profitability likewise infected Moody's.  As reported in the April 11, 2008, The Wall Street Journal, Mark Froeba, who was a senior vice president in the CDO Group at the time he left Moody's after ten years of employment, stated that while there was no explicit directive to abandon ratings objectivity to earn business from investment banks, there was "***a palpable erosion of institutional support for rating analysis that threatened market share.***"  (emphasis added).

219.    The Chief Executive Officer of Moody's, Raymond McDaniel, confirmed that Moody's was, in fact, pressured to provide strong ratings:  "Everybody always seeks to pressure us.  Anyone with a position in the credit markets will hope that the credit-rating agencies agree with its opinion.  It's a conflict of interest question."

220.    Moody's began to feel and acted upon this pressure beginning in 2000 when it became a stand-alone public company.  Mark Froeba, stated that "[t]he story at Moody's doesn't start in 2007; it starts in 2000," and that there was:

> [A] systematic and aggressive strategy to replace a culture that was very conservative, an accuracy and quality orientated culture, a getting the rating right kind of culture, with a culture that was supposed to be business friendly but was consistently less likely to assign a rating that was tougher than our competitors.

221.   This emphasis at Moody's on being business friendly over being accurate was confirmed in an internal Structured Finance Market Share Commentary, dated November 19, 2003, in which Moody's admitted that:  "We at all times attempt to have our models proactively on the frontier between "aggressive" and "correct."   In the same document Moody's further admitted concerns about other rating agencies lowering their ratings criteria in an effort to compete:  "[C]urrently we are near the edge with our models and continue to have concerns that since the other agencies do not seem to be able to effectively compete with us on research, analytics or service that they will turn to lowering levels further."

222.   Moody's attention to the business implications of its rating methodologies at the expense of rating accuracy is further reflected in a March 2005 e-mail.  A Moody's analyst confirmed that Moody's intended "to test all three 'packages' [new default table, correlation and stress factors]  in order to determine which one makes most sense *from a business perspective*." (emphasis added).

223.   In a 2006 Business Effectiveness Survey, Moody's employees likewise pointedly commented on Moody's emphasis on profitability over accuracy:

- With respect to Moody's representations concerning neutrality:  "sometimes that is true, sometimes it isn't;"

- "Manager focuses on making bankers happy instead of focusing on the issues involved with respect to the transactions.  Individuals are being promoted/rewarded who do not read the documents and do not truly analyze the documents.  They simply convey what the bankers tell them.  There is a check the bo[x] mentality;" and

- "I think that senior management favors big clients.  There were instances where I felt that we compromise our rating due to pressure from senior management that wanted to please big clients."

224.   On October 22, 2008, Jerome Fons, former Managing Director of Credit Policy of Moody's, testified before the House Committee on Oversight and Government Reform about a

shift in focus by Moody's from investors to issuers.  He confirmed that, over time, Moody's sought to satisfy issuers at the expense of the investors who relied upon Moody's rankings. Specifically, Fons testified that:

> A 1994 article in Treasury & Risk Management Magazine pointed to surveys that highlighted issuers' frustrations with Moody's.  This had a profound impact on the firm's thinking.  It raised questions about who our clients were and how best to deal with them.  ***Management undertook a concerted effort to make the firm more issuer-friendly.  In my view, the focus of Moody's shifted from protecting investors to marketing ratings***.

(emphasis added).

225.    Fons thus admitted that Moody's "began to emphasize customer service and commissioned detailed surveys of client attitudes."  Fons testified that he "believe[d] the first evidence of this shift manifested itself in flawed ratings on large telecom firms during that industry's crisis in 2001."  According to Fons:

> Following [Moody's] 2000 'spin' from Dun & Bradstreet . . . management's focus increasingly turned to maximizing revenues.  Stock options and other incentives raised the possibility of large payoffs.  Managers who were considered good businessmen and women — not necessarily the best analysts — rose through the ranks.  Ultimately, this focus on the bottom line contributed to an atmosphere in which . . . rating shopping could flourish.

226.    Consistent with Fons' testimony about the focus on client service, in his prepared statement to the Financial Crisis Inquiry Commission, dated June 2, 2010, Mark Froeba explained that Brian Clarkson, Moody's former President and Chief Operating Officer, used fear and threats of termination to encourage analysts to work more cooperatively with investment bankers at the expense of ratings quality.

227.    On April 23, 2010, a former Moody's Managing Director, Erick Kolchinsky, likewise testified before the Senate Permanent Subcommittee on Investigations about the deterioration in credit standards and the intense pressure placed on managing directors to increase market share at the expense of rating quality:  "Managers of rating groups were

expected by their supervisors and ultimately the Board of Directors of Moody's to build, or at least maintain, market share. It was an unspoken understanding that loss of market share would cause a manager to lose his or her job." Kolchinsky explained that "[e]ven if market share dropped by a few percentage points, managers would be expected to justify 'missing' the deals which were not rated."

228. Former Moody's employees also admit that Moody's staffed deals according to the requests of particular issuers, and that analysts were discouraged from being thorough. For example, Richard Michalek, the former head of the Structured Finance Group, noted that he was told explicitly that he was "not welcome" to work on deals structured by certain issuers because his analysis was too comprehensive. Specifically, Michalek's statement to the Senate Permanent Subcommittee on Investigations, dated April 23, 2010, recounts:

> In my 'discussion' [with Clarkson], I was told that he had met with investment banks to learn how our Group was working with the various clients and whether there were any analysts who were either particularly difficult or particularly valuable. I was named . . . as two of the more 'difficult' analysts who had a reputation for making 'too many' comments on the deal documentation.

> The conversation was quite uncomfortable, and it didn't improve when he described how he had previously had to fire [another analyst], a former leader of the Asset-Backed group who he otherwise considered a 'good guy.' He described how, because of the numerous complaints he had received about [that analyst's] extreme conservatism, rigidity and insensitivity to client perspective, he was left with no choice . . . . He then asked me to convince him why he shouldn't fire me . . . . [T]he primary message of the conversation was plain; further complaints from 'customers' would very likely abruptly end my career at Moody's.

229. This focus on market share and profitability caused Moody's and the other Rating Agencies to turn a blind eye to the increasing risk inherent in the mortgage market, and particularly the subprime market. Raymond McDaniel testified on October 22, 2008, before the U.S. House of Representatives Committee on Oversight and Government Reform that

"[b]etween 2003 and 2006, Moody's observed an increase in the risk profile of subprime mortgage portfolios that [it was] asked to review prior to assigning ratings."

230.    Yet, despite the increase in risk, during his October 22, 2008, testimony before the Committee on Oversight and Government Reform, Jerome Fons indicated that Moody's loosened its rating standards:  "[T]he focus of Moody's shifted from protecting investors to being a market-driven organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

231.    Fons testified that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality."  Fons testified that the Rating Agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  Fons said it was this business model that "prevented analysts from putting investor interests first."

232.    Mark Adelson, a former Moody's managing director also commented on the Rating Agencies' efforts to win business from one another.  In an August 15, 2007, The Wall Street Journal article, Adelson said:  "It was always about shopping around" for higher ratings, although industry insiders referred to it by other names, including "best execution" or "maximizing value."

233.    Jerome Fons explained how ratings shopping created the deep conflicts at Moody's.  Fons was a frequent in-house critic of Moody's overly optimistic credit ratings, but was not able to persuade Moody's to change its policies.  In his White Paper on Rating Competition and Structured Finance, dated January 10, 2008, Fons unequivocally admitted that

***"[t]he recent failure of rating agencies to signal in a timely and accurate fashion the condition of many securities backed by subprime housing loans can be traced to weaknesses (or outright failures) in the protections against conflicts of interest*.**" (emphasis added).

234.     In a March 16, 2009, opinion editorial for The New York Times, Fons stated that "the agencies put troubled companies on artificial 'watch lists' while they maintained overly optimistic letter ratings."

235.     In testimony given before the Financial Crisis Inquiry Commission on June 2, 2010, Mark Froeba, also acknowledged the pressure created by the conflict internally at Moody's:

> Before [2000], Moody's had an extremely conservative analytical culture. Moody's analysts were proud to work for what they believed was by far the best of the rating agencies.   Everyone understood that for any new product that was unusual or complex, the Moody's rating was the one to get and that without it, it would be difficult or even impossible to market the new product.  In short, the Moody's of that time had the stature and maybe even the power to stop something like the subprime bubble had it arisen then.

> Unfortunately, by the time the bubble arrived, Moody's had deliberately abandoned its stature, surrendered its power, and given up its analytical distinctiveness.

> How did it happen?  Under the guise of making Moody's more business friendly, for example, making sure that analysts would return phone calls.  Moody's senior managers set in motion a radical change in Moody's analytical culture that not only changed the rating process, but also profoundly changed Moody's ratings.

236.     Froeba also testified before Congress regarding the increasingly "business friendly" culture at Moody's and the negative impact it had on analysts' work product:

> When I joined Moody's in late 1997, an analyst's worst fear was that he would contribute to the assignment of a rating that was wrong, damage Moody's reputation for getting the answer right, and lose his job as a result.

> When I left Moody's [in 2007], an analyst's worst fear was that he would do something that would allow him to be singled out for jeopardizing Moody's market share, for impairing Moody's revenue, or for damaging Moody's relationships with its clients, and lose his job as a result.

\*       \*       \*

Moody's senior managers never set out to make sure that Moody's rating answers were always wrong.  Instead, they put in place a new culture that would not tolerate for long any answer that hurt Moody's bottom line.  Such an answer became, almost by definition, the wrong answer, whatever its analytical merit.  As long as market share and revenue were at issue, Moody's best answer could never be much better than its competitors' worst answers.  But arriving at an accurate answer was never objectionable so long as that answer did not threaten market share and revenue.

\*       \*       \*

Moody's managers deliberately engineered a change to its culture to ensure that rating analysis never jeopardized market share and revenue.  They accomplished this both by rewarding those who collaborated and punishing those who resisted.  In addition to intimidating analysts who did not embrace the new values, they also emboldened bankers to resist Moody's analysts if doing so was good for Moody's business.

237.    William Harrington, an analyst in the Derivatives Group at Moody's from June 1999 until July 2010, similarly confirmed that Moody's increasingly pressured its analysts to issue "market friendly," rather than accurate ratings.  In an August 8, 2011, letter to the SEC, Mr. Harrington detailed how Moody's Compliance Department functioned to pressure analysts to issue higher — rather than accurate — ratings:

The Compliance Department is also an enforcer that actively harasses analysts viewed as 'troublesome,' i.e., independent, and is well experienced in doing so.  Several of its prominent officers trained for the Compliance Department (and Credit Policy) by managing the issuing and monitoring of RMBS opinions.  The contributor can attest to harassment meted out by the Compliance Department while employed by Moody's as well as ongoing harassment that has stopped only recently. . . .  Unfortunately, the contributor participated in numerous committees where management maneuvered for a prescribed result through intimidation of other voting members.  Intimidation could be blatant, with managers belittling opposing views, interrupting while others speak, making evident that they didn't consider the committee memo to be relevant or engaging in non-committee activities such as communicating on an electronic device until ready to speak themselves.

238.    Raymond McDaniel, the CEO of Moody's, specifically acknowledged the degradation of ratings standards caused by the conflict of interest.  In a presentation to Moody's

Board of Directors in October 2007, McDaniel told the Board:  "The real problem is not that the market . . . underweights ratings quality but rather that, in some sectors, it actually penalizes quality . . . .  It turns out that ratings quality has surprisingly few friends."  He noted that "Moody's for years has struggled with this dilemma.  On the one hand, we need to win the business and maintain market share, or we cease to be relevant.  On the other hand, our reputation depends on maintaining ratings quality (or at least avoiding big visible mistakes)."  With respect to the pressure exerted on analysts to come up with high ratings, McDaniel explained that "[a]nalysts and [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'"  McDaniel admitted that "[c]oupled with strong internal emphasis on market share & margin focus, this does constitute a 'risk' to ratings quality."

239.    Moody's business concerns also impacted its staffing, which trickled down to the effectiveness of the operations of its Structured Finance Group.  Moody's Structured Finance Group 2002 Associate Survey revealed that:

> There [was] some concern about workload and its impact on operating effectiveness . . . .  Most acknowledge that Moody's intends to run lean, but there is some question of whether effectiveness is compromised by the current deployment of the staff.

> * * *

> When asked about how business objectives were translated into day-to-day work, most agreed that writing deals was paramount, while writing research and developing new products and services received less emphasis.

### c.    Fitch

240.    Fitch likewise relaxed its ratings criteria to stay competitive.

241.    As McDaniel noted, this degradation of ratings quality was not limited to Moody's:  "Now, it was a slippery slope, what happened in '04 and '05 with respect to

subordinated tranches is that our competition, Fitch and S&P, went nuts.  Everything was investment grade.  It didn't really matter . . . No one cared because the machine just kept going."

242.    An internal e-mail from Gus Harris, a Moody's Managing Director, dated March 21, 2007, reflects the degree and extent of the competition between Rating Agencies, and how it negatively affected the accuracy of their ratings.  Harris complains that Fitch was using a more lenient ratings methodology to award higher ratings and steal business from Moody's.  The internal correspondence confirms that Fitch knowingly employed lax rating standards with respect to "haircuts" to win business.  (A "haircut" is a term of art referring to the percentage that is subtracted from the market value of an asset that is being used as collateral.  The size of the haircut reflects the perceived risk associated with holding the asset.)  The e-mail confirms that Moody's felt pressure to do the same in order to compete effectively:

> We have heard that [Fitch] had approached managers and made the case to remove Moody's from their deals and have Fitch rate the deals because of our firm position on the haircuts. We have lost several deals because of our position.

**2.    _The Rating Agencies' Motive for Sacrificing Objectivity and Accuracy is Clear — it was Profitable to do so_**

243.    There is a reason the Rating Agencies relaxed their standards — it was profitable to do so.  Statements by industry insiders indicate the Rating Agencies were paid nearly three times the amount to rate CDOs and/or RMBS, including, upon information and belief, those listed on Appendix A, than they would have received to rate a traditional corporate debt obligation.  This incentivized the Rating Agencies to cave to issuer demands and undermined the credibility of their ratings to such a significant degree as to make those ratings false and misleading.

244.    Specifically, Sean Egan, the managing director of Egan-Jones Ratings, testified before the Committee on Oversight and Government Reform on October 22, 2008, that:

Issuers paid huge amounts to [the Rating Agencies] for not just significant rating fees but, in many cases, very significant consulting fees for advising the issuers on how to structure the bonds to achieve maximum triple-A ratings. This egregious conflict of interest may be the single greatest cause of the present global economic crisis. . . . The credit rating industry is a $5 to $6 billion market with these three companies, S&P, Moody's and Fitch, controlling more than 90 percent of the market. With enormous fees at stake, it is not hard to see how these companies may have been induced, at the very least, to gloss over the possibilities of default or, at the worst, knowingly provide inflated ratings.

245.     The Rating Agencies charged substantial fees to rate a product. For example, S&P charged up to 12 basis points for a CDO issue, but only 4.25 basis points for a corporate bond rating. A basis point is one hundredth of one percent so, stated differently, that means that S&P charged as much as $600,000 to rate a $500 million CDO.

246.     Moody's charged 4.25 basis points for rating corporate and financial institutions, but up to 11 basis points for complex structured finance products.

247.     Similarly, Fitch charged 7-8 basis points to rate a CDO.

248.     In 2006, Moody's global Structured Finance Group revenues were $860.4 million, exceeding 2005 by 25% and budget by 18%. For 2007, Moody's forecasted 13% revenue growth.

249.     The Rating Agencies' revenue growth during the relevant time period was driven directly by the creation of structured finance securities. This growth is illustrated by the following chart, generated by the U.S. House of Representatives Committee on Oversight and Government Reform, published on October 22, 2008:



250. From 2004 to 2007, S&P and Moody's produced a record number of ratings and a record amount of revenues in structured finance, primarily because of RMBS and CDO ratings. A 2008 S&P submission to the SEC indicates, for example, that from 2004 to 2007, S&P issued more than 5,500 RMBS ratings and more than 835 mortgage-related CDO ratings. The number of ratings it issued increased each year, going from approximately 700 RMBS ratings in 2002, to more than 1,600 in 2006. Its mortgage-related CDO ratings increased tenfold, going from 34 in 2002, to over 340 in 2006. The share of total Structured Finance revenue attributable to CDOs grew from an estimated 23% in 2002 to an estimated 26% in 2005.

251. Moody's experienced similar growth. The SEC Office of Compliance Inspections and Examinations, Division of Trading and Markets and Office of Economic Analysis ("OCIE") reported that "[f]rom 2002 to 2006 the volume of RMBS deals rated by Moody's increased by 137%, and the number of CDO deals rated by Moody's increased by 700%. Correspondingly, the revenue Moody's derived from RMBS deals increased from $61.8 million in 2002 to $168.9 million in 2006 and CDO revenue increased from $11.7 million in 2003 to $91.2 million in 2006." In 2006, Moody's global Structured Finance Group revenues were $860.4 million,

exceeding 2005 by 25% and budget by 18%. For 2007, Moody's forecasted 13% revenue growth. OCIE, however, reported that for CDOs, Moody's staff did not increase commensurate to the volume of deals rated — "Moody's increased CDO staff by 24% as volume increased by 700%."

252.    On May 31, 2007, an article published by Bloomberg reported that for Fitch, for the fiscal year ended on September 30, 2006, the rating of structured finance securities accounted for 51% of total revenue of $480.5 million. The same article reported that for 2006, S&P's revenue rose by 20 percent to $2.7 billion. Almost half of that growth was from increased sales of structured finance ratings.

253.    Given their clear conflict of interest based on the "issuer pays" model and the tremendous amount of money in fees at stake, it is not surprising that the Rating Agencies repeatedly eased their ratings standards in order to capture more market share of ratings business.

**C.    As a Result of the Rating Agencies' Sacrifice of Objectivity and Accuracy in Favor of Profitability, the Ratings Were Devoid of any Meaningful Factual or Statistical Basis, Recklessly Issued, and Knowingly False**

254.    In their effort to secure market share and earn fees from their clients, the Rating Agencies issued ratings that were knowingly false, and/or were issued with reckless disregard as to their accuracy.

255.    For example, the Rating Agencies failed to account for major changes in the types of assets they rated. The structures they were rating were increasingly based on subprime RMBS securities and other "new" mortgage products. The historical data they relied upon was from a time period when such products were much less in use; such historical data thus had marginal utility.

256.    In particular, the Rating Agencies used models based on historical information preceding 2000 that could not accurately evaluate the exotic mortgage products introduced into the U.S. marketplace thereafter and the prevalence of those mortgages.  Subprime mortgages rose from 8% of all mortgages in 2003 to 20% in 2005 and 33% in 2006.  Interest-only and payment-option mortgages increased from 2% of all mortgages in 2003 to 20% in 2005.  The models used by the Rating Agencies failed to account for these changes.

257.    In addition, the percentage of subprime mortgages underlying CDOs increased during the relevant time period.  An article entitled "CDO Ratings and Systemic Instability: Causes and Cures," by John Crawford, published in the *New York University Journal of Law and Business* in Fall 2010, reports that "[i]n the period from 2005-2007, the issuance of structured finance CDOs tripled, and CDO portfolios became increasingly concentrated in subprime mortgages."  According to the article, high-grade CDOs, on average, had half their portfolio invested in subprime RMBS, and three-quarters of the average mezzanine CDO was devoted to subprime RMBS, in that 2005 to 2007 period.

258.    The Rating Agencies had unique and specialized knowledge — unavailable to other market participants, including the Funds — concerning this increasing decline in the quality of the collateral underlying the CDOs and/or RMBS at issue.  Under the contractual terms of the hundreds of billions of dollars of mortgage-backed securities they rated, the Rating Agencies received product information and performance data on billions of dollars in U.S. mortgage loans.  The Funds did not and could not receive this same information prior to making an investment.

259.    Yet during the relevant period, and continuing through the global financial crisis until their ultimate downgrade of the securities in question, the Rating Agencies did not upgrade

to, or upgraded to but elected not to use, models that were designed to account for this increasing concentration in subprime RMBS.

260.    More generally, the Rating Agencies purposely used outdated versions of their models in rating securities and/or purposely failed to use updated models to rate new offerings. The Rating Agencies engaged in this misconduct in the name of profitability — because updating their models would result in downgrades, which the issuers who were paying them did not want.

261.    As yet further examples of their wrongdoing, during the relevant period, each of the Rating Agencies (i) employed assumptions in their modeling that had no basis in fact; (ii) purposely understated the correlation assumptions in their modeling (which assumptions take into consideration the inter-relationships between the securities being rated); and (iii) engaged in "grandfathering," whereby they purposely declined to apply updated models to securities previously rated.

262.    In their memo to the Senate Permanent Subcommittee on Investigations, Senators Levin and Coburn confirmed that the Rating Agencies failed to use up-to-date and accurate data as the basis for their predictive models and, as a result, the models were inaccurate:

> The models used by Moody's and S&P provide thousands of ratings that turned out to be inaccurate.  They did so, in part, because the models did not contain adequate performance data for subprime, interest-only, option ARM, and other high risk mortgages that had come to dominate the housing market, and did not contain adequate data for higher risk borrowers.  According to the Congressional Research Service, the models failed to understand the likelihood of falling house prices, attached the wrong weights to the effect of falling house prices on loan default rates, and miscalculated the interdependence among loan defaults.

263.    More broadly, as stated in the memo to the Senate Permanent Subcommittee on Investigations, the Rating Agencies purposely used faulty models, purposely used faulty

assumptions, and failed to dedicate sufficient resources to modeling and surveillance.   As a result, they corrupted their ratings:

> Additional factors responsible for the inaccurate ratings include rating models that failed to include relevant mortgage performance data, unclear and subjective criteria used to produce ratings, a failure to apply updated rating models to existing rated transactions, and a failure to provide adequate staffing to perform rating and surveillance services, despite record revenues.

> The ratings agencies weakened their standards as each competed to provide the most favorable rating to win business and greater market share. The result was a race to the bottom.

264.    Each of the Rating Agencies is guilty of these various acts of wrongdoing.

**1.      _S&P_**

265.    For example, with respect to S&P, a slide presentation by S&P's Capital Markets Task Force, circulated internally on March 14, 2008, highlights that S&P had knowledge of the subprime meltdown from as early as 2005.  It notes:  "2005: Early Warning Signs of Housing Bubble Forming As A Result of Low Rates."  Moreover, notes attached to the slides reflect that S&P knew that the deterioration of the credit quality of subprime mortgages underlying CDOs had a material impact on ratings thereof.

266.    Notwithstanding this knowledge, during the relevant period, S&P knowingly and/or recklessly assigned ratings to CDOs and/or RMBS based on historical, irrelevant, and obsolete data, which as they knew, did not reflect either market realities or that the credit quality of the underlying mortgages was rapidly deteriorating.

267.    For example, as stated by Kai Gilkes, managing director and head of S&P's structured finance quantitative group in a February 18, 2005, e-mail, "[n]ow that we have the data — and the analytics — to make statistically accurate and robust estimates of corporate

default behavior, we are updating the asset default table, *but of course maintaining the same "idealized" view of CDOs in our rating analysis.*"  (emphasis added).

268.    Elsewhere, S&P likewise strikingly admitted its failure to use accurate and updated underlying data.   In an internal memorandum, entitled "S&P Vulnerabilities in a Downturn," S&P admitted:

> The measurement system on which we rely for our default and transition experience is not flawless, and we should be mindful of the gap between the extent of reliance on our historical record, and the modest investment and slow pace of development in that infrastructure.  The discipline capture post NR default has not been maintained creating the risk that the default experience of the ratings could be understated . . . .  ***The significant volume of paper rated based on a relatively short and limited credit history, with reliance on a model that has not been adequately supported represents our most meaningful franchise risk.***

(emphasis added).

269.    As another example, in September 2006, the Director of Servicer Evaluations of S&P wrote that the head of U.S. RMBS Surveillance told him losses in home loans were in the "high 40s - low 50s %" and that he agreed the cause to be "underwriting fraud; appraisal fraud and the general appetite for new product among originators resulting in loans being made that shouldn't be made" which "could be a RICO offense!" The Director wanted to publish a commentary to disclose the high losses he was warned about, but realized this would be "too much of a powder keg."  Thus, despite its clear recognition of the numerous and severe problems with the collateral underlying many of the securities it rated, S&P did nothing to evaluate or change its ratings, including the ratings on the securities identified in Appendix A.

270.    A month later, in October 2006, an S&P director in the structured finance group confirmed that news of deteriorating home loans was "[p]retty grim . . . as we suspected . . .  I think things are going to get mighty ugly next year!"  But S&P again did nothing to change its ratings, including the ratings on the securities identified on Appendix A.

271.    Along these lines, the DOJ Action alleges that in early January 2007, S&P's RMBS Surveillance group recognized that a "Housing Bubble" existed, that there was a "slowdown," that the "Bubble is deflating" and that the projection was for "20% default this year."

272.    Indeed, the DOJ Action further alleges that a January 2007 S&P publication entitled "CDO Spotlight U.S. Cash Flow CDO Rating Performance Hit New Highs in 2006, While Synthetics Showed Mixed Results; Outlook Varies By Deal Type," stated that across "different types of CDO of ABS transactions," "subprime RMBS dominated the collateral at the end of 2006, accounting for 43.1% of the overall assets" and that RMBS Alt-A "followed with 12.1% exposure."  The DOJ Action alleges that the publication specifically acknowledged the link between the performance of CDOs and subprime RMBS tranches.  The publication noted that for "later vintage mezzanine SF CDOs (those rated in late 2002 and after), the rating outlook is closely linked to the performance of mezzanine ('BBB' and 'BB' rated) tranches of subprime RMBS transactions, which are the predominant collateral type for these deals," and that "given the high concentration of 'BBB' and 'BB' rated subprime RMBS tranches found in later vintage mezzanine SF CDO collateral pools, *if subprime RMBS ratings perform worse than expected, it will have a major impact on the CDO ratings*." (emphasis added).  But as noted in the DOJ Action, despite its clear awareness and concern regarding subprime RMBS at this point in January 2007, S&P did not disclose this concern to investors, nor did it issue downgrades at that time.

273.    Likewise in the California Action, it is alleged that in February 2007, S&P director Frank Parisi informed senior management that losses for 2006 vintage subprime RMBS

deals could be one and half to two times as high as losses for 2000 vintage deals.  But again, S&P took no action.

274.    Despite its inaction, *internally* S&P was clearly concerned about the state of the subprime market.  For example, as alleged in the DOJ Action, on March 19, 2007, one of the S&P analysts involved in rating the securities at issue ("Analyst D") e-mailed a parody of the Talking Heads song "Burning Down the House" with the following lyrics, and he and his co-workers later recorded a video of him performing the song:

> Watch out
> Housing market went softer
> Cooling down
> Strong market is now much weaker
> Subprime is boi-ling o-ver
> Bringing down the house
>
> Hold tight
> CDO biz – has a bother
> Hold tight
> Leveraged CDOs they were after
> Going – all the way down, with
> Subprime mortgages
>
> *       *       *
>
> Own it
> Hey you need a downgrade now
> Free-mont
> Huge delinquencies hit it now
> Two-thousand-and-six vintage
> Bringing down the house.

275.    Notwithstanding its clear concern, as demonstrated by this parody, regarding the subprime collateral underlying many of the securities in question, S&P did not share that concern regarding the subprime market with investors, including the Funds.  Nor did S&P, or any of the other Rating Agencies, take these increasing delinquencies into consideration in its modeling to issue downgrades — not, at least, until it was too late.

276.    S&P also failed to upgrade to, or upgraded to but elected not to use, models that were designed to accurately and appropriately rate the CDOs and/or RMBS and their constituent assets.  The Rating Agencies purposely did so to make more profit — because updating their models would result in downgrades — which the issuers who were paying them did not want.

277.    For example, in a June 8, 2005, e-mail, an S&P employee admitted that S&P's CDO rating model, the CDO Evaluator, was out-of-date and insufficient for accurately rating CDOs — yet S&P was still using it to stay competitive with Moody's and Fitch:

> In its current state [Evaluator] is not adequate for these deals and we have been applying makeshift solutions but are in need of a more scientific or robust solution at this point . . . .  Moody's and Fitch have become very competitive and the volume of these deals has increased significantly.  If we were using Evaluator in its current state without the tweaks, we would not be rating these deals right now.  As you know, if we don't rate the CDOs, we will lose the primary deals as well.

278.    By the end of 2005, the need for a newer, up-to-date model was even more readily apparent to S&P.  In fact, a draft CDO Strategic Plan, dated December 8, 2005, recommended that S&P "Launch CDO Evaluator (version 3.0) into the market as soon as possible."

279.    Internal S&P documents demonstrate that S&P delayed the launch of new, enhanced risk assessment models and continued to use outdated models in an effort to satisfy clients and enhance revenue, at the expense of accuracy.

280.    An S&P slide presentation, dated April 10, 2007, entitled "A New Approach to Estimating ABS [Probabilities of Default]" highlights best the fact that, at all relevant times, S&P's concerns regarding market share and profitability drove the development of S&P's CDO rating model.  A slide entitled "A Better Mousetrap," summarized S&P's old ways and new ways of updating its rating models.

281.    "The Old [W]ay," characterized as a "One Way Street," worked as follows:

- 81 -

> To come up with [Probabilities of Default] and asset correlations in [CDO Evaluator] 2.4.3, we look at our raw data and come up with a statistical best fit. *When this does not meet our business needs, we have to change our parameters ex-post to accommodate.* (emphasis added).

282.    The "New [Way]" or the "two way street," simply started with the desired business outcome.  If the data did not lead to the desired business outcome, then S&P simply "use[d] another set" of default probabilities.

283.    The slides make clear that satisfying S&P's "business needs" by settling on "business friendly" as opposed to "business unfriendly" models was a central component of both ways.  A graph highlighted the operative question:  "Does this work [for] our rating business?  If it does not, need to tweak [Probabilities of Default]."  (emphasis added).

284.    Personnel at S&P expressed concern regarding the focus on business interests and the impact such focus had on S&P's willingness to invest in, update, and release newer and more accurate models.  These concerns went unheeded.

285.    For example, in deposition testimony in an action captioned <u>Abu Dhabi Commercial Bank v. Morgan Stanley & Co.</u>, No. 08-cv-07508 (S.D.N.Y. 2008), Frank Raiter, an S&P Managing Director and head of the Residential Mortgage Rating Group from 1995 through 2005, testified that by the end of 2004 it was clear that the models S&P was running were inaccurate:

> [B]y the end of 2004, the beginning of 2005, the model that [S&P] [was] running was underestimating the risk associated with some . . . products, particularly the subprime, no income, no asset type loans, and the lower quality Alt-A loans.

286.    On April 23, 2010, in his testimony before the Senate Permanent Subcommittee on Investigations, Raiter confirmed that S&P did not adequately update and implement its risk assessment models:

> Adequate staffing was not the only challenge faced in trying to maintain the quality of the rating process.  The accuracy of the predictive models used to

evaluate risk was also critical to the quality of the ratings.  The version of LEVELS model developed in 1996 was based on a data set of approximately 250,000 loans.  It was, I believe, the best model then used by a rating agency.  As new models were programmed and tested, analysts continued to collect larger data sets for the next versions of the model.  In late 2002 or early 2003, another version of the model was introduced based on approximately 650,000 loans.  At the same time, a data set of approximately 2.8 million loans was collected for use in developing the next version of the model.  By early 2004 preliminary analysis of this more inclusive data set and the resulting econometric equation was completed.  That analysis suggested that the model in use was underestimating the risk of some Alt-A and subprime products.  ***In spite of this research, the development of this model was postponed due to a lack of staff and IT resources.  Adjustments to the model used in 2004, with the identified problems, were not made until March, 2005.  To my knowledge, a version of the model based on the 2.8 million loan data set was never implemented.***

(emphasis added).

287.    Mr. Raiter testified before the Senate Permanent Subcommittee on Investigations that when he retired from S&P in early 2005, S&P had 10 million more loans in its modeling database that could have been used to improve S&P's credit ratings process.  Yet they were not.

288.    An internal S&P e-mail chain, dated March 23, 2005, highlights S&P's *intentional* failure to keep its LEVELS model up-to-date and/or its failure to implement updated models:

> We have known for some time (based upon pool level data and LEVELS 6.0 testing) that [loss coverage levels for:]
>
> Subprime:     B and BB levels need to be raised
>
> ALT A:        B, BB and BBB levels need to be raised . . .
>
> * * *
>
> When we first reviewed Version 6.0 results ** a year ago ** we saw the sub-prime and Alt-A numbers going up and that was a major point of contention which led to all the model tweaking we've done since.  ***Version 6.0 could've been released months ago and resources assigned elsewhere if we didn't have to massage the sub-prime and Alt-A numbers to preserve market share*** . . . .

(emphasis added).

289.    As alleged in the DOJ Action, it was not until *March 2007* that S&P management finally released a watered-down LEVELS 6.0.  Even then, it was only effective starting with deals rated in May 2007.  Compounding the harm from the delay, S&P management only permitted the use of the incomplete version of LEVELS 6.0.  The California Action alleges that the fully updated model would result in substantially lower ratings.

290.    Moreover, as alleged in the California Action, the version of LEVELS 6.0 that was released was based on data that was valid for the rising housing market of *2004,* which was obsolete by 2007, after the housing market had peaked.

291.    S&P's concerns about keeping and growing its market share trumped implementing updated LEVELS models recommended by its ratings group.  In an interview for the PBS program "NOW," originally aired on November 21, 2008, Frank Raiter stated that the

> **[R]equests for additional and more powerful databases and to build databases inside the firm were just — rejected. . . .  [T]he most important reason that we can point to [for this rejection] is that [S&P] [was] already making so much money that continuing to invest in — in the new models and in the R and D work wasn't necessarily [going to] result in a bigger market share. . . .  Profits were running the show.  I mean, in a nutshell that was the simple answer.  And the business managers that were in charge just wanted to get as much of the revenue into their coffers**.

(emphasis added).

292.    According to Frank Raiter, S&P had developed models that accounted for the new type of mortgage products available after 2000.  These models better captured the changes in the post-2000 mortgage landscape and were, therefore, better at determining default risks posed by these new mortgages.  However, S&P did not implement these models due to their cost and because improving the model would not add to S&P's revenues.

293.    As Raiter explained in his October 22, 2008, written statement to Congress, the unfortunate consequences of continuing to use outdated versions of the rating model included

"the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market." Put simply, S&P's intentional failure to update its models led to the losses that the Funds and other investors suffered.

294.    The failure to update the models was intentional. Raiter specified that S&P's management did not see the need to keep its models current for three reasons. First, "it was expensive to build or acquire the growing data bases, perform the necessary statistical analyses, complete the IT code modifications and implement and distribute new versions of the model — this process also required significant additions to staff." According to Raiter, "[b]y 2001, the focus at S&P was profits for the parent company, McGraw-Hill — it was not incurring additional expense."

295.    Second, Raiter explained that "[t]he Managing Director of the surveillance area for RMBS did not believe loan level data was necessary and that had the effect of quashing all requests for funds to build in-house data bases."

296.    A third reason S&P did not implement the then-existing updated models was "that the RMBS group enjoyed the largest ratings market share among the three major rating agencies (often 92% or better), and improving the model would not add to S&P's revenues." Put simply, it was not profitable to update these models, so S&P purposely refrained from doing so.

297.    The former President of S&P, Deven Sharma, corroborated Raiter's comments regarding the use of outdated models. In Sharma's testimony to Congress on October 22, 2008, he noted: "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work."

298.   Not only did S&P purposely fail to implement updated versions of its models, including LEVELS, but it also manipulated the data inputted into the software to satisfy issuers wanting higher ratings.  For example, in an internal February 8, 2006, e-mail, Frank Bruzese, an employee in structured finance at S&P, described to several senior RMBS managers how he manipulated payment dates in LEVELS to try to improve the rating of an RMBS to satisfy the issuer:  "I changed the first payment date for all loans that were seasoned 5 years or greater back to their original date so they would receive credit in LEVELS (approx. 17.4% of total pool balance).  The net effect was not as great as expected."  In response, Brian Vonderhorst, an S&P senior director, clearly encouraged the practice, stating:  "I don't think this is enough to satisfy them.  What's the next step?"

299.   An internal S&P e-mail from Lapo Guadagnuolo, dated September 6, 2004, reflects further model and rating manipulations.  Guadagnuolo, an S&P analyst, admitted that he "had difficulties explaining 'HOW' [S&P] got to" certain numbers "since there is no science behind it."

300.   As a result of these failures to update its models, ratings manipulations, and other acts of wrongdoing, S&P's ratings did not reflect its then current view of the credit-worthiness of the assets rated.  For example, on December 12, 2011, Elwyn Wong, a former director and customer value manager in S&P's structured finance group, was deposed by the United States Department of Justice and testified that, by at least March 2007, S&P did not believe in the ratings it was ascribing to subprime-related securities.   Wong, who had responsibility for overseeing the process utilized by the S&P structured finance group to rate deals, testified:

Q:  . . . [I]s it fair to say that by March of 2007 with regard to the subprime class of collateral that you didn't believe that those ratings were going to hold on average.

A:  That's a fair statement.

Q:  And isn't it a fair statement that your colleagues share that sentiment based on your conversations and interaction with your colleagues?

A:  That would be a fair statement.

Q:  And, I mean your colleagues at your level in the CDO Group, the other managing directors in the CDO Group.

A:  That's a fair statement.

Q:  **_It's a fair statement that you and the other people in the CDO Group at the leadership level just didn't believe in the RMBS ratings, the subprime RMBS ratings._**

A:  **_That would be correct._**

(emphasis added).  This is a clear admission that S&P knowingly engaged in fraud.

301.    Wong also admitted that S&P's strategy with respect to updates to its CDO models was driven by business concerns at the expense of accuracy.  For example, Wong testified:

Q:  . . . [I]sn't that a fair characterization of the goal of the effort to update the CDO evaluator model at the time; namely, that there be minimal impact in non-investment grade and somewhat of an improvement in the ratings the investment grade side?

A:  That would be a fair statement.

Q:  And that goal was dictated by the business people, right?

A:  . . . So that is correct.

302.    Indeed, S&P's manipulations were so rampant and extreme that in an e-mail dated December 12, 2006, Wong expressed concern that he was "going to jail soon."

303.    By virtue of these ratings manipulations, S&P deviated from its published rating criteria.  As a criteria officer in the structured finance surveillance group noted in a March 14, 2007, e-mail:

Our published criteria as it currently stands is a bit too unwieldy and all over the map in terms of being current or comprehensive.  It might be too much of a stretch to say that we're complying with it because our [structured finance] rating

approach is inherently flexible and subjective, while much of our written criteria is detailed and prescriptive.

304.    Wong further admitted that S&P developed and/or adjusted the assumptions in its

models to appease the bankers who created and structured CDOs:

Q:  So on occasion if bankers told S&P that certain assumptions would not work for the economics of their deals, S&P would sometimes adjust its assumptions to address those concerns.  Is that a fair statement?

A:  That is fair.

* * *

Q:  And it's also a fair statement that the predominant purpose of the beta testing was to determine whether the proposed CDO model updates would be acceptable to S&P's business.  Is that a fair statement?

A:  I would say that a good proportion of that is due to — is for that reason . . .

* * *

Q:  Is it fair to say generally that the feedback that you got from CDO issuers relating to the beta testing of proposed models was generally such that the issuers were arguing for higher ratings, but lower subordination?

A:  In general, yes.

305.    On December 13, 2012, Richard Gugliada was deposed by the United States

Department of Justice.  Gugliada worked at S&P from August 1997 through November 2006 and

ultimately became the global practice leader for CDOs.   His group was responsible for

developing, maintaining, and building all quantitative models used by all divisions of S&P

ratings.

306.    Gugliada admitted that S&P's decision to delay the implementation of updates to

the CDO Evaluator, which was S&P's primary analytical tool used to measure credit risk in any

and all types of CDOs, were driven by, among other things, business concerns:

Q:  It is fair to say that both analytical concerns and the concerns to be competitive, and preserve market penetration, were part of the calculus in determining updates to the CDO Evaluator.

A:  Yes.

Q:  You  . . . pushed back against  . . . proposed updates to the CDO Evaluator because they would have had a significant negative effect on Standard & Poor's market share and rating business, correct?

A:  Correct.

* * *

Q:  One of the reasons for minimizing changes to the subordination requirements is that large increases in subordination requirements would make CDOs less profitable for issuers, correct?

A:  Correct.

Q:  That could result in Standard & Poor's losing ratings business and market share, correct?

A:  Correct.

Q:  That was your understanding at the time; is that correct:

A:  Correct.

* * *

Q:  While you were head of the CDO group, it was your experience that the risk of losing transaction revenue was a factor that affected the updates of CDO Evaluator?

A:  Yes.

 * * *

Q:  . . . This is an August 17, 2004 e-mail chain.  The second e-mail . . . states, "We are meeting with your group this week to discuss adjusting criteria for rating CDOs of real estate assets this week because of the ongoing threat of losing deals."

Did I read that correctly?

A:  Yes.

Q:  This email led to a loosening in the stringency of the CRE CDO ratings, or CMBS CDO ratings by reducing the correlation between different categories of CMBS, correct?

A:  Among other changes, yes.

Q:  It also resulted in changes to the credit estimates that S&P provided that resulted in those estimates being less conservative, correct?

A:  Yes.

307.   S&P's highest managers and executives coordinated this strategy of delaying and watering down updates to the CDO Evaluator rating model to increase market share — a strategy that the California Action alleges was presented to S&P's President Corbett in 2006:

> Fitch and Moody's have recently liberalized their criteria for rating real estate CDOs.  Implication:  If S&P requires higher credit support levels than the other rating agencies, we will likely lose rating mandates and our dominant market share position . . . Members of the CDO group, the CMBS group and SFLT are working on revisions to E3 [Evaluator 3] in an effort to avoid a decline in S&P's market share primary CMBS rating resulting from the rollout of the new evaluator for cash deals . . . .

308.   The DOJ Action alleges that S&P developed an update to CDO Evaluator called "E3 Low" (as opposed to the more rigorous E3) specifically to address market concerns, and not data or analytical integrity.  S&P selectively applied E3 Low to certain securities to achieve the ratings the issuers wanted.  In fact, analysts were specifically instructed "If the transaction fails E3, then use E3 low."

309.   As Wong testified, S&P also purposely did not use its purportedly updated models to assess certain kinds of CDOs — again for business reasons:

Q: . . .  CDO Evaluator 3.0 was released on December 19, 2005.  Does that sound right?

A:  That's correct.

Q: And it's correct that at the time it only applied to synthetic deals, right?

A:  Yes.

Q: Cash deals were exempted at that time from CDO Evaluator 3.0, right?

A:  Yes.

Q: And one of the reasons for that exemption was because it was going to negatively impact the pipeline of cash CDOs; is that fair?

A:  That would be a fair statement.

310.    Gugliada confirmed that CDO Evaluator 3.0 was not used to evaluate cash CDOs because doing so would hurt S&P's business.  Specifically, he testified:

Q: It's your understanding that one of the reasons Standard & Poor's did not apply CDO Evaluator 3.0 to cash CDOs is that doing so would negatively impact Standard & Poor's cash CDO rating business, correct?

A:  Correct.

Q:  By that I mean a loss in market share.

A.  Market penetration.

311.    In internal e-mails, S&P acknowledged that this failure to update and use the latest version of its models significantly impacted the accuracy of its ratings.  For example, in a June 17, 2005 e-mail, Kai Gilkes, a Managing Director in Structured Finance Ratings involved with the updates to CDO Evaluator noted "Remember the dream of being able to defend the model with sound empirical research?  The sort of activity a true quant . . . should be doing perhaps?  If we are just going to make it up in order to rate deals, then quants are of precious little value."  Clearly, ratings should not be "made up."

312.    As a  further example, in an internal 2005 presentation entitled "The Future of CDO Analytics," S&P noted that its "Model development [was] somewhat "ad hoc," and under the heading "Little or no strategic research," S&P further admitted:

- We are almost purely "reactive" to the market
- We create new model risks every day
- We can produce a rating, but have very little idea how sensitive those ratings are to market developments or model assumptions

313.    In a similar vein, in a November 25, 2006, e-mail regarding S&P's lack of default data for ABS deals, analyst Stephen McCabe commented "from looking at the numbers it is obvious that we have just stuck our pr[o]verbial finger in the air!"

314.     S&P director Frank Parisi summed up these issues by saying that the model S&P used to rate residential mortgage-backed securities in 2005 and 2006 was only marginally more accurate than "if you just simply flipped a coin."

315.     The fact, as acknowledged by S&P, that its ratings were "made up," and no more accurate than "if you just simply flipped a coin," makes S&P's representations regarding the purported accuracy and integrity of its ratings detailed above clearly fraudulent.

316.     In addition to failing to implement updated versions of its CDO ratings model, and to apply them to certain types of CDOs, S&P also purposely failed to apply newer versions of the model to older deals because S&P realized that doing so would result in material changes to existing ratings.  Despite the warnings of deteriorating loan markets, S&P "grandfathered" securities it previously rated (that is, S&P refused to use updated models to assess the accuracy of prior ratings) and did not update those ratings to reflect S&P's then-current assessment of the credit risks associated with those securities.

317.     In fact, those conducting surveillance were pressured by upper management *not* to re-rate prior deals using the updated model.  The reason S&P did so was simple:  It did not want to upset the issuers of the grandfathered securities.  If S&P had done otherwise, many securities would have been put on Credit Watch or been downgraded as early as 2005, causing major headaches for their issuers.

318.     As S&P outright acknowledged, this practice of "grandfathering" sacrificed accuracy in the name of business concerns.  For example, in an August 6, 2004, e-mail to David Tesher and others, Richard Gugliada of S&P raised the following questions:

> What are we going to do with existing deals that have been modeled under different cash flow models?

Do we change ratings or grandfather them and use the old models? *If we grandfather old models, how do we handle the PR when the Online system disagrees with our ratings?*

(emphasis added).

319.    The Senate Permanent Subcommittee on Investigations found an e-mail suggesting that the reason the re-testing of ratings using newer models did not occur was because "S&P did not have the resources to retest, and lower ratings on existing deals might have disrupted the marketplace, upsetting investment banks and investors."

320.    S&P failed to disclose to investors, including the Funds, that it was applying outdated models to surveil prior deals.

321.    As alleged in the DOJ Action, S&P further knowingly exacerbated the inaccuracy of ratings inflation in 2006 by unilaterally opting to minimize the consideration of credit correlation, or the inter-relationships between various securities, in its credit modeling.  Credit correlation helps determine how a default in certain deals may impact other deals.  Failure to adequately consider this factor can lead to over-stated ratings and under-stated estimates of the potential for default.  This again made S&P's model and ratings much more "market friendly," but also grossly inaccurate.

322.    According to the DOJ Complaint, a CDO analyst commented to a former co-worker on or about April 2, 2007, that this correlations loophole in S&P's rating model was "big enough to drive a Mack truck through."  As a result, the analyst further queried whether S&P "care[d] about deal volume or sound credit standards?"

323.    In internal e-mails, S&P admits that it purposely manipulated its correlation assumptions to make its rating more business friendly.  Moreover, S&P makes clear that this manipulation was concealed.  For example, in a September 6, 2005, e-mail to Kai Gilkes and Juan Mantorell, Perry Inglis wrote:

Can we perhaps have a chat about this when we get back as we do have new
Default Tables and correlation assumptions for corps and it would be good to get
an idea of how far these would have to change for us to be 'competitive' on these
types of deals. ***I'm a bit unclear if it is a big change or a 'wee itty bitty no one's
going to notice' change!***

(emphasis added).

324.    Again, investors, including the Funds, were not informed that S&P manipulated

its modeling platform — to curry favor with issuers — in contravention of its representation that

it was "objective."

325.    S&P also short-staffed surveillance and, as a result, failed to account for the rapid

deterioration in the quality of the mortgage assets underlying the securities it rated — resulting in

inflated ratings.    In early February 2007, Ernestine Warner, the head of S&P's RMBS

Surveillance Group, sent a series of e-mails expressing anxiety that S&P's ratings were not going

to hold due to deterioration of the underlying assets, and that S&P lacked the resources to

monitor these rapidly deteriorating deals:

> I talked to Tommy yesterday and he thinks that the [RMBS] ratings are not going
> to hold through 2007.  He asked me to begin discussing taking rating actions
> earlier on the poor performing deals.  I have been thinking about this for much of
> the night.  We do not have the resources to support what we are doing now.  A
> new process, without the right support, would be overwhelming.
>
> * * *
>
> My group is under serious pressure to respond to the burgeoning poor
> performance of sub-prime deals . . . we are really falling behind. . . .  I am seeing
> evidence that I really need to add to staff to keep up with what is going on with
> sub prime and mortgage performance in general, NOW."

Despite this clear concern, S&P did not take action to bolster its surveillance capabilities —

making its ratings increasingly inaccurate.

326.    Indeed, in the memorandum entitled "S&P Vulnerabilities In A Downturn," dated

June 15, 2007,  S&P outright admitted the inadequacy of its staffing:

We don't formally measure and report on staff experience to work complexity, or the increasing demands of our constituencies, ***however there is anecdotal evidence that our staff experience to work requirements is not keeping pace with internal or customer requirements.***

(emphasis added).

327.    Despite this clear admission of the inexperience and inadequacy of its staff and the resultant impact on its surveillance capabilities, S&P did nothing to address this issue, as doing so would not benefit its bottom line.

328.    In an S&P U.S. Cash Flow CDO Assessment Summary, dated January 30, 2006, it was reported that S&P's surveillance team had eleven people with responsibility for performing "surveillance on nearly 1000 CDO deals with about 300 new deals and an annual growth approaching 50% for the foreseeable future."  The Summary concludes that "this volume strains . . . the human resources who are increasingly a [sic] bottleneck in resolving data related issues."  Clearly and as admitted, S&P lacked the staff needed to conduct ongoing surveillance to ensure the accuracy of its ratings.

329.    In sum, S&P:  (i) failed to base its ratings on accurate historical data; (ii) purposely failed to update its rating models; (iii) used knowingly inaccurate correlation and other assumptions; and (iv) failed to maintain sufficient staff to conduct ongoing surveillance to ensure the continued accuracy of its ratings.  What is more, S&P knowingly and purposely engaged in these practices to curry favor with issuers and thereby increase its market share and profitability — in direct contravention of its repeated representations regarding its objectivity and independence.  Finally, S&P purposely concealed these failures from investors, including the Funds.

330.    Perhaps most succinctly, on November 23, 2005, Mr. Wong characterized the continuing corruption of S&P's ratings when he unambiguously wrote in an e-mail:  "Lord help our f***ing scam" (expletive partially redacted).

### 2.    *Moody's*

331.    Executives at Moody's likewise admitted an intentional failure to invest in Moody's rating models and the resulting inability of Moody's ratings to capture the decrease in lending standards which characterized the collapse of the U.S. housing market.

332.    Moody's executives were well aware of the decrease in lending standards that marred the relevant time period.  Raymond McDaniel noted in his testimony on October 22, 2008, before the House Committee on Oversight and Government Reform that "[b]etween 2003 and 2006, Moody's observed an increase in the risk profile of subprime mortgage portfolios that we were asked to review prior to assigning ratings."  Jerome Fons similarly noted at the same hearing that:  "Although evidence of falling home values began to emerge in late 2006, ratings did not reflect this development for some time."

333.    In slides for an internal Moody's United States Structured Finance Group presentation, which were circulated internally on June 9, 2008, Moody's admitted that "[s]tarting in 2003, [it] published reports on lax lending standards, inflated housing prices and rising defaults in 2006 vintage sub-primate mortgages."

334.    Notwithstanding the increased risks, on September 10, 2007, at a Managing Director's Town Hall Meeting, Brian Clarkson — the former President and Chief Operating Officer of Moody's — admitted that Moody's failed to incorporate decreased lending standards into its ratings, stating:  "We should have done a better job monitoring that [decrease in underwriting standards]."

335.    On October 21, 2007, in a confidential presentation to Moody's Board of Directors, Raymond McDaniel acknowledged that underfunding can put ratings accuracy at risk. He then admitted that "Moody's Mortgage Model (M3) needs investment."

336.    McDaniel went on to say that "[t]he RMBS and CDO . . . ratings are simply the latest instance of trying to hit perfect rating pitch in a noisy market place of competing interests." Thus, McDaniel conceded that Moody's ratings models were designed not to capture the entire risk attendant to the CDOs and RMBS at issue, but instead reflected an intentional and/or reckless attempt to appease issuers and capture market share at the expense of ratings accuracy.

337.    An internal Moody's e-mail dated January 18, 2006, from Jay Siegel regarding "2006 Priorities for M3 Team," confirms McDaniel's statements regarding the flaws with Moody's models.  Mr. Siegel stated his belief that Moody's needed "full functionality [with] M3 first, esp. if we're to remain short-staffed for yet another year."

338.    A January 19, 2006, e-mail from Roger Stein to Warren Kornfeld and Michael Kanef, also regarding "2006 Priorities for M3 team," further confirms that Moody's was aware of problems with its models from as early as 2004, and the impact of those problems on the accuracy of its ratings.  The e-mail noted that "[n]ot recalibrating the Prime model and not fixing the simulation will create a growing number of inconsistencies (problems) in the existing models as was the case through most of 2004."

339.    In an internal Moody's e-mail dated April 11, 2006, Karen Ramallo also admitted to historical problems with Moody's rating models, noting that they had been "wrong in the past."

340.    Despite Moody's knowledge that its models were not fully functional or were inaccurate — or both — Moody's painted a rosy picture to the public of the quality of its ratings, which was wholly inconsistent with its own true opinion of the credibility thereof.

341.    On September 26, 2005, Moody's published a methodology paper entitled "Moody's Modeling Approach to Rating Structured Finance Cash Flow CDO Transactions," in which Moody's explained that it was implementing and adopting a "new quantitative modeling approach for structured finance cash flow CDO transactions."   However, the new approach ultimately made Moody's rating methodology *less* conservative.

342.    Moody's official public explanation for this transition was that:

> As structured finance cash flow CDOs evolve towards transactions with increasingly concentrated collateral pools, mostly pools with more than 50% of the assets in the RMBS sector, it is important to have a modeling method that can accurately capture the correlation among the underlying assets . . . .

343.    Notwithstanding its public description, the default correlations and loss estimates for the underlying RMBS and other ABS that Moody's built into its model in September 2005 were far too low because they had been developed on a relatively limited data set.  This reality led Moody's knowingly to underestimate the credit risk associated with these structured finance securities.

344.    Although presented publicly as an attempt to significantly improve analytical precision in credit risk evaluation, Moody's adaptations to its model implemented in September 2005 were in fact influenced by its desire to employ an analytical approach that kept it competitive with other rating agencies and, thereby, gain market share and enhance Moody's revenue.  None of these objectives were consistent with Moody's Code or its public commitment to maintaining the highest level of independence, objectivity, and integrity in its credit ratings.

The action did have the desired effect of boosting Moody's market share for rating CDOs, however, which increased to approximately 85% in 2005 and 96% in 2006.

345.     In fact, Moody's did not update its key assumptions for rating structured finance CDOs until December 2008, when, among other changes, Moody's revised model resulted in asset correlations that were approximately two to three times higher than previously used.

346.     Moody's business decision not to update its models was ongoing and repeated and began as early as 2000.  Tellingly, in a November 3, 2000, e-mail, Brian Clarkson admitted that Moody's models were purposely outdated and arbitrary:

> I have a wild thought also — let[']s not even consider BUYING anymore data, programs, software or companies until we figure out what we have and what we intend to do with what we have.  From what I have heard and read so far we have approaches (MBS, Tranching and Spread) few use or understand (let alone being able to explain it to the outside) and new data that we are unable to use. We want more data when most of the time we rate MBS deals using arbitrary rule of thumb?!!

347.     Moody's was more concerned about marketing then about obtaining data to improve its models and rating accuracy.  Thus, in follow-up correspondence to Mr. Clarkson, a Moody's employee admitted that "[t]he most convincing argument for buying the data was that it would be a cornerstone for marketing."

348.     Thus, despite its public representations to the contrary, from as early as 2000, Moody's considered its ratings to be "arbitrary," could not process and assess data it possessed, and intentionally and/or recklessly assigned ratings based on incomplete information.

349.     On May 5, 2005, for example, in the context of building different structured products, David Rosa, a Moody's senior analyst, wrote an e-mail to investment bankers in which he admitted that there was "no actual data backing up the current model assumptions" with respect to how "Aa" and "A" subprime bonds would perform over time, but that Moody's would treat them the same as "Aaa" RMBS.

350.    In a similar vein, Moody's likewise admitted that it did not obtain or utilize underlying loan level data.  In particular, the April 13, 2011, Senate Permanent Subcommittee on Investigations Report notes that "Moody's advised the Subcommittee that, in fact, it generally did not obtain any new loan data for its RMBS model development for four years, from 2002 until 2006."   Indeed, as specifically found by the Senate Permanent Subcommittee, "neither [Moody's nor S&P's] model re-analyzed any underlying RMBS securities included within a CDO.    Instead, both models simply relied on the credit rating already assigned to those securities."

351.    Moody's further made baseless assumptions in applying its models.  For example, without any apparent basis, Moody's model assumed "that house prices would appreciate 4% each and every year for 45 years" — which was the legal life of the mortgage transactions it was evaluating.   Moody's likewise assumed that the quality of the originators and services of the loans underlying the loans it rated remained the same, even if that rating related to an originator "known for issuing poor quality loans or servicers known for providing poor quality servicing."

352.    On September 6, 2006, Moody's acknowledged that its models for analyzing subprime mortgages were "built on older data" and that its historical ratings may be based on "key factors [that] were adjusted outside the model."

353.    Further, in a document entitled "Credit Policy Recommendations Post-Subprime," dated September 16, 2007, Moody's admitted to the inaccuracy of its models in light of the inadequate historical data on which they were based:

> Relevant subprime performance data goes back to 1998 but is weighted toward 2003-2004 and hence did not include extreme environments against which to benchmark until now.  *There wasn't enough historical data on new variants of adjustable rate loans to allow for reasonable predictions of performance.*

(emphasis added).

354.    Additionally, like S&P, Moody's "grandfathered" prior deals.  During a panel presentation in March 2006, Frederic Drevon of Moody's stated that Moody's official position is that there is no grandfathering.  Yet, internal Moody's e-mail correspondence dated May 2, 2007, from Mark Froeba to Zach Buchwald and William May, reflects Moody's did, in fact, engage in grandfathering.   The e-mail string shows that Moody's agreed to grandfather eighteen transactions for a significant client, despite getting that client "up-to-speed with" Moody's newer rating methodology.  Another e-mail string, between William May and Alexey Dronov, dated April 11, 2007, reflects that Moody's agreed to "[g]o ahead and use the old methodology" to rate a new deal.

355.    With respect to grandfathering, during an internal Moody's Practice Leader meeting on July 20, 2004, a Moody's employee ("Guido") stated that new ratings methodologies "do NOT have to be driven by their impact on old deals."   He further stated that Moody's "consciously provide[d] surveillance deals under the old methodology."

356.    Like S&P, Moody's also failed to live up to its commitment of conducting ongoing surveillance of prior deals.  For example, in March 2006, Frederic Drevon admitted that the "truth" was that Moody's surveillance practices were severely lacking because Moody's did not have the resources to review thousands of transactions and, thus, focused only on those that it felt were more at risk.

357.    Moody's failure to commit resources to surveillance is further demonstrated by the fact that in 2007, Moody's only had 26 surveillance analysts tracking over 13,000 rated CDOs.  An internal Moody's e-mail to Yuri Yoshizawa, dated July 9, 2007, notes:

> Thanks for sharing the draft of the CDO surveillance piece you're planning to publish later this week. . . .   In the section about your CDO surveillance infrastructure, we were struck by the data point about the 26 professionals who are dedicated to monitoring CDO ratings.  While this is, no doubt, a strong team,

we wanted to at least raise the question about whether the company's critics could twist that number — *e.g.*, by comparing it to the 13,000+ CDOs you're monitoring — and once again question if you have adequate resources to do your job effectively.   Given that potential risk, we thought you might consider removing any specific reference to the number of people on the CDO surveillance team.

358.    Indeed, an April 7, 2006, presentation to the Moody's Derivative Team summarizing a 2005 survey noted Moody's analysts' complaints that "We are overworked.  Too many demands are placed on us for admin[istrative] tasks . . . and are detracting from primary workflow . . . We need better technology to meet the demand of running increasingly sophisticated models."

359.    In a 2006 Business Effectiveness Survey, Moody's employees commented that:

[T]he still heavy deal flow, combined with improved but still inadequate technical and admin manpower resources, as well [as] ever multiplying administrative tasks (doc retention and much faster accurate turnaround times being chief among them), forces the deal analysts to give short-shrift to credit analysis, and, most significantly, deal document analysis on regular basis.  This is not a recipe for ethical behavior.

360.    Moody's employees also confessed to "light" review of deals for which it received a low fee.  In an internal e-mail dated May 1, 2006, Richard Michalek of Moody's worried that Moody's was not able to "give these complicated deals the attention they really deserve."  Mr. Michalek further commented that "[w]hen you add a 'reduced fee' to the sale, it definitely tips it over to 'light review.'"  Additionally, Michalek commented that, with reduced fees, "the incentive to unravel the documents and try to understand just how the complicated pieces fit together is growing ever smaller."

361.    Like S&P, Moody's also failed to update its models in light of the increasing deterioration of the housing and mortgage market.  By the end of 2007, in a Report on Company and Key Executives' Performance, Ray McDaniel admitted to "shortcomings" in Moody's rating methodologies, including an inability to absorb the scale and pace of the U.S. housing downturn.

McDaniel further admitted to "shortcomings" in Moody's predictions of correlation under stress for certain asset classes held by CDOs.

362.   On October 22, 2008, Jerome Fons, Managing Director of Credit Policy, explained that "[a]lthough evidence of falling home values began to emerge in late 2006, ratings did not reflect this development for some time."  Fons was clear that:

> The deterioration in standards was probable. . . .  [E]vidence first arose at least in 2006 that things were slipping, *and the analysts or the managers for whatever reason turned a blind eye to this***, did not update their models or their thinking and allowed this to go on.**

(emphasis added).

363.   In fact, Moody's rating models depended on the continued deterioration in lending standards and continued appreciation in housing prices — assumptions that Moody's knew were no longer reasonable to make at least as of 2006.  This fact is made clear by the following statement made by Brian Clarkson at the Managing Director's Town Hall Meeting on September 10, 2007:

> [T]he housing price decline and the tightening of credit completely swamped everything else.  If either one of those had remained, if housing prices still went up, or if cheap credit, the tightening of underwriting standards or loosening of underwriting standards was still around, there wouldn't have been any problem because, at the end of the day, the bad underwriting, the cheap credit, and housing prices were there in '03, '04, '05.  ***What happened was the music stopped in '06.***

(emphasis added).

364.   Moody's own managing directors posed the following questions in feedback to the Town Hall meeting, unequivocally demonstrating that, at the time, given the decline in housing prices, Moody's understood that its ratings of CDOs and RMBS were inaccurate and misleading:

> (i)      "Who is going to accept responsibility within Moody's for the lack of oversight of [the] structured ratings group."

    (ii)    "Multi-notch downgrades in Structured Finance (SIV's and others) — what exactly were the reasons for that and what are lessons? ***Doesn't an Aaa also imply a certain low migration [transition downward from one rating to another] risk?***"

    (iii)    "Really no discussion of why the structured group refused to change their ratings in the face of ***overwhelming evidence that they were wrong.***"

(emphasis added).

365.    In feedback from the Town Hall meeting, Moody's senior management also admitted that, given Moody's knowledge of deteriorating lending standards and depreciation in the housing market, Moody's credit analysis and ratings were based on unreasonably optimistic assumptions, and/or were blatantly and purposely false:

> We heard two answers yesterday [at the Town Hall meeting]. 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets. ***As for #1, it seems to me that we had blinders on and never questioned the information we were given.*** Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan? ***As for #2, it is our job to think of the worst case scenarios and model them; why didn't we envision that credit would tighten after being loose, and housing prices would fall after rising,*** after all most economic events are cyclical and bubbles inevitably burst. ***Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both.***

(emphasis added).

366.    Put simply, Moody's issued ratings with models it knew were inaccurate, outdated, and/or based on unreasonable assumptions.  Moody's did so largely to appease issuers.  Moreover, Moody's failed to apply updated models to older deals, and failed to conduct adequate surveillance of prior deals — again, because doing so did not benefit its bottom line.

367.    Finally, Moody's concealed from investors its internal concerns regarding these failures.  For example, in an internal e-mail dated December 12, 2006, Riggi Marjan of Moody's expressed concern to Warren Kornfeld of Moody's that he might be questioned at an investor

meeting regarding whether early payment defaults on mortgages would be higher than anticipated, and whether Moody's had taken this into account in its ratings.  In response, Warren Kornfeld advised Marjan Riggi that "[t]he less you say on this, the better."  In an e-mail later in the chain, David Weil advised both Marjan Riggi and David Kornfeld that investors may also be aware of "this issue of delinquencies at closing," but further advised, "[d]on't bring it up."

368.    Put simply, Moody's knowingly issued ratings it knew were false — leading to huge losses for investors generally, and specifically the Funds.

### 3.      *Fitch*

369.    Fitch's models likewise, despite its representations, suffered from admitted accuracy problems.  For example, in a document entitled "Fitch RMBS Model Redevelopment Plan," Fitch admitted that:

> The single largest problem with our current modeling system is that widely varying results can be obtained for loans with similar characteristics.  This is largely due to the independent estimation of models for prime, alt-a, and subprime loans.  Loans with identical characteristics will generate more conservative loss expectations from the prime model than from the alt-a model, and in turn the alt-a model will generate more conservative results than the subprime model.  ***This is not only inconsistent but probably wrong in many instances***.

(emphasis added).

370.    Fitch's models also were likewise overly dependent on housing price appreciation.

371.    For example, Fitch admitted in a private telephone conversation with an investor in March 2007 that its models were based on home price appreciation and that, in the absence of home price appreciation, its models were entirely erroneous:

> We were on the March 22 [2007] call with Fitch regarding the sub-prime securitization market's difficulties.  In their talk, they were highly confident regarding their models and their ratings.  My associate asked several questions.  "What are the key drivers of your rating model?"  They responded, FICO scores

and home price appreciation (HPA) of low single digit (LSD) or mid single digit (MSD), as HPA has been for the past 50 years.  ***My associate then asked, "What if HPA was flat for an extended period of time?"  They responded that their model would start to break down.  He then asked, "What if HPA were to decline 1% to 2% for an extended period of time?"  They responded that their models would break down completely.  He then asked, "With 2% depreciation, how far up the rating's scale would it harm?"  They responded that it might go as high as the AA or AAA tranches.***

(emphasis added).

372.   Fitch likewise admitted that, despite its public representations concerning its surveillance obligations, it was unable to conduct appropriate surveillance of deals that it already had rated.  Indeed, on October 10, 2007, Fitch stated that it did not start to provide monthly updates of rating actions taken with respect to RMBS and CDOs until October 2007 in response to investor requests for more data and information on ratings activity.

373.   On April 22, 2008, during testimony before the Senate Committee on Banking, Housing, and Urban Affairs, Stephen Joynt, President and CEO of Fitch, admitted that Fitch was aware of the deteriorating quality of the subprime mortgages underlying the CDOs and RMBS discussed herein but did not perform the surveillance and analysis it had promised to do:

> [I]t was not like we were unaware of these being weak loans. . . .  [We] did not do the due diligence function of trying to recognize whether there was fraud involved in the origination of loans.  That is certainly true.  And I believe that has become one of the biggest accelerants for why there have been problems so across the board in the mortgage markets itself. . . .  But we were aware of the weakness of the loans.

374.   On April 15, 2009, during an SEC Roundtable to Examine Oversight of Credit Rating Agencies, Stephen Joynt further admitted that Fitch was aware that, despite its public representations to the contrary, the reliability of its ratings was questionable, at best:

> [I]n the last few years, especially three or four years, and in some securitization markets and with synthetic CDOs, for example, that the derivative instruments became so volatile that it is and was hard to assign ratings that would have much stability to them, and that certainly proved to be the case.

\*      \*      \*

375.    In sum, throughout the relevant period, and through at least July 2007, the Rating

Agencies kept using their outdated rating models, despite their knowledge that the housing

market decline and tightening of credit underwriting standards rendered them inaccurate, because

they were being paid by the issuers of the CDOs and RMBS at issue and, thus, it was in their

interest to make believe nothing had changed.

376.    Moreover, despite their repeated representations that they would conduct ongoing

surveillance of the securities in question to confirm that their ratings continued to be accurate,

the Rating Agencies either failed to do so, or did so with intentional and/or reckless disregard for

the ratings' accuracy.  Indeed, the Rating Agencies did not change their ratings of the securities,

including those reflected on Appendix A, until they were downgraded in or after mid-July 2007

— when it was too late, and the Funds already had absorbed astronomical losses and were

destined for failure.

**D.     The Rating Agencies' Misrepresentations Regarding Specific
        Securities Purchased by the Funds**

377.    The Rating Agencies' misconduct alleged herein infected each of the ratings

assigned to the securities purchased by the Funds (as listed on Exhibit A) beginning by no later

than January 2006.

378.    The Rating Agencies had no reason to believe that those ratings matched their

public standards.  Indeed, the Rating Agencies had ample reason to believe the opposite, or

recklessly disregarded the truth.  And the Rating Agencies did not in fact believe the ratings of

the securities listed in Appendix A to be accurate.

379.    The Rating Agencies knew that the ratings for the CDOs and RMBS reflected on

Appendix A, at least, were based on obsolete data and employed "guesses" and "magic

numbers."  Further, the RMBS ratings were "massage[d]" to please issuers and with an eye towards competition for market share.  Thus, the ratings process was corrupted by business considerations.

380.    As a result of these and other flaws, the Rating Agencies could not possibly have thought that, for example, a AAA or AA or equivalent rating meant what investors such as the Funds thought them to mean — namely, that the securities so rated had an extremely low potential for default.

381.    All of the initial ratings of the securities listed in Appendix A were therefore false and  fraudulent.    They  did  not  represent  the  Rating  Agencies'  true  analyses  of  the creditworthiness  of  the  rated  investment  products.    Rather,  the  Rating  Agencies  issued  and maintained them with, at best, reckless disregard and deliberate ignorance as to whether the securities merited the ratings given to them.  The Rating Agencies knew that the securities did not  meet  the  standards  for  their  ratings,  but  intentionally  and/or  recklessly  assigned  and maintained inflated ratings to maximize their revenue and market share.

382.    However, at no time did the Rating Agencies disclose to the Funds the issues identified above with their ratings and their asserted "surveillance" of the ratings.

383.    As just a representative sample, the following is a discussion of the Rating Agencies'  fraudulent  misrepresentations  with  respect  to  ten  specific  securities  listed  on Appendix A.

**1.**    ***Timberwolf***

384.    On March 13, 2007, the Funds invested in Class A-1b and A-1c Floating Rate Notes issued by the Timberwolf I, Ltd. Structured Product CDO ("Timberwolf CDO").

385.   The Timberwolf CDO was offered to a select group of institutional investors, including the Funds.   Moreover, the Timberwolf structure was marketed by means of a Confidential Offering Circular and other materials, which were distributed only to this select group of investors.

386.   As noted in the Timberwolf Confidential Offering Circular, the Class A1-b and A-1c Notes received a AAA rating from S&P, and a Aaa rating from Moody's.   By means of these ratings, S&P and Moody's indicated that the Class A-1b and A-1c Notes were securities of the highest credit quality and carried minimal risk.

387.   As further noted by the Timberwolf Confidential Offering Circular, the AAA rating issued by S&P to the Class A-1b and A-1c Notes purportedly represented "the likelihood of the timely payment of interest and then ultimate payment of principal" on the notes, and was purportedly derived from an analysis of the "(i) credit quality of the Collateral Assets securing the Notes; (ii) cash flow used to pay liabilities and the priorities of these payments; and (iii) legal considerations."

388.   Furthermore, the AAA rating issued by S&P was purportedly derived from application of:

> Standard & Poor's proprietary default expectation computer model, the Standard & Poor's CDO Monitor . . . which is used to estimate the default rate the portfolio is likely to experience.   The Standard & Poor's CDO Monitor calculates the projected cumulative default rate of a pool of Collateral Assets consistent with a specified benchmark rating level based upon S&P's proprietary corporate debt default studies.   The Standard & Poor's CDO Monitor takes into consideration the rating of each issuer or obligor, the number of issuers or obligors, the issuer or obligor industry concentration and the remaining weighted average maturity of each of the Collateral Assets and Eligible Investments included in the portfolio. The risks posed by these variables are accounted for by effectively adjusting the necessary default level needed to achieve a desired rating.   The higher the desired rating, the higher the level of defaults the portfolio must withstand.

389.     Similarly, as likewise noted by the Timberwolf Confidential Offering Circular, the Aaa rating assigned to the Timberwolf Class A-1b and A-1c securities by Moody's purportedly was based upon Moody's assessment of "the probability that the Collateral Assets will provide sufficient funds to pay such Securities, based largely upon Moody's statistical analysis of historical default rates on debt obligations with various ratings, expected recovery rates on the Collateral Assets and the asset and interest coverage required for such Securities (which is achieved through the subordination of more junior Notes)."

390.     Moreover, the Aaa rating issued by Moody's was purportedly based on Moody's analysis of "the likelihood that each debt obligation included in the portfolio will default, based on historical default rates for similar debt obligations, the historical volatility of such default rates (which increases as securities with lower ratings are added to the portfolio) and an additional default assumption to account for future fluctuations in defaults."

391.     As demonstrated by the evidence cited herein, these ratings, and/or these statements about the ratings, were knowingly false when made, or were made with reckless disregard as to their truth and accuracy.

392.     Notably, at least 80% of the Timberwolf CDO was comprised of mezzanine assets, meaning that such assets were only one level above the equity tranche.  The equity tranche was comprised of assets which absorbed the first losses in their respective structures.  As mezzanine securities were only one level above the equity tranche, they were neither senior, nor high grade.  Yet both S&P and Moody's ascribed the highest rating available to the A-1b and A-1c Notes of the Timberwolf CDO.

393.    Moreover, as of the March 2007 Closing Date for the Timberwolf CDO, RMBS subprime assets were "expected to make up approximately 57.4% of the Aggregate Reference Notional Amount" of the Timberwolf assets.

394.    Despite the fact that a significant quantity of the assets underlying the Timberwolf structure were mezzanine, subprime, or otherwise not secure, investment grade assets, both S&P and Moody's ascribed the highest rating available to the Class A-1b and A1-c securities. Moreover, both S&P and Moody's *maintained* that rating through 2007 — despite the rapid deterioration of the RMBS market, and particularly the subprime RMBS market, during that time period.  As demonstrated above, S&P and Moody's were clearly aware of the deterioration of the subprime market.  Yet notwithstanding this knowledge, both S&P and Moody's maintained their highest ratings on the Timberwolf Class A-1b and A-1c notes.  By doing so, S&P and Moody's falsely led the Funds to believe that the Timberwolf Class A -1b and A-1c securities were, and continued to be, a safe, secure investment.

395.    As reflected in Appendix A, both S&P and Moody's significantly downgraded their ratings of the Class A-1c Notes of the Timberwolf CDO on March 25, 2008 and March 31, 2008, respectively.  S&P downgraded the A-1c Notes to BB-*-, and Moody's downgraded the A-1c Notes to Caa1*- — both junk grade ratings.  Likewise, on May 8, 2008, S&P downgraded the A-1b Notes to CCC-*-, and on March 31, 2008, Moody's downgraded the A-1b Notes to Ba3*-.  Moreover, both S&P and Moody's noted that these significantly reduced ratings were trending *downwards*.  Put simply, despite the fact that both S&P and Moody's previously gave these securities the highest rating available, a rating akin to that ascribed to Treasury notes, both S&P and Moody's subsequently downgraded their ratings of the Class A-1b and A-1c Notes of the Timberwolf CDO to non-investment grade *junk.*

396.   As a result of this fraud by S&P and Moody's, the Funds lost at least

$13,560,807 with respect to the Timberwolf Class A-1 Notes.

    **2.**   ***Octans II***

397.   On September 20, 2006, the High-Grade Enhanced Funds invested in Class A-3A

Senior Secure Floating Rate Notes issued by the Octans II CDO ("Octans II CDO").

398.   The Octans II CDO was offered to a select group of institutional investors,

including the Funds.  Moreover, the Octans II structure was marketed by means of a Confidential

Offering Circular and other materials, which were distributed only to this select group of

investors.

399.   As noted in the Octans II Confidential Offering Circular, the Class A-3A Notes

received a AAA rating from S&P, and a Aaa rating from Moody's.  By means of these ratings,

S&P and Moody's indicated that the Class A-3A Notes were securities of the highest credit

quality and carried minimal risk.

400.   As further noted by the Octans II Confidential Offering Circular, the AAA rating

issued by S&P to the Class A-3A Notes purportedly represented its opinion regarding the credit

quality of the Notes, and was based upon S&P's evaluation of the safety of principal and interest

payments to be provided by the Notes.

401.   Furthermore, as noted by the Octans II Confidential Offering Circular, the AAA

rating issued by S&P was purportedly derived from application of:

> Standard & Poor's proprietary default expectation computer model, the Standard &
> Poor's CDO Monitor . . . the dynamic, analytical computer model (including all written
> instructions and assumptions necessary for running the model) provided by Standard &
> Poor's to the Issuer, the Collateral manager, and the Collateral Administrator on or prior
> to the Ramp-Up Completion Date for the purpose of estimating the default risk of
> Collateral Debt Securities, as amended by Standard & Poor's from time to time . . . .  The
> Standard & Poor's CDO Monitor calculates the cumulative default rate of a pool of
> Collateral Debt Securities consistent with a specified benchmark rating level based upon

Standard & Poor's proprietary corporate debt default studies.  In calculating the Class Scenario Default Rate, the Standard & Poor's CDO Monitor considers each obligor's most senior unsecured debt rating, the number of obligors in the portfolio, the obligor and industry concentration in the portfolio and the remaining weighted average maturity of the Collateral Debt Securities and calculates a cumulative default rate based on the statistical probability of distributions of defaults on the Collateral Debt Securities.

402.    As demonstrated by the evidence cited herein, these ratings, and these statements about the ratings, were knowingly false when made, or were made with reckless disregard as to their truth and accuracy.

403.    As noted in the Term Sheet for the Octans II CDO, at least **90%** of the Octans II CDO was comprised by securities backed by midprime and subprime assets, a substantial percentage of which were rated below investment grade.

404.    Despite the fact that a significant quantity of the securities underlying the Octans II structure were backed by midprime, subprime, or otherwise not secure, investment grade assets, S&P and Moody's ascribed the highest rating available to the Class A-3A securities.  Moreover, both S&P and Moody's *maintained* that rating through 2007 — despite the rapid deterioration of the RMBS market, and particularly the subprime RMBS market, during that time period.  As demonstrated above, S&P and Moody's were clearly aware of the deterioration of the subprime market.  Notwithstanding this knowledge, both S&P and Moody's maintained their highest ratings of the Octans II Class A-3A notes.  By doing so, S&P and Moody's falsely led the Funds to believe that the Octans II Class A-3A securities were, and continued to be, a safe, secure investment.

405.    As reflected in Appendix A, S&P and Moody's each significantly downgraded their ratings of the Class A-3A Notes of the Octans II CDO on February 22, 2008 and March 27, 2008, respectively.  S&P downgraded the A-3A Notes to B-, and Moody's downgraded the A-3A Notes to Ba2*-, trending downwards.  These are both non-investment grade, "junk" ratings.

Put simply, despite the fact that S&P and Moody's previously gave these securities the highest rating available, a rating akin to that ascribed to Treasury notes, S&P and Moody's both subsequently downgraded their ratings of the Class A-3A Notes of the Octans II CDO to non-investment grade *junk.*

406.    As a result of this fraud by S&P and Moody's, the Funds lost at least $7,913,567 with respect to the Octans II Class A-3A Notes.

      **3.**      ***Tasman***

407.    On December 11, 2006, the High-Grade Enhanced Funds invested in Class A-1S Senior Secured Floating Rate Notes issued by the Tasman CDO, Ltd. (the "Tasman CDO").

408.    The Tasman CDO was offered to a select group of institutional investors, including the Funds.  Moreover, the Tasman structure was marketed by means of a Confidential Offering Circular and other materials, which were distributed only to this select group of investors.

409.    As noted in the Tasman Confidential Offering Circular, the Class A-1S Notes received a AAA rating from S&P, and a Aaa rating from Moody's.  By means of these ratings, S&P and Moody's indicated that the Class A-1S Notes were securities of the highest credit quality and carried minimal risk.

410.    As stated in the Tasman Confidential Offering Circular, "the ratings issued by Moody's to the Secured Notes address the ultimate cash receipt of all required interest and principal payments on each such Class of Secured Notes, in each case as provided in the governing documents, and are based on the expected loss posed to the Secured Noteholders."

411.    As stated in the Tasman Confidential Offering Circular, "the ratings assigned by Standard and Poor's to the Secured Notes . . . address the timely payment of interest and ultimate payment of principal on each such Class of the Secured Notes."

412.    As demonstrated by the evidence cited herein, these ratings, and these statements about the ratings, were knowingly false when made, or were made with reckless disregard as to their truth and accuracy.

413.    The Tasman Confidential Offering Circular stated that a portion of the portfolio of the CDO would be comprised of RMBS securities, and that a significant quantity of the underlying assets of those RMBS securities would be comprised of subprime mortgages.

414.    Despite the fact that a significant quantity of the securities underlying the Tasman structure were backed by subprime assets, S&P and Moody's ascribed the highest rating available to the Class A-1S securities.  Moreover, S&P and Moody's *maintained* that rating through 2007 — despite the rapid deterioration of the RMBS market, and particularly the subprime RMBS market, during that time period.  As demonstrated above, S&P and Moody's were clearly aware of the deterioration of the subprime market.  Notwithstanding this knowledge, S&P and Moody's maintained their highest ratings of the Tasman Class A-1S notes.  By doing so, S&P and Moody's falsely led the Funds to believe that the Tasman Class A-1S securities were, and continued to be, a safe, secure investment.

415.    As reflected in Appendix A, S&P and Moody's each significantly downgraded their ratings of the Class A-1S Notes of the Tasman CDO on March 7, 2008 and March 26, 2008, respectively.  S&P downgraded the A-1S Notes to BB-, and Moody's downgraded the A-1S Notes to Ba1*-, trending downwards.  These are non-investment grade, "junk" ratings.  Put simply, despite the fact that both S&P and Moody's previously gave these securities the highest

rating available, a rating akin to that ascribed to Treasury notes, S&P and Moody's both subsequently downgraded their ratings of the Class A-1 Notes of the Tasman CDO to non-investment grade *junk.*

416.    As a result of this fraud by S&P and Moody's, the Funds lost at least $7,495,290 with respect to the Tasman Class A-1S Notes.

**4.    *Lexington***

417.    On December 18, 2006, the High-Grade Enhanced Funds invested in Class A-2 Second Priority Senior Floating Rate Notes issued by the Lexington Capital Funding III CDO ("Lexington CDO").

418.    The Lexington CDO was offered to a select group of institutional investors, including the Funds.   Moreover, the Lexington structure was marketed by means of a Confidential Offering Circular and other materials, which were distributed only to this select group of investors.

419.    As noted in the Lexington Confidential Offering Circular, the Class A-2 Notes received a AAA rating from S&P, a Aaa rating from Moody's, and a AAA rating from Fitch.  By means of these ratings, S&P, Moody's, and Fitch all indicated that the Class A-2 Notes were securities of the highest credit quality and carried minimal risk.

420.    As further noted by the Lexington Confidential Offering Circular, the AAA rating issued by S&P to the Class A-2 Notes purportedly represented its opinion regarding the credit quality of the Notes, and was allegedly based upon S&P's evaluation of the safety of principal and interest payments to be provided by the Notes.

421.    Furthermore, as noted by the Lexington Confidential Offering Circular, the AAA rating issued by S&P was purportedly derived from application of:

Standard & Poor's proprietary default expectation computer model, the Standard & Poor's CDO Monitor . . . the dynamic, analytical computer model (including all written instructions and assumptions necessary for running the model) provided by Standard & Poor's to the Issuer, the Collateral manager, and the Collateral Administrator on or prior to the Ramp-Up Completion Date for the purpose of estimating the default risk of Collateral Debt Securities, as amended by Standard & Poor's from time to time . . . .  The Standard & Poor's CDO Monitor calculates the cumulative default rate of a pool of Collateral Debt Securities consistent with a specified benchmark rating level based upon Standard & Poor's proprietary default studies.  In calculating the Class Scenario Default Rate, the Standard & Poor's CDO Monitor considers each obligor's most senior unsecured debt rating, the number of obligors in the portfolio, the obligor and industry concentration in the portfolio and the remaining weighted average maturity of the Collateral Debt Securities and calculates a cumulative default rate based on the statistical probability of distributions of defaults on the Collateral Debt Securities.

422.    As demonstrated by the evidence cited herein, these ratings, and these statements about the ratings, were knowingly false when made, or were made with reckless disregard as to their truth and accuracy.

423.    As noted in the Lexington Confidential Offering Circular, "A large percentage of the RMBS acquired by Issuer will be Residential B/C Mortgage Securities, which are secured primarily by subprime mortgages."  And as set forth in the Term Sheet for the Lexington CDO, at least 90% of the Lexington CDO was comprised by securities backed by midprime and subprime assets, a substantial percentage of which were rated below investment grade.

424.    Despite the fact that a significant quantity of the securities underlying the Lexington structure were backed by midprime, subprime, or otherwise not secure, investment grade assets, S&P, Moody's, and Fitch ascribed the highest rating available to the Class A-2 securities.  Moreover, S&P, Moody's, and Fitch all *maintained* that rating through 2007 — despite the rapid deterioration of the RMBS market, and particularly the subprime RMBS market, during that time period.  As demonstrated above, S&P, Moody's, and Fitch were clearly aware of the deterioration of the subprime market.  Notwithstanding this knowledge, S&P, Moody's, and Fitch all maintained their highest ratings of the Lexington Class A-2 notes,

through 2007 and into 2008. By doing so, S&P, Moody's, and Fitch falsely led the Funds to believe that the Lexington Class A-2 securities were, and continued to be, a safe, secure investment.

425. As reflected in Appendix A, S&P, Moody's, and Fitch each significantly downgraded their ratings of the Class A-2 Notes of the Lexington CDO on February 12, 2008, March 26, 2008, and November 12, 2007, respectively. S&P downgraded the A-2 Notes to CCC+; Moody's downgraded the A-2 Notes to Ba2*-, trending downwards; and Fitch downgraded the A-2 notes to CCC+. These are all non-investment grade, "junk" ratings. Put simply, despite the fact that all three Rating Agencies previously gave these securities the highest rating available, a rating akin to that ascribed to Treasury notes, all three Rating Agencies subsequently downgraded their ratings of the Class A-2 Notes of the Lexington CDO to non-investment grade *junk.*

426. As a result of this fraud by S&P, Moody's, and Fitch, the Funds lost at least $4,210,159 with respect to the Lexington Class A-2 Notes.

### 5. *Commodore*

427. On August 14, 2006, the Funds invested in Class A-1B Notes issued by Commodore CDO V, Ltd. ("Commodore CDO"). The Commodore CDO was offered to a select group of institutional investors, including the Funds. Moreover, the Commodore CDO was marketed by means of a Confidential Offering Circular and other materials, which were distributed only to this select group of investors.

428. The Commodore Confidential Offering Circular, indicated that the Class A-1B Notes of the Commodore CDO received a AAA rating from S&P and a Aaa rating from

Moody's.  By means of these ratings, S&P and Moody's indicated that the Class A-1B Notes were securities of the highest credit quality and carried minimal risk.

429.    As further noted by the Commodore Confidential Offering Circular, the Aaa rating issued by Moody's to the A-1B Notes purportedly represented the likelihood of the "ultimate cash receipt of all required interest and principal payments" on the Notes, and was purportedly "based on the expected loss posed to the Secured Noteholders relative to the promise of receiving the present value of such payments."

430.    As demonstrated by the evidence cited herein, these ratings, and/or these statements about the ratings, were knowingly false when made, or were made with reckless disregard as to their truth and accuracy.

431.    The offering memorandum for the Commodore CDO noted that "a large percentage of RMBS purchased by the Issuer will be Sub-Prime RMBS, which are secured primarily by subprime mortgages."  Moreover, a preliminary term sheet for the Commodore CDO noted that the assets underlying the CDO would be comprised of up to 23.8% RMBS subprime assets rated Baa; up to 0.8% RMBS subprime assets rated Ba, and up to 6.9% synthetic RMBS subprime assets rated Baa.  That same term sheet further noted that the assets underlying the Commodore CDO would also be comprised of up to 27.2% RMBS midprime assets rated Baa, and up to 2% RMBS midprime assets rated Ba.  In total, well over 50% of the Commodore CDO consisted of subprime or midprime RMBS assets, a significant portion of which were rated as non-investment grade.

432.    Despite the fact that a significant portion of the assets underlying the Commodore CDO were subprime, midprime, and/or not investment grade, S&P and Moody's each ascribed their highest ratings available to the Class A-1B securities.  Moreover, both S&P and Moody's

maintained these ratings throughout 2007 — despite the rapid deterioration of the RMBS, and particularly the subprime RMBS market, during that time period.  As demonstrated above, S&P and Moody's were each clearly aware of the deterioration of the subprime and midprime markets.  Notwithstanding this knowledge, S&P and Moody's each maintained their highest ratings on the Class A-1B securities.  By doing so, S&P and Moody's falsely led the Funds to believe that the Commodore Class A-1B securities were, and continued to be, a safe, secure investment.

433.    As reflected on Appendix A, S&P and Moody's each significantly downgraded their ratings of the Commodore Class A-1B securities.  On July 24, 2008, S&P downgraded its ratings of the Class A-1B Notes to B-, and on June 2, 2008, Moody's downgraded its ratings of the Class A-1B Notes to B3*-.  Put simply, despite the fact that they each previously gave these securities the highest rating available, a rating akin to that ascribed to Treasury notes, S&P and Moody's each downgraded their ratings of the Class A-1 Notes of the Commodore CDO to non-investment grade *junk*.

434.    As a result of this fraud by S&P and Moody's, the Funds lost at least $9,474,347 with respect to the Commodore Class A-1B Notes.

**6.      *Adams Square Funding***

435.    On February 9, 2007, the High-Grade Enhanced Funds invested in Class A-2 Notes issued by the Adams Square Funding II, Ltd. ABS CDO ("Adam Square Funding CDO").

436.    The Adams Square Funding CDO was offered to a select group of institutional investors, including the Funds.  Moreover, the Adams Square Funding structure was marketed by means of a Confidential Offering Circular and other materials, which were distributed only to this select group of investors.

437.    As noted in the Adams Square Funding Confidential Offering Circular, the Class A-2 Notes of the Adams Square Funding CDO received a AAA rating from S&P and a Aaa rating from Moody's.  By means of these ratings, S&P and Moody's indicated that the Class A-2 Notes were securities of the highest credit quality and carried minimal risk.

438.    As demonstrated by the evidence cited herein, these ratings, and these statements about the ratings, were knowingly false when made, or were made with reckless disregard as to their truth and accuracy.

439.    The Confidential Offering Circular for the Adams Square Funding CDO indicated that up to 90% of the assets underlying the Adam Square CDO would be RMBS Securities and, in particular, primarily B/C Mortgages, or mortgages "originated using underwriting standards that are less standardized and less predictable than the underwriting standards for agency programs such as Fannie Mae."

440.    A preliminary term sheet for the Adam Square Funding CDO noted that the target asset composition included 60.2% subprime RMBS and 26.8% midprime RMBS.  In total, the Adam Square Funding CDO consisted of over 85% subprime or midprime RMBS assets.

441.    Despite the fact that a significant portion of the securities underlying the Adams Square Funding structure were subprime, midprime, or assets of otherwise questionable credit quality, S&P and Moody's each ascribed their highest ratings to the Class A-2 securities. Moreover, S&P and Moody's each maintained these ratings throughout 2007 — despite the rapid deterioration of the RMBS, and particularly the subprime RMBS market — of which, as demonstrated above, S&P and Moody's were clearly aware.  By doing so, S&P and Moody's falsely led the Funds to believe that the Adams Square Funding Class A-2 securities were, and continued to be, a safe, secure investment.

442.    As reflected in Appendix A, S&P downgraded its ratings of the Class A-2 Notes to CC on February 6, 2008, and Moody's downgraded its ratings of the Class A-2 Notes to Caa2*- on January 16, 2008 — both of which are "junk" level ratings.  Put simply, despite the fact that they both previously gave these securities the highest ratings available — a rating akin to that ascribed to Treasury notes —S&P and Moody's each subsequently downgraded their ratings of the Class A-2 Notes of the Adams Square Funding CDO to non-investment grade *junk*.

443.    As a result of this fraud by S&P and Moody's, the Funds lost at least $3,048,167 with respect to the Adams Square Funding Class A-2 Notes.

### 7.    *Caldecot*

444.    On October 11, 2006, the High-Grade Enhanced Funds invested in Class A-2 Second Priority Senior Floating Rate Notes issued by the Caldecot CDO ("Caldecot CDO").

445.    The Caldecot CDO was offered to a select group of institutional investors, including the Funds.  Moreover, the Caldecot structure was marketed by means of a confidential Offering Circular and other materials, which were distributed only to this select group of investors.

446.    As noted in the Caldecot Confidential Offering Circular, the Class A-2 Notes received a AAA rating from S&P and a Aaa rating from Moody's.  By means of these ratings, S&P and Moody's indicated that the Class A-2 Notes were securities of the highest credit quality and carried minimal risk.

447.    As further noted by the Caldecot Confidential Offering Circular, the AAA rating issued by S&P to the Class A-2 Notes purportedly represented its opinion regarding the credit

quality of the Notes, and was based upon S&P's evaluation of the safety of principal and interest payments to be provided by the Notes.

448.    Furthermore, as noted by the Caldecot Confidential Offering Circular, the AAA rating issued by S&P was purportedly derived from application of

> Standard & Poor's proprietary default expectation computer model, the Standard & Poor's CDO Monitor . . . the dynamic, analytical computer model (including all written instructions and assumptions necessary for running the model) provided by Standard & Poor's to the Issuer, the Collateral manager, and the Collateral Administrator on or prior to the Ramp-Up Completion Date for the purpose of estimating the default risk of Collateral Debt Securities, as amended by Standard & Poor's from time to time. . . .  The Standard & Poor's CDO Monitor calculates the cumulative default rate of a pool of Collateral Debt Securities consistent with a specified benchmark rating level based upon Standard & Poor's proprietary default studies.  In calculating the Class Scenario Default Rate, the Standard & Poor's CDO Monitor considers each obligor's most senior unsecured debt rating, the number of obligors in the portfolio, the obligor and industry concentration in the portfolio and the remaining weighted average maturity of the Collateral Debt Securities and calculates a cumulative default rate based on the statistical probability of distributions of defaults on the Collateral Debt Securities.

449.    As demonstrated by the evidence cited herein, these ratings, and these statements about the ratings, were knowingly false when made, or were made with reckless disregard as to their accuracy.

450.    As noted in the Term Sheet for the Caldecot CDO, at least 67% of the Caldecot CDO was comprised by securities backed by midprime and subprime assets, a substantial percentage of which were rated below investment grade.

451.    Despite the fact that a significant quantity of the securities underlying the Caldecot structure were midprime, subprime, or otherwise not secure, investment grade assets, S&P and Moody's each ascribed the highest rating available to the Class A-2 securities. Moreover, S&P and Moody's each *maintained* that rating through 2007 — despite the rapid deterioration of the RMBS market, and particularly the subprime RMBS market, during that time period.  As demonstrated above, S&P and Moody's were clearly aware of the deterioration of the

subprime market.  Notwithstanding this knowledge, S&P and Moody's each maintained their highest ratings of the Caldecot Class A-2 notes.  By doing so, S&P and Moody's falsely led the Funds to believe that the Caldecot Class A-2 securities were, and continued to be, a safe, secure investment.

452.    As reflected in Appendix A, S&P and Moody's significantly downgraded their ratings of the Class A-2 Notes of the Caldecot CDO on February 11, 2008 and March 27, 2008, respectively.  S&P downgraded the A-2 Notes to B- and Moody's downgraded the A-2 Notes to Ba2*-, trending downwards.  These are both non-investment grade, "junk" ratings.  Put simply, despite the fact that S&P and Moody's previously gave these securities the highest rating available, a rating akin to that ascribed to Treasury notes, S&P and Moody's each subsequently downgraded their ratings of the Class A-2 Notes of the Caldecot CDO to non-investment grade *junk.*

453.    As a result of this fraud by S&P and Moody's, the Funds lost at least $2,553,299 with respect to the Caldecot Class A-2 Notes.

**8.    *Scorpius***

454.    On September 29, 2006, the Funds invested in Class A-2A Notes issued by the Scorpius CDO, Limited ("Scorpius CDO").

455.    The Scorpius CDO was offered to a select group of institutional investors, including the Funds.  Moreover, the Scorpius structure was marketed by means of a Confidential Offering Circular and other materials, which were distributed only to this select group of investors.

456.    As noted in the Scorpius Confidential Offering Circular and other materials, the Class A-2A Notes of the Scorpius CDO received a AAA rating from S&P and a Aaa rating from

Moody's.  By means of these ratings, S&P and Moody's indicated that the Class A-2A Notes were securities of the highest credit quality and carried minimal risk.

457.    As demonstrated by the evidence cited herein, these ratings, and these statements about the ratings, were knowingly false when made, or were made with reckless disregard as to their truth and accuracy.

458.    A preliminary term sheet indicated that the representative composition of the Scorpius CDO would be 52% synthetic RMBS securities.

459.    Moreover, the Confidential Offering Circular for the Scorpius CDO noted that a large percentage of the underlying portfolio would be secured primarily by subprime assets.

460.    Despite the fact that a significant portion of the securities underlying the Scorpius CDO were secured by subprime assets, S&P and Moody's each ascribed their highest ratings to the Class A-2A securities.  Moreover, S&P and Moody's each maintained these ratings throughout 2007 — despite the rapid deterioration of the RMBS market, and particularly the subprime RMBS market — of which, as demonstrated above, S&P and Moody's were clearly aware.  By doing so, S&P and Moody's falsely led the Funds to believe that the Scorpius Class A-2A securities were, and continued to be, a safe, secure investment.

461.    As reflected in Appendix A, S&P downgraded its rating of the Class A-2A Notes to B+ on February 20, 2008, and Moody's downgraded its rating of the Class A-2A Notes to Caa1*- on March 12, 2008 — both of which are "junk" level ratings.  Moreover, Moody's noted that its rating was tending downwards.  Put simply, despite the fact that they both previously gave these securities the highest ratings available — a rating akin to that ascribed to Treasury notes — S&P and Moody's each subsequently downgraded their ratings of the Class A-2A Notes of the Scorpius CDO Limited to non-investment grade ***junk***.

462.     As a result of this fraud by S&P and Moody's, the Funds lost at least $6,145,612 with respect to the Scorpius CDO Limited Class A-2A Notes.

**9.     *Pampelonne***

463.     On February 22, 2007, the High-Grade Enhanced Funds invested in Class A-1 Senior Floating Rate Notes issued by Pampelonne CDO II, Ltd. ("Pampelonne CDO").

464.     The Pampelonne CDO was offered to a select group of institutional investors, including the Funds.   Moreover, the Pampelonne structure was marketed by means of a Confidential Offering Circular and other materials, which were distributed only to this select group of investors.

465.     As noted in the Pampelonne Confidential Offering Circular, the Class A-1 Notes received a AAA rating from S&P, and a Aaa rating from Moody's.   By means of these ratings, S&P and Moody's indicated that the Class A-1 Notes were securities of the highest credit quality and carried minimal risk.

466.     As represented in the Pampelonne Confidential Offering Circular, the ratings issued by S&P and Moody's to the Class A-1 Notes purportedly were "based upon that Rating Agency's assessment of the probability that the Collateral Assets will provide sufficient funds to pay such Notes (based upon the respective interest rate and principal balance), based largely upon such Rating Agency's statistical analysis of historical default rates on debt securities with various ratings, the terms of the Indenture, the asset and interest coverage required for the Rated Notes (which is achieved through the subordination of the Income Notes and certain Classes of Notes through the Priority of Payments as described herein), and the Reinvestment Criteria that must be satisfied or improved in the manner described herein in order to reinvest in additional Collateral Assets."

467.     Furthermore, as represented in the Pampelonne Confidential Offering Circular, "[i]n addition to their respective quantitative tests, the ratings of each Rating Agency take into account qualitative features of a transaction, including the legal structure and the risks associated with such structure, such Rating Agency's view as to the quality of the participants in the transaction and other factors that it deems relevant."

468.     Specifically with respect to Moody's, the Pampelonne Confidential Offering Circular stated that "the rating assigned by Moody's to each Class of Rated Notes addresses the ultimate cash receipt by the Holders of the Rated Notes of all required interest and principal payments on the Rated Notes as required by the Indenture."

469.     Specifically with respect to S&P, the Pampelonne Confidential Offering Circular stated that:

> The ratings assigned to the Rated Notes and the Principal Protected Notes by S&P address (i) the timely payment of interest on the Class S Notes, the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class B Notes, (ii) the ultimate payment of interest on the Class C Notes, the Class D Notes and the Class E Notes by their Stated Maturity Date, (iii) the ultimate payment of principal of each Class of Rated Notes by their Stated Maturity Date and (iv) with respect to the Principal Protected Notes, the ultimate payment of the PPN Amount.

> S&P will rate the Rated Notes in a manner similar to the manner in which it rates other structured issues. This requires an analysis of the following: (i) credit quality of the Collateral Assets securing the Rated Notes; (ii) cash flow used to pay liabilities and the priorities of these payments; and (iii) legal considerations. Based on these analyses, S&P determines the necessary level of credit enhancement needed to achieve a desired rating.

> S&P's analysis includes the application of its proprietary default expectation computer model, the S&P CDO Monitor, which is used to estimate the default rate that the portfolio is likely to experience, and which will be provided by S&P to the Collateral Manager and the Trustee after the Effective Date. The S&P CDO Monitor calculates the projected cumulative default rate of a pool of Collateral Assets consistent with a specified benchmark rating level based upon S&P's proprietary corporate debt default studies. The S&P CDO Monitor takes into consideration the rating of each issuer or obligor, the number of issuers or obligors, the issuer or obligor industry concentration and the remaining weighted

- 127 -

average maturity of each of the Collateral Assets (other than Defaulted Securities) and Eligible Investments included in the portfolio and calculates a cumulative default rate based on the statistical probability of distributions or defaults on the Collateral Assets and Eligible Investments included in the portfolio. The risks posed by these variables are accounted for by effectively adjusting the necessary default level needed to achieve a desired rating. The higher the desired rating, the higher the level of defaults the portfolio must withstand.

Credit enhancement to support a particular rating is then provided based, in part, on the results of the S&P CDO Monitor, as well as other more qualitative considerations such as legal issues and management capabilities. Credit enhancement is typically provided by a combination of overcollateralization/subordination, cash collateral/reserve account, excess spread/interest and amortization. A transaction specific cash flow model (the "Transaction-Specific Cash Flow Model") is used by S&P to evaluate the portfolio and determine whether it can withstand an estimated level of defaults while fully repaying the class of debt under consideration.

470.   As demonstrated by the evidence cited herein, these ratings, and these statements about the ratings, were knowingly false when made, or were made with reckless disregard as to their truth and accuracy.

471.   The Pampelonne Confidential Offering Circular stated that "a significant portion of the Collateral Assets will consist of Structured Finance Securities, or Synthetic Assets referencing Structured Finance Securities, that are subordinate in right of payment and rank junior to other securities that are secured by or represent an ownership interest in the same pool of assets."

472.   The Pampelonne Confidential Offering Circular further stated that a significant portion of the portfolio of the CDO would be comprised of RMBS securities, a substantial portion of which would be backed by subprime and/or non-conforming mortgage loans.

473.   Despite the fact that a significant quantity of the securities underlying the Pampelonne CDO structure were backed by subordinate, subprime, and/or non-conforming assets, S&P and Moody's each ascribed the highest rating available to the Class A-1 securities.

Moreover, both S&P and Moody's each *maintained* that rating through 2007 — despite the rapid deterioration of the RMBS market, and particularly the subprime RMBS market, during that time period.  As demonstrated above, S&P and Moody's were clearly aware of, the deterioration of the subprime market.  Notwithstanding this knowledge, S&P and Moody's maintained their highest ratings of the Pampelonne Class A-1 notes.  By doing so, S&P and Moody's falsely led the Funds to believe that the Pampelonne Class A-1 securities were, and continued to be, a safe, secure investment.

474.    As reflected in Appendix A, S&P and Moody's each significantly downgraded their ratings of the Class A-1 Notes of the Pampelonne CDO on February 1, 2008 and February 27, 2008, respectively.  S&P downgraded the A-1 Notes to BB*-, and Moody's downgraded the A-1 Notes to C.  These are nearly the lowest ratings on S&P and Moody's respective rating scales.  Furthermore, S&P and Moody's each indicated that these ratings were trending downwards.  Put simply, despite the fact that S&P and Moody's previously gave these securities the highest rating available, a rating akin to that ascribed to Treasury notes, S&P and Moody's both subsequently downgraded their ratings of the Class A-1 Notes of the Pampelonne CDO to non-investment grade *junk.*

475.    As a result of this fraud by S&P and Moody's, the Funds lost at least $698,332 with respect to the Pampelonne Class A-1 Notes.

**10.    *GSC***

476.    On September 21, 2006, the High-Grade Enhanced Funds invested in Class A-1 Senior Secured Floating Rate Notes issued by the GSC ABS CDO 2006-4A, Ltd. (the "GSC CDO").

477.    The GSC CDO was offered to a select group of institutional investors, including the Funds.  Moreover, the GSC structure was marketed by means of a Confidential Offering Circular and other materials, which were distributed only to this select group of investors.

478.    As noted in the GSC Confidential Offering Circular, the Class A-1 Notes received a AAA rating from S&P, a Aaa rating from Moody's, and a AAA rating from Fitch.  By means of these ratings, S&P, Moody's, and Fitch indicated that the Class A-1 Notes were securities of the highest credit quality and carried minimal risk.

479.    As represented in the GSC Confidential Offering Circular, the AAA rating issued by S&P and Fitch to the Class A-1 Notes purportedly "address[ed] the timely payment of interest and ultimate payment of principal" on the Notes at their stated maturity.

480.    Furthermore, as represented in the GSC Confidential Offering Circular, the Aaa rating issued by Moody's to the Class A-1 Notes purportedly "address[ed] the ultimate cash receipt of all required interest and principal payments on such Class of Notes, as provided in the governing documents, and [was] based on the expected loss posed to the Class A-1 Noteholders relative to the promise of receiving the present value of such payments."

481.    As demonstrated by the evidence cited herein, these ratings, and these statements about the ratings, were knowingly false when made, or were made with reckless disregard as to their accuracy.

482.    The GSC Confidential Offering Circular stated that the majority of the portfolio of the CDO would be comprised of RMBS securities, a substantial portion of which would be securities whose underlying assets were comprised of subprime mortgages.

483.    Despite the fact that a significant quantity of the securities underlying the GSC structure were backed by subprime assets, S&P, Moody's, and Fitch each ascribed the highest

rating available to the Class A-1 securities.  Moreover, S&P, Moody's, and Fitch *maintained* that rating through 2007 — despite the rapid deterioration of the RMBS market, and particularly the subprime RMBS market, during that time period.  As demonstrated above, S&P, Moody's, and Fitch were clearly aware of the deterioration of the subprime market.  Notwithstanding this knowledge,  S&P, Moody's, and Fitch each maintained their highest ratings of the GSC Class A-1 notes.  By doing so, S&P, Moody's, and Fitch falsely led the Funds to believe that the GSC Class A-1 securities were, and continued to be, a safe, secure investment.

484.    As reflected in Appendix A, S&P, Moody's, and Fitch significantly downgraded their ratings of the Class A-1 Notes of the GSC CDO on February 6, 2008, December 20, 2007, and November 12, 2007, respectively.   S&P downgraded the A-1 Notes to B; Moody's downgraded the A-1 Notes to B2*-; and Fitch downgraded the A-1 Notes to BB-, trending downward.  These are non-investment grade, "junk" ratings.  Put simply, despite the fact that all three Rating Agencies previously gave these securities the highest rating available, a rating akin to that ascribed to Treasury notes, S&P, Moody's, and Fitch each subsequently downgraded their ratings of the Class A-1 Notes of the GSC CDO to non-investment grade *junk.*

485.    As a result of this fraud by S&P and Moody's, the Funds lost at least $123,611 with respect to the GSC Class A-1 Notes.

**E.     The Rating Agencies' Failure to Timely Downgrade, and the Resultant Collapse of the Funds**

486.    Despite the numerous concerns internally at the Rating Agencies, as detailed above, the Rating Agencies continued to maintain their ratings for the bulk of the securities listed on Appendix A through at least mid-July 2007.  Indeed, it was only in mid-July 2007 that the Rating Agencies began to downgrade certain of these securities.

487.     Yet, as set forth herein, at least by 2006, the Rating Agencies already saw rapid and unprecedented deterioration in the RMBS underlying the CDOs they had rated, including those CDOs listed on Appendix A, which increased the risk that the tranches purchased by the Funds would be negatively impacted.

488.     For example, in an e-mail dated August 7, 2006, Richard W. Koch, S&P's Director of Structured Finance Ratings, acknowledged that S&P was aware that there had been "rampant appraisal and underwriting fraud in the industry for quite some time as pressure has mounted to feed the origination machine."  On September 29, 2006 — nine months before the Rating Agencies began downgrades — Koch wrote that the data "is telling us that underwriting fraud; appraisal fraud and the general appetite for new product among originators is resulting in loans being made that shouldn't be made."  Koch wrote, "if [then-New York Governor] Spitzer could prove coercion this could be a RICO offense!"

489.     By the second half of 2006, the Rating Agencies recognized that the subprime mortgages underlying recent vintage RMBS, in particular 2006 vintage RMBS, were severely underperforming.  On September 30, 2006, Michael Gutierrez, an S&P employee, stated that he:

> [N]oticed a disturbing pattern — for each of three companies with high gross and net proceeds recovery the loss severity was mind-boggling — between 40 and 52% (even for one with 92% net proceeds recovery.)  I think this may be a story that needs to be told and it isn't about broken servicing shops.

490.     The delinquencies in the underlying loans were so great that in some instances, the Rating Agencies were seeing realized losses — which was unprecedented in the first six to ten months of a loan rated for 30 year maturity.  Indeed, the performance of the mortgage loans underlying the 2006 subprime RMBS were so bad that analysts initially thought the data contained typographical errors.

491.    As alleged in the DOJ Action, on November 14, 2006, an e-mail was circulated internally at S&P in which the author stated:

> I have attached a report that shows that more than 50% of the sub-prime deals rated in 2006 have severely delinquent loans that represent 25% or more of credit enhancement for the lowest rated [class].  Many have realized losses already.

492.    Attached to the November 14, 2006, e-mail was a spreadsheet titled "Suprime_Trouble.xls" that listed *770* S&P-rated RMBS tranches for which severe delinquencies totaled more than 25% of available credit support.  Those 770 tranches came from 133 subprime RMBS deals, or more than half of the total subprime RMBS deals rated by S&P in the first half of 2006.

493.    The DOJ Action also alleges that on December 11, 2006, in "Confidential Working Notes," David Tesher, Managing Director at S&P in charge of the cash CDO group wrote "This market is a wildly spinning top which is going to end badly."

494.    Despite these serious and dramatic issues with regard to the underlying collateral — issues the Rating Agencies clearly recognized — they did not downgrade these securities, including those on Appendix A; rather analysts were prevented from downgrading due to concerns that the Rating Agencies' business would be affected if they did so.  As specifically found by the Senate Permanent Subcommittee Report on "Wall Street and the Financial Crisis," dated April 13, 2011:  "In late 2006, high risk mortgages began incurring delinquencies and defaults at an alarming rate. Despite signs of a deteriorating mortgage market, Moody's and S&P continued for six months to issue investment grade ratings for numerous RMBS and CDO securities."

495.    Analysts repeatedly expressed frustration that notwithstanding the dire performance of subprime RMBS, they were precluded from downgrading the ratings of subprime RMBS due to concerns that business would be affected if there were downgrades.

- 133 -

496.    For example, the DOJ Action alleges that on February 7, 2007, an S&P RMBS Surveillance Committee meeting was held, during which it was discussed that numerous RMBS tranches were experiencing "higher than expected delinquency and loss performance," that "[s]everely delinquent percentages are increasing [at] a rapid pace," and that "[l]osses are occurring very early in some of the deals."  The group "concluded that there were 'Issues with Subprime, some AltA', and that RMBS rated 'A and below are in trouble for 80% of the deals.'" Despite these clearly expressed concerns regarding the underlying collateral, the S&P committee improperly decided that none of the deals in question would be downgraded at the time.  This was in large part due to concerns regarding profitability.

497.    As a result, the Rating Agencies issued and maintained ratings they knew were inaccurate.  Indeed, when Wong was asked during his testimony "is it fair to say that by March of 2007 with regard to the subprime class of collateral that you didn't believe that those ratings were going to hold on average?", Wong responded, "That's a fair statement."  Nevertheless, the Rating Agencies failed to downgrade until the dates set forth on Appendix A.

498.    In June 2007, the concerns intensified.  S&P acknowledged that "The meltdown of the subprime-mortgage market will increase both foreclosures and the overhang of homes for sale."  In June 2007, Moody's likewise was discussing internally "increased amounts of lying on income," "increased amounts of occupancy misstatements" in mortgage applications, and that "most payers in the market" believed that subprime "would perform extremely poorly" and that the problems were "quite serious."  Yet despite this clear internal acknowledgement that the Rating Agencies knew there were serious issues with the mortgages underlying many RMBS securities, including those listed on Appendix A, the Rating Agencies still failed to issue any significant downgrades at that time.

499.    Again, this was in large part due to the Rating Agencies' continued commitment to appeasing issuers.  Indeed, the DOJ Action alleges that a July 5, 2007, e-mail from an S&P structured finance analyst to an investment banker client acknowledged this:

> The fact is, there was a lot of internal pressure in S&P to downgrade lots of deals earlier on before this thing started blowing up.  But the leadership was concerned of p*ssing off too many clients and jumping the gun ahead of Fitch and Moody's.

500.    Investors, including Plaintiffs, were not informed of these issues and other concerns of the Rating Agencies regarding numerous RMBS deals, including those underlying the securities set forth on Appendix A.  By continuing to maintain their ratings, despite their clear awareness that these ratings were no longer justified and no longer valid, the Rating Agencies continued to perpetrate their fraud.

501.    Finally, on July 10, 2007, S&P publicly announced for the first time that it was placing 612 2005 and 2006 vintage subprime RMBS on CreditWatch — representing over $12 billion in rated securities — and that large-scale downgrades of these assets would follow.  Two days later, on July 12, 2007, S&P announced a mass downgrade of 2005 and 2006 vintage subprime RMBS.

502.    S&P admitted that these actions were "being taken at this time because of poor collateral performance, our expectations of increasing losses in the underlying collateral pools, the consequent reduction of credit support, and changes that will be implemented with respect to the methodology for rating new transactions."  S&P further admitted that (i) its prior correlation assumptions were understated, and (ii) that it would be implementing a new ratings methodology to transactions closing after July 10, 2007 "that will result in greater credit protection for rated transactions."  Put simply, S&P blatantly admitted that its prior assumptions and methodologies — and the ratings that they produced — were faulty, if not fraudulent.

503.    Likewise on July 10, 2007, Moody's announced downgrades and other negative rating agency actions with respect to 431 2006 vintage subprime RMBS securities — representing $5.2 billion in value.

504.    Two days later, on July 12, 2007, Fitch announced that it would likewise be taking negative rating action with respect to hundreds of subprime securities it had rated.

505.    By the time these downgrades were issued and other measures were taken, it was too late to avoid the massive losses that followed.  By July 17, 2007, it was evident that at least the CDOs and RMBS listed on Appendix A had become virtually worthless.  As a result, the Funds had not just lost profitability, but viability, and it became evident that liquidation was the only option.

506.    As specifically found by the Senate Permanent Subcommittee Report on "Wall Street and the Financial Crisis," dated April 13, 2011, "over 90% of the AAA ratings given to subprime RMBS securities originated in 2006 and 2007 were later downgraded by the credit rating agencies to junk status."   Moreover, as likewise found by the Senate Permanent Subcommittee Report, when the Rating Agencies issued these mass downgrades, they caused losses to the Funds and other investors, and precipitated the financial crisis more generally:

> Moody's and S&P provided AAA ratings to tens of thousands of high risk RMBS and CDO securities and then, when those products began to incur losses, issued mass downgrades *that shocked the financial markets, hammered the value of the mortgage related securities, and helped trigger the financial crisis.*

(emphasis added).

507.    The Rating Agencies have acknowledged that the ratings they issued through the summer of 2007 were wrong.  Indeed, Eric Kolchinsky, a former Moody's Managing Director, acknowledged in testimony to the U.S. Senate on April 23, 2010, that Moody's ratings of subprime and non-prime RMBS in 2007 were inaccurate:

During the course of [2007], the group which rated and monitored subprime bonds did not react to the deterioration in their performance statistics.  That changed by late summer 2007.  In early September, I was told that the ratings on the 2006 vintage of subprime bonds were about to be downgraded severely.  While the understaffed group needed time to determine the new ratings, *I left the meeting with knowledge that the then current ratings were wrong and no longer reflected the best opinion of the rating agency.*

(emphasis added).

508.    What is more, as specifically found by the Senate Permanent Subcommittee on Investigations in its April 13, 2011 report on "Wall Street and the Financial Crisis," the Rating Agencies were aware of the problems in the mortgage market *before* the downgrades issued starting in late summer 2007, and had they taken action earlier, they could have avoided investor losses such as those at issue here:

> Evidence gathered by the Subcommittee shows that the credit rating agencies were aware of problems in the mortgage market, including an unsustainable rise in housing prices, the high risk nature of the loans being issued, lax lending standards, and rampant mortgage fraud.  Instead of using this information to temper their ratings, the firms continued to issue a high volume of investment grade ratings for mortgage backed securities.  *If the credit rating agencies had issued ratings that accurately reflected the increasing risk in the RMBS and CDO markets and appropriately adjusted existing ratings in those markets, they might have discouraged investors from purchasing high risk RMBS and CDO securities, and slowed the pace of securitizations.*

(emphasis added).

509.    By issuing ratings, including those pertaining to the securities listed on Appendix A, that the Rating Agencies knew at the time were false, and/or by issuing ratings that they subsequently learned, but failed to disclose, were no longer valid and accurate, the Rating Agencies engaged in fraud.  As noted, all of the securities listed on Appendix A were given the highest rating by one or more of the Rating Agencies.  But the facts demonstrate that the Ratings Agencies knew these highest ratings they gave to the securities listed on Exhibit A were false from the outset and/or that the Ratings Agencies subsequently learned that these ratings were

false, but failed to disclose this fact to the Funds.  Put simply, as their own employees have admitted, the Rating Agencies "knew [their ratings] were wrong at the time;" knew their models "[did] not capture half of the risk;" acknowledged that their criteria became so lax that deals "could be structured by cows and we would rate it;" and acknowledged that their ratings were "marginally more accurate than if you just flipped a coin."  The Rating Agencies thus have admitted to issuing and/or maintaining ratings they knew were false, and upon which the Funds relied.  They should be held accountable to the victims of this fraud, including the Funds.

## VI.   DERIVATIVE ALLEGATIONS

510.   The Liquidators having made demand on the liquidators of the Master Funds to commence proceedings on behalf of the Master Funds on substantially the grounds stated herein, and the liquidators of the Master Funds having declined to do so, the Honorable Andrew J. Jones QC, Permanent Judge of the Cayman Court (the court overseeing the liquidation of the Overseas Funds and the Master Funds), ratified the Liquidators' authority to continue to assert claims derivatively on behalf of the Master Funds by Orders dated as of October 30, 2013.

## CAUSE OF ACTION

### COUNT ONE
### (Fraud)

511.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

512.   The Rating Agencies made materially false and misleading representations and omissions concerning their objectivity and independence, the accuracy of their ratings, and their commitment to conduct ongoing surveillance to ensure the continued accuracy of their ratings, including their ratings of the CDO and/or RMBS securities reflected on Appendix A hereto.

513.     The Rating Agencies were aware that, given their special role in the financial markets, investors, including the Funds, relied upon the Rating Agencies for objective, independent, and accurate ratings.

514.     The false and misleading statements concerning the Rating Agencies' objectivity and independence, as well as the ratings assigned to the CDOs and RMBS reflected on Appendix A, were published on the Rating Agencies' respective websites and otherwise made known to the Funds through various private information services, including Bloomberg, and confirmed through private placement memoranda and other communications.

515.     The Funds relied upon the Rating Agencies and their ratings, objectivity, and independence with respect to the securities listed on Appendix A.

516.     The Rating Agencies knew at all times that investors, including the Funds, would and did reasonably rely on the false ratings in connection with the decision to invest, directly or indirectly, in CDOs and RMBS, and to maintain those investments, including the investments reflected on Appendix A.

517.     The ratings were false and misleading because, as set forth herein, the Rating Agencies possessed unique, specialized, and material information, solely knowable by them, concerning the deterioration of the U.S. housing market during the relevant time period and its impact on the quality of the mortgages underlying the CDOs and RMBS reflected on Appendix A hereto, which was not reflected in the ratings assigned to those CDOs and RMBS.

518.     To secure market share and earn fees from their clients, the Rating Agencies intentionally and/or recklessly failed to account for the deteriorating credit quality of mortgages underlying CDOs and RMBS they had knowledge of, and, notwithstanding such deterioration, assigned top ratings to the CDOs and RMBS reflected on Appendix A hereto.

519.    Moreover, despite their repeated representations that they would conduct ongoing surveillance to ensure that their ratings remained accurate, the Rating Agencies maintained, and in many instances republished these ratings, and failed to downgrade them — despite the fact they knew, or recklessly disregarded, in light of the deteriorating credit quality of the mortgages underlying the securities in question, these ratings were no longer accurate.

520.    The Rating Agencies' representations and omissions concerning the objectivity, independence, and accuracy of their ratings, and the credit quality and risk of default associated with the CDOs and RMBS to which the Funds were exposed, including those on Appendix A hereto, were knowingly false.  When the true credit quality and risk of those structured finance products was revealed, the Funds lost all value and collapsed.  The fraudulent conduct described herein was the cause of the losses that the Funds seek to recover.

521.    As described herein, the Rating Agencies demonstrated a willful, deliberate, and wanton disregard for the consequences of their misconduct or the interests of market participants, including the Funds.  Further, the Rating Agencies' fraudulent misconduct, as described herein, involves a high degree of moral culpability.

522.    The Funds have been injured as a result of the Rating Agencies' fraudulent conduct and representations and omissions, in an amount to be determined at trial.


[Remainder of Page Intentionally Left Blank]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(i)     awarding damages in an amount to be determined at trial, but believed to be not less than $1 billion, against the Defendants;

(ii)    awarding Plaintiffs punitive damages;

(iii)   awarding Plaintiffs pre- and post-judgment interest and reasonable Court costs, including attorneys' fees; and

(iv)    awarding such other and further relief as the Court deems just and proper against all Defendants, or any of them.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:      New York, New York
            November 11, 2013

REED SMITH LLP

James C. McCarroll
Jordan W. Siev
C. Neil Gray
Samuel Kadosh
599 Lexington Avenue
New York, NY  10022-7650
Telephone: +1 212 521 5400
Facsimile: +1 212 521 5450

*Attorneys for Plaintiffs*

US_ACTIVE-114887974

- 141 -

## Appendix A
## Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd.

| No. | CUSIP | Description | Date Of Investment | Initial Rating S&P | Date | Moody's | Date | Fitch | Date | Date of Close Out | Rating at Downgrade S&P | Date | Moody's | Date | Fitch | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 202636AC0 | COMMO 2006-5A A1B 5.72202 FLT | 8/14/2006 | AAA | 9/22/2006 | Aaa | 9/28/2006 | | | 6/20/2007 | B- | 7/24/2008 | B3*- | 6/2/2008 | | |
| 2 | 8091I8JAC9 | SCORP 2006-1A A2A 5.7675 11/07/2046 FLT | 9/29/2006 | AAA | 11/1/2006 | Aaa | 10/16/2006 | | | 6/20/2007 | B+ | 2/20/2008 | Caa1*- | 3/12/2008 | | |
| 3 | 68571WAA3 | ORCHID 2006-3A A1A 5.26355 01/06/2046 FLT | 2/23/2006 | AAA | 3/16/2006 | Aaa | 3/9/2006 | | | 6/20/2007 | BB-* | 8/21/2008 | Ba3*- | 5/30/2008 | | |
| 4 | 88714PAC0 | TWOLF 2007-1A A1B 5.827419 12/03/2039 F | 3/13/2007 | AAA | 4/3/2007 | Aaa | 3/30/2007 | | | 6/19/2007 | CCC-* | 5/8/2008 | Ba3*- | 3/31/2008 | | |
| 5 | 87337WAB6 | TABS 2006-5A A1J 5.76125 10/08/2046 FLT | 9/11/2006 | AAA | 10/13/2006 | Aaa | 10/5/2006 | | | 6/7/2007 | CCC-* | 12/19/2007 | Caa2*- | 12/3/2007 | | |
| 6 | 18272FAA7 | CLSVF 2007-3A S 5.7 02/28/2015 FLT | 4/4/2007 | AAA | 4/2/2007 | Aaa | 2/28/2007 | | | 6/15/2007 | BB- | 3/13/2008 | B3*- | 1/16/2008 | | |
| 7 | 347288AE2 | FTDQ 2006-1A A2.5 84375 10/26/2046 FLT, | 9/27/2006 | AAA | 10/31/2006 | Aaa | 11/28/2006 | | | 5/16/2007 | BB-* | 8/12/2008 | Ba2*- | 6/17/2008 | | |
| 8 | 589368AC3 | MRCY 2005-2A A2 4.4725 11/29/2045 FLT | 3/31/2006 | AAA | 12/12/2005 | Aaa | 11/22/2005 | | | 10/5/2006 | CCC- | 11/6/2008 | B1*- | 5/29/2008 | | |
| 9 | 053500AA2 | AVNT 2006-1A A1 5.70236 06/06/2046 FLT | 5/30/2006 | AAA | 6/22/2006 | Aaa | 6/22/2006 | | | | CCC-* | 8/12/2008 | Caa2*- | 5/29/2008 | | |
| 10 | 0008IBAA5 | ABSHOKE 2006-1 CLASS 1 5.57 3/25/2036 | 2/7/2006 | AAA | 3/2/2006 | Aaa | 3/28/2006 | | | | B | 8/15/2008 | Ba1*- | 4/23/2008 | | |
| 11 | 766167AC4 | RDGW 2006-1A A2 5.89887 11/05/2046 FLT | 7/19/2006 | AAA | 7/27/2006 | Aaa | 7/27/2006 | | | | CCC-* | 5/22/2008 | Caa3*- | 5/23/2008 | | |
| 12 | 40432AAE1 | HSPI 2007-2A A2 6.08036 07/30/2052 FLT | 5/29/2007 | AAA | 6/25/2007 | Aaa | 6/29/2007 | | | | B | 3/5/2008 | Ba1*- | 4/3/2008 | | |
| 13 | 25698AAE5 | DHAR 2006-1A A2 5.55224 08/05/2046 FLT | 5/4/2006 | AAA | 6/8/2006 | Aaa | 6/1/2006 | | | | BB-* | 8/12/2008 | B1*- | 6/2/2008 | | |
| 14 | 73629RAC2 | PS 3A B 5.08354 04/08/2041 SUB.FLT | 2/15/2006 | AA | 10/25/2005 | Aa2 | 10/25/2005 | AA | 10/25/2005 | 8/30/2006 | B*- | 8/21/2008 | Caa1*- | 6/9/2008 | BB | 11/21/2007 |
| 15 | 357297AF9 | FHLT 2006-C M1 5.62 10/25/2036 MEZ.FLT+ | 12/15/2006 | AA+ | 9/11/2006 | Aa1 | 9/19/2006 | AA+ | 9/7/2006 | 1/10/2007 | B | 9/22/2008 | B1*- | 4/17/2008 | CCC | 2/15/2008 |
| 16 | 827699AE9 | SELMS 2007-1A B 5.95771 03/20/2051 SUB | 4/11/2007 | AA | 5/2/2007 | Aa2 | 4/26/2007 | | | | CC (sf) | 3/25/2008 | Ca | 5/29/2008 | | |

Boxes Shaded Gray = Not Rated

## Appendix A
## Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd.

| No. | CUSIP | Description | Date Of Investment | Initial Rating | | | | | | Date of Close Out | Rating at Downgrade | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | S&P | Date | Moody's | Date | Fitch | Date | | S&P | Date | Moody's | Date | Fitch | Date |
| 1 | 18272F AC3 | CLSVF 2007-3A A2 5.86 2/28/2047 | 2/15/2007 | AAA | 4/2/2007 | Aaa | 2/28/2007 | | | 6/20/2007 | CC | 3/13/2008 | Ca | 1/16/2008 | | |
| 2 | 88714P AD8 | TWOLF 2007-1A A1C 6.12741 9/09/03/2044 F | 3/13/2007 | AAA | 4/3/2007 | Aaa | 3/30/2007 | | | 6/19/2007 | BB-*- | 3/25/2008 | Caa1*- | 3/31/2008 | | |
| 3 | 67572A AL9 | OCTAN 2006-2A A3A 5.80875 11/12/2051 FL | 9/20/2006 | AAA | 10/12/2006 | Aaa | 10/12/2006 | | | 6/19/2007 | B- | 2/22/2008 | Ba2*- | 3/27/2008 | | |
| 4 | 87652A AA4 | TASMN 2006-1A A1S 5.79 03/21/2047 FLT | 12/11/2006 | AAA | 1/11/2007 | Aaa | 1/26/2007 | | | 7/3/2007 | BB- | 3/7/2008 | Ba1*- | 3/26/2008 | | |
| 5 | 66988I AA2 | NSCDO 2007-1A A1 5.68 02/08/2047 FLT | 1/23/2007 | AAA | 2/8/2007 | Aaa | 2/8/2007 | AAA | 2/8/2007 | 6/21/2007 | BB- | 2/11/2008 | | | BB | 11/12/2007 |
| 6 | 52902Y AC9 | LEXN 2007-3A A2 5.75952 04/10/2047 FLT | 12/18/2006 | AAA | 2/2/2007 | Aaa | 1/26/2007 | AAA | 1/11/2007 | 6/20/2007 | CCC+ | 2/12/2008 | Ba2*- | 3/26/2008 | CCC+ | 11/12/2007 |
| 7 | 05350 0AA2 | AVNTI 2006-1A A1 5.70236 06/06/2046 FLT | 8/1/2006 | AAA | 6/22/2006 | Aaa | 6/22/2006 | | | 6/20/2007 | CCC-*- | 8/12/2008 | Caa2*- | 5/29/2008 | | |
| 8 | 20263 6AC0 | COMMO 2006-5A A1B 5.72202 FLT | 8/14/2006 | AAA | 9/22/2006 | Aaa | 9/28/2006 | | | 6/20/2007 | B- | 7/24/2008 | B3*- | 6/2/2008 | | |
| 9 | 88714P AC0 | TWOLF 2007-1A A1B 5.82741 9 12/03/2039 F | 3/13/2007 | AAA | 4/3/2007 | Aaa | 3/30/2007 | | | 6/19/2007 | CCC-*- | 5/8/2008 | Ba3*- | 3/31/2008 | | |
| 10 | 00636 9AE2 | ADMSQ 2007-2A A2 5.89901 03/08/2047 FLT | 2/9/2007 | AAA | 3/8/2007 | Aaa | 3/8/2007 | | | 6/20/2007 | CC (sf) | 2/6/2008 | Caa2*- | 1/16/2008 | | |
| 11 | 68571W AA3 | ORCHD 2006-3A A1 5.26355 01/06/2046 FLT | 8/1/2006 | AAA | 3/16/2006 | Aaa | 3/9/2006 | | | 6/20/2007 | BB-*- | 8/21/2008 | Ba3*- | 5/30/2008 | | |
| 12 | 12877 7AC3 | CLDCT 2006-1A A2 5.7968 FLT | 10/11/2006 | AAA | 12/21/2006 | Aaa | 12/21/2006 | | | 6/20/2007 | B- | 2/11/2008 | Ba2*- | 3/27/2008 | | |
| 13 | 80918H AC9 | SCORP 2006-1A A2A 5.7675 11/07/2044 FL | 9/29/2006 | AAA | 10/16/2006 | Aaa | 10/16/2006 | | | 6/20/2007 | B+ | 2/20/2008 | Caa1*- | 3/12/2008 | | |
| 14 | 40536I AB8 | HLCDO 2006-1A A2 5.85438 10/12/2050 FLT | 9/25/2006 | AAA | 10/26/2006 | Aaa | 10/19/2006 | | | 6/21/2007 | B-*- | 8/21/2008 | Caa1*- | 5/18/2008 | | |
| 15 | 25569 8AE5 | DIHAR 2006-1A A2 5.55224 08/05/2044 FLT | 8/1/2006 | AAA | 6/8/2006 | Aaa | 6/1/2006 | | | 7/3/2007 | BB-*- | 8/12/2008 | B1*- | 6/2/2008 | | |
| 16 | 46601W AD7 | IXION 2006-6 1 0 10/31/2041 FLT | 9/21/2006 | AAA | 11/1/2006 | Aaa | 11/29/2006 | | | 5/16/2007 | CC (sf) | 9/14/2009 | Caa2*- | 4/23/2008 | | |
| 17 | 69772 9AA9 | PAMP 2007-2A A1 5.72567 05/11/2052 FLT | 2/22/2007 | AAA | 3/26/2007 | Aaa | 3/29/2007 | | | 6/22/2007 | BB*- | 2/1/2008 | C | 2/27/2008 | | |
| 18 | 59802R AA4 | MIDOR 2006-1A A1F 5.79458 02/15/2047 FL | 8/4/2006 | AAA | 9/6/2006 | Aaa | 8/15/2006 | | | 6/19/2007 | B-*- | 8/7/2008 | B1*- | 5/9/2008 | | |
| 19 | 00056 4AB0 | ABCDS 2006-1A A3 5.85 12/15/2050 FLT | 1/25/2007 | AAA | 3/1/2007 | Aaa | 2/15/2007 | | | 5/31/2007 | CCC- | 2/21/2008 | B2*- | 3/26/2008 | | |

## Appendix A
## Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd.

| No. | CUSIP | Description | Date Of Investment | Initial Rating | | | | | | Date of Close Out | Rating at Downgrade | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | S&P | Date | Moody's | Date | Fitch | Date | | S&P | Date | Moody's | Date | Fitch | Date |
| 20 | 45072HAE0 | IXCBO 2006-2A A2 5.82218 12/13/2046 FLT | 8/1/2006 | AAA | 6/30/2006 | Aaa | 6/2/2006 | | | 5/16/2007 | B | 2/20/2008 | Ba1*- | 2/20/2008 | | |
| 21 | 87337WAB6 | TABS 2006-5A A1J 5.76125 10/08/2046 FLT | 9/11/2006 | AAA | 10/13/2006 | Aaa | 10/5/2006 | | | 6/7/2007 | CCC-* | 12/19/2007 | Caa2*- | 12/3/2007 | | |
| 22 | 45072HAA8 | IXCBO 2006-2A A1 5.62218 12/13/2046 FLT | 8/1/2006 | AAA | 6/2/2006 | Aaa | 6/2/2006 | | | 6/19/2007 | BB+* | 3/18/2008 | B3*- | 3/14/2008 | | |
| 23 | 18272FAA7 | CLSVF 2007-3A S 5.7 02/28/2015 FLT | 4/4/2007 | AAA | 4/2/2007 | Aaa | 2/28/2007 | | | 6/15/2007 | BB+ | 3/13/2008 | B3*- | 1/16/2008 | | |
| 24 | 36247PAB3 | GSCSF 2006-4A A1 5.81 11/06/2046 FLT | 9/21/2006 | AAA | 10/26/2006 | Aaa | 10/6/2006 | AAA | 10/6/2006 | 5/16/2007 | B | 2/6/2008 | B2*- | 12/20/2007 | BB- | 11/12/2007 |
| 25 | 02076VAA8 | ALPHA 2007-1A 2.5.8 03/11/2047 FLT | 2/2/2007 | AAA | 3/1/2007 | Aaa | 3/1/2007 | | | 5/16/2007 | BB+ | 2/27/2008 | Caa3*- | 5/7/2008 | | |
| 26 | 53015OAE1 | LBRTS 2006-1A A2 5.67419 12/05/2043 FLT | 8/1/2006 | AAA | 5/30/2006 | Aaa | 5/25/2006 | AAA | 5/25/2006 | 5/16/2007 | CCC-* | 8/7/2008 | Caa2*- | 6/9/2008 | BB- | 11/21/2007 |
| 27 | 347288AE2 | FTDQ 2006-1A A2.5.84375 10/26/2046 FLT, | 9/27/2006 | AAA | 10/31/2006 | Aaa | 11/28/2006 | | | 5/16/2007 | BB-* | 8/12/2008 | Ba2*- | 6/17/2008 | | |
| 28 | 11161RAD4 | BWIC 2006-1A A2 5.55 07/13/2041 FLT | 8/1/2006 | AAA | 5/19/2006 | Aaa | 5/11/2006 | | | 5/16/2007 | BB- | 8/7/2008 | Caa2*- | 6/9/2008 | | |
| 29 | 04010AMY4 | ARSI 2005-W1 A2 3.55438 05/25/2035 STEP | 8/1/2006 | AAA | 4/19/2005 | Aaa | 6/27/2005 | | | 5/16/2007 | BB | 3/31/2008 | Ba2 | 3/24/2009 | | |
| 30 | 589368AC3 | MRCY 2005-2A A2 5.4725 11/29/2045 FLT | 8/1/2006 | AAA | 12/12/2005 | Aaa | 11/22/2005 | | | 5/16/2007 | CCC- | 11/6/2008 | B1*- | 5/29/2008 | | |
| 31 | 00081BAA5 | ABSPOKE 2006-1 CLASS 1 5.57 3/25/2036 | 8/1/2006 | AAA | 3/2/2006 | Aaa | 3/28/2006 | | | 5/16/2007 | B | 8/15/2008 | Ba1*- | 4/23/2008 | | |
| 32 | 766167AC4 | RDGW 2006-1A A2.5.89887 11/05/2046 FLT | 8/1/2006 | AAA | 7/27/2006 | Aaa | 7/27/2006 | | | 5/16/2007 | CCC-* | 5/22/2008 | Caa3*- | 5/23/2008 | | |
| 33 | 73629RAB4 | PS 3A A2 4.98854 04/08/2041 FLT | 8/1/2006 | AAA | 10/25/2005 | Aaa | 10/25/2005 | AAA | 10/25/2005 | | CC | 11/13/2008 | Ba3*- | 6/9/2008 | CCC | 8/5/2008 |
| 34 | 81375WHC3 | SABR 2005-OP2 M4 5.96 10/25/2035 MEZ,FL | 2/5/2007 | A+ | 12/30/2005 | A1 | 1/3/2006 | AA- | 12/28/2005 | 6/21/2007 | CCC (sf) | 7/23/2008 | B1 | 3/20/2009 | BB | 4/4/2008 |
| 35 | 000824AE2 | ACABS 2007-1A A2.5.98194 05/14/2047 FLT | 2/15/2007 | AA | 3/27/2007 | Aa2 | 3/30/2007 | | | 6/15/2007 | CC (sf) | 2/6/2008 | Caa2*- | 12/3/2007 | | |
| 36 | 669881AC8 | NSCDO 2007-1A B 6.01 02/08/2047 FLT | 1/12/2007 | AA | 2/8/2007 | Aa2 | | AA | 2/8/2007 | 6/21/2007 | CCC+ | 2/11/2008 | Caa2*- | 2/13/2008 | B | 11/12/2007 |
| 37 | 40650MAB6 | HALYD 2006-1A B 6.04625 10/30/2051 FLT | 10/16/2006 | AA | 10/30/2006 | Aa2 | 11/3/2006 | | | 5/16/2007 | CC | 4/2/2008 | B1*- | 2/13/2008 | | |
| 38 | 827699AE9 | SELMS 2007-1A B 5.95771 03/20/2051 SUB | 4/11/2007 | AA | 5/2/2007 | Aa2 | 4/26/2007 | | | | CC (sf) | 3/25/2008 | Ca | 5/29/2008 | | |

## Appendix A
## Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd.

| No. | CUSIP | Description | Date Of Investment | Initial Rating | | | | | | Date of Close Out | Rating at Downgrade | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | S&P | Date | Moody's | Date | Fitch | Date | | S&P | Date | Moody's | Date | Fitch | Date |
| 39 | 35729TAP9 | FHLT 2006-C M1 5.62 10/25/2036 MEZ,FLT+ | 12/15/2006 | AA+ | 9/11/2006 | Aa1 | 9/19/2006 | AA+ | 9/7/2006 | 1/10/2007 | B | 9/22/2008 | B1*- | 4/17/2008 | CCC | 2/15/2008 |

Boxes Shaded Gray = Not Rated

4